```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF ILLINOIS
```

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )
                             ) Cause No.
   vs.                       ) 3:23-cr-30076-SPM-1
                             ) East St. Louis, IL
NIRAV B. PATEL,              ) February 3, 2025
                             ) 9:02 a.m.
        Defendant.           )


                    Before the
       HONORABLE JUDGE STEPHEN P. MCGYLNN


                **TRANSCRIPT OF JURY TRIAL**
                      **VOLUME 1**


FOR PLAINTIFF:     Mr. Peter T. Reed
                   Mr. Steven D. Weinhoeft
                   United States Attorney's Office
                   9 Executive Drive
                   Fairview Heights, Illinois  62208
                   peter.reed@usdoj.gov
                   steven.weinhoeft@usdoj.gov


FOR DEFENDANT:     Ms. Kim C. Freter
                   Federal Public Defender's Office
                   650 Missouri Avenue, Suite G10A
                   East St. Louis, Illinois  62201
                   kim_freter@fd.org


INTERPRETERS:      Nita Shah and Chetan Vyas


COURT REPORTER:    Erin M. Materkowski, RPR, CRR
                   erin_materkowski@ilsd.uscourts.gov
                   750 Missouri Avenue
                   East St. Louis, IL  62201

(Proceedings taken by machine shorthand; transcript
     produced by computer-aided transcription)

1                              **INDEX**

2                        **WITNESSES INDEX**

3    **PLAINTIFF'S WITNESSES**                              **PAGE**

4    VONDA LUTZ

5        Direct By Mr. Reed.................................... 47

6        Cross By Ms. Freter ................................. 93

7    KODY MARTIN

8        Direct By Mr. Reed.................................... 107

9        Cross By Ms. Freter ................................. 126

10

11

12

13

14

15                        **EXHIBITS INDEX**

16    **EXHIBIT**                              **EVIDENCE**

17    Government's No. 1 ...................... 115

18    Government's No. 20..................... 53

19    Government's No. 23..................... 121

20    Government's No. 24..................... 66

21    Government's No. 26..................... 90

22    Government's No. 28..................... 68

23

24

25

Vol. 1 - 3

1          (In open court.)

2          COURTROOM DEPUTY:  Court calls Case

3    No. 3:23-cr-30076, the *United States of America v.*

4    *Nirav Patel.*  Case is called for day one of jury

5    trial.

6          Parties, please identify yourselves for

7    the record.

8          MR. REED:  Good morning, Judge.  Peter

9    Reed for the United States along with Steve

10   Weinhoeft; Paralegal, Sandra Keller, and Agent Kaur

11   from HSI.

12         THE COURT:  Good morning.

13         MS. FRETER:  Good morning, Your Honor.

14   Kim Freter for Mr. Patel, who is present, along

15   with two interpreters in the Gujarati language.

16         THE COURT:  Please swear in the

17   interpreters.

18         (Interpreters sworn.)

19         COURTROOM DEPUTY:  Thank you.

20         THE COURT:  All right.  It was brought to

21   the Court's attention that the defendant -- it is

22   his intent to waive his right to a jury trial and

23   request a bench trial; is that correct?

24         MS. FRETER:  Yes, Judge --

25         THE COURT:  No one is interpreting to him.

Vol. 1 - 4

1    Who is the interpreter?

2             INTERPRETER:  (Indicating.)

3             THE COURT:  Okay.  Go ahead.

4             MS. FRETER:  We have two issues for the

5    Court this morning, Judge.  The first one is

6    Mr. Patel requested that I ask the Government for

7    consent, Rule 23(a)(2), for a bench trial.  The

8    Government declined.  Mr. Patel doesn't agree with

9    my view of Rule 23(a)(2), along with *Singer v.*

10   *U.S.,* which is *380 U.S. 24 (1965),* from the Warren

11   Court that says, essentially, that Rule 23(a)(2) is

12   constitutional in that while defendants may have a

13   right to a jury trial, they don't have a right to

14   compel the Government to change how it presents its

15   evidence or case by waiving a jury and having a

16   bench trial.  So that's the first issue.

17             The second issue is that Mr. Patel was

18   provided court attire by my office --

19             THE COURT:  We'll take that up.

20             MS. FRETER:  Okay.

21             THE COURT:  We'll take that up

22   separately.

23             MS. FRETER:  Okay.  Sure.

24             THE COURT:  As I read the case law, I

25   could conclude in the interests of justice that

Vol. 1 - 5

1    despite the Government's refusal to consent to a

2    bench trial, that under extraordinary

3    circumstances, I could order it, or so tell -- the

4    Government, tell me what is your rationale for

5    wanting a bench trial -- I mean, a jury trial.

6            MR. REED:  Judge, I ran the question up

7    our management chain as is our typical practice.

8    My management indicated under the facts of these

9    circumstances, the Government would not consent to

10   a bench trial, and we believe that we have the --

11           THE COURT:  That doesn't give me a

12   reason.

13           MR. REED:  -- right to present a case to a

14   jury.

15           THE COURT:  That doesn't give me a reason.

16   That just tells me that someone above you said no.

17   I want to know what the rationale is for it.

18           MR. REED:  Judge, we think the victims in

19   this case who will be testifying have a right to

20   put their case in front of a jury as well as the

21   people in this district.

22           THE COURT:  Any response?

23           MS. FRETER:  Well, I mean, Mr. Patel would

24   very much like a bench trial.  I do not have any

25   case law or citation that I can offer the Court to

Vol. 1 - 6

1     say that *Singer* was wrongly decided.  I can make a

2     general Sixth Amendment argument that it's the

3     defendant's right to a trial.  It's the defendant's

4     right to a jury trial, that the Government

5     shouldn't be able to dictate whether he has a jury

6     or a bench trial, and that *Singer* and Rule 23(a)(2)

7     are unconstitutional under the Sixth Amendment, but

8     I don't have any case law that overrules *Singer*.

9          THE COURT:  The only thing I found was --

10    I shouldn't say the only thing, but there was a

11    case out of the Eastern District of New York during

12    the time of COVID.  It was a high-profile security

13    fraud case.  The defendant wished to waive -- or

14    waived his right to a jury trial, wanting a bench

15    trial, and that COVID created some problems.

16         At that time I don't think that they were

17    hearing -- they weren't impaneling juries.  The

18    Government refused to consent, and the Court

19    ultimately held that in the interests of justice

20    that there was extraordinary circumstances that

21    would justify overruling the Government's

22    requirement that the Government consent.  I haven't

23    been given much of a rationale.

24         One of the things that we are to look for

25    is if there is a proper reason for the Government

1    insisting on a jury trial.  This is going to be a

2    very difficult case to present to a jury because of

3    the defendant's inability to speak English.  We

4    also have a defendant that is insisting on wearing

5    prison garb instead of civilian clothes which were

6    presented to him this morning.  The Government has

7    been able to observe the defendant during the

8    course of pretrial hearings in this case.  I think

9    a combination of his inability to understand the

10   English language as well as, perhaps, his customs

11   and cultures from where he is from in India, he's

12   not followed the rules of decorum for a defendant

13   in this matter.  If he continues with that, that

14   may adversely impact the way the jury sees this

15   case.

16          Does the Government want to give any other

17   reasons why you think that you should not be

18   required to allow him to proceed with a bench

19   trial?

20          MR. REED:  Judge, I guess I would say

21   three things.  The first, the Government agrees

22   with the defense counsel's reading of Rule

23   23(a)(2), that for a bench trial to occur, the

24   Government must consent.  The Government does not

25   consent here.

1          In addressing the case out of New York

2    that you raise, I'm familiar with the case.  I

3    believe it's a due process ruling that had to do

4    with bringing the case to trial in a timely manner.

5    I don't think that's what's going on here, and so I

6    just don't think the same principles apply here,

7    and we can have a jury trial this morning.  There's

8    nothing unconstitutional about Rule 23's

9    requirements as applied to this situation.  We are

10   ready to go.  There is a jury pool downstairs.

11          The second thing I'd say, in terms of the

12   government's reasons for not consenting, those are

13   conversations I was not privy to, higher management

14   team.  I can't stand here and tell you what those

15   conversations sounded like; and I'm not sure that I

16   would, if I had been privy.  How our management

17   team chooses to make its deliberative choices is

18   something that is a term of privilege.

19          And third, we certainly weighed the

20   considerations that the Court brings up.  There

21   have been concerns, but there are multiple people,

22   there a bunch of parties involved with this trial,

23   there are victims as well as a defendant, and

24   those -- all of those considerations have to be

25   taken together, and for those reasons, we'll stand

1    on our rights under Rule 23(a)(2).

2            THE COURT:  All right.  The Court does not

3    find that there's been a sufficient basis to find

4    there are extraordinary circumstances that would

5    justify allowing the defendant to proceed to a

6    bench trial without the consent of the Government.

7            All right.  Second thing you need to bring

8    up is the defendant's insistence on his wearing a

9    prison jumpsuit to court as opposed to civilian

10   clothing that you have presented to him.

11           Counsel?

12           MS. FRETER:  Yes, Judge.  I don't know --

13   I can consult with Mr. Patel here in a second.  He

14   was very convinced that he would be getting a bench

15   trial, and so I don't know if that factored into

16   his calculation regarding his attire.  The marshals

17   have been very accommodating this morning, and they

18   have his clothes, I believe, up on this floor if he

19   would like to change so that we wouldn't be unduly

20   delayed if -- I'll ask him again in just a second,

21   but if he insists on wearing his jail attire, I

22   would just ask the Court to make a record, *Duck v.*

23   *Missouri* -- or *Missouri v. Duck,* which was the

24   handcuff case, has language in there in terms of

25   what the jury can see and not see and how that

1    might be prejudicial, and that Mr. Patel is aware

2    of that and he's waiving that.

3         I'd note for the record that the courtroom

4    is set up in such a manner so that there is black

5    privacy panel on the side of the counsel table so

6    that it's the marshal's process in this courthouse

7    that defendant remain shackled to the floor.

8    However, the jury, whether they're in the pews or

9    in the box, should not be able to see that because

10   of the privacy panel, but they would be able to see

11   Mr. Patel's prison attire, which in this case is a

12   very bright orange-and-white striped outfit.

13   Mr. Patel has also indicated at different points

14   that he may intend to testify so that if he was up

15   on the witness stand, that attire would be even

16   more visible to the jury.

17        It is against my very strong professional

18   advice that he remain in jail attire.  Just like

19   with advertising or any other things, there are

20   subliminal or psychological messages that are sent

21   to the jury.  I use just a very recent example.

22   I'm a judiciary employee.  I knew I was still going

23   to have telework as an option, but the media kept

24   saying that all federal employees can't telework.

25   It caused me to look at the executive order even

Vol. 1 - 11

1    though I knew the answer.  That people are just

2    susceptible to messaging and visual stimuli such

3    that jurors may view Mr. Patel as guilty or more

4    likely to view him as guilty or dangerous if he

5    appears in jail attire rather than civilian

6    clothes, and so it's my strong professional

7    recommendation that he appear in civilian attire.

8            THE COURT:  Mr. Patel, you are -- as you

9    sit here, you're presumed innocent and you're

10   presumed innocent unless and until the Government

11   proves to the unanimous satisfaction of the jury

12   that you are guilty beyond a reasonable doubt.  In

13   courthouses throughout the country in criminal

14   cases, we allow the accused to dress in civilian

15   attire.  The reason we do that is because if they

16   see that you are wearing a prison jumpsuit, they

17   may conclude you're already guilty or that you're

18   in prison for some other reason, and it is the

19   considered judgment of judges both at the district

20   level, the appellate level and the Supreme Court

21   level, that's very important that the accused be

22   allowed to dress in civilian clothing unless the

23   accused does something so obnoxious or so dangerous

24   that they become a safety risk.

25            You should really consider the advice of

1    your attorney on this one.  There's no upside for

2    you for wearing a prison jumpsuit when you have the

3    opportunity to wear civilian clothing.

4           All right.  He has his hand up.  Counsel,

5    you can talk to him.

6           Who -- let him talk.

7           THE DEFENDANT:  Can I say something?

8           THE COURT:  Yes.

9           THE DEFENDANT:  The attire does not

10   identify a particular position, and I apologize for

11   that.  The mind and the body do.

12          THE COURT:  Okay.

13          THE DEFENDANT:  Then the clothes have no

14   value.  I am by mind, body and soul totally

15   clear.

16          THE COURT:  You are, but that's -- our

17   concern is how jurors who know nothing about this

18   case, who know nothing about you, when they first

19   walk in and see you, their first impression is

20   you're a prisoner, and it invites them to see you

21   as a convict and invites them to speculate as to

22   why you're here in a prison uniform, and I think

23   that it would be very prejudicial to you and your

24   case if you decide to wear a prison uniform.

25          The jury will be instructed to disregard

1    it, but I think that you would be prejudicing your

2    own interests in insisting to continue to wear the

3    jumpsuit during the trial, but I'll allow you to

4    take it up with your attorney at a break, and you

5    can make that determination.  You've been warned.

6              THE DEFENDANT:  Can I say something?  I

7    want a bench trial, not a jury trial.

8              THE COURT:  I understand, completely

9    understand, but under the federal rules, the

10   Government has to agree that it will submit its

11   case to the Judge only and not to a jury, and they

12   don't consent to that, and so we are proceeding to

13   a jury trial.  Okay.

14             With jury selection -- have a seat,

15   please -- with jury selection, I will -- please sit

16   down, Mr. Patel.

17             THE DEFENDANT:  I have an objection

18   because just as the jury is not my jury, my

19   attorney is not mine either.  I don't trust.

20             THE COURT:  Jury selection, I intend to

21   inquire of prospective jurors about the fact that

22   some of the victims -- some of the alleged victims

23   are elderly, and I will ask about if any of them

24   have experienced or loved one experienced being

25   exploited or scammed because of their age.

Vol. 1 - 14

1          Anyone have an objection to that line of

2    questioning?

3          MS. FRETER:  No, Your Honor.

4          MR. REED:  No, Judge.

5          THE COURT:  All right.  Mr. Patel, you

6    said that the lawyer is not yours and that the jury

7    is not yours.  Counsel has been appointed and has

8    been representing you.  We've had multiple

9    conversations.  As I explained to you previously,

10   if you wish to hire at your own expense a lawyer,

11   you can choose who you want.  The Court has watched

12   very keenly the interaction with -- between you and

13   your lawyer and on multiple occasions have

14   discussed with you your concerns.  The biggest

15   problem seems to be that you want the Government to

16   make an offer that they are not willing to offer,

17   and you're frustrated with your attorney that the

18   Government will not make that offer.  Specifically,

19   on multiple occasions, you have claimed that you

20   are innocent, and you'd be willing to -- what's --

21   let's seal this part of the transcript.

22          (Proceedings heard under seal.)

23          (Proceedings continued in open court.)

24          THE COURT:  Is the Government ready to

25   proceed to trial?

1          THE DEFENDANT:  No, I don't need any

2     attorney.  Whatever decision you render will be

3     acceptable to me, and I respect law enforcement

4     from the bottom of my heart.

5          THE COURT:  Thank you, sir.

6          Is the Government ready to proceed to

7     trial?

8          MR. REED:  Yes, Judge.

9          THE COURT:  Is the defense ready to

10    proceed to trial?

11         MS. FRETER:  Yes, Your Honor.

12         THE COURT:  Okay.  Am I ready to proceed

13    to trial?  Call it in the air.

14         All right.  Anything we need to take up

15    before we bring up the potential jurors?

16         MR. REED:  Judge, there's one outstanding

17    objection on the video deposition transcript.  We

18    can take that up now or --

19         THE COURT:  Yes, let's take it up now.

20         MR. REED:  Judge, the objection from

21    Ms. Freter was in response to a series of questions

22    where the Government asked a witness, "Did you hear

23    any officer tell Mr. Patel that there was money in

24    the box?"  And the witness, Sergeant Towell,

25    responded, "Not to my knowledge."  Ms. Freter's

1    objection was that the question and answer called

2    for hearsay.

3         As previously communicated to the Court,

4    the Government's position that the answer, "Not to

5    my knowledge," confirming that no officer made such

6    a statement, contains no hearsay, first, because

7    hearsay requires a statement, and the whole point

8    was that there was no statement; and second,

9    because even if the nonstatement could be construed

10    as a statement, it's not being admitted for the

11    truth of the matter asserted under 801(c)(2).

12         The Government is not seeking to prove

13    that there was money in the box, will establish

14    that of course there was, but we're trying to show

15    that no officer conveyed that information to Patel,

16    and so his later statements about the money in the

17    box show his independent knowledge.

18         MS. FRETER:  Your Honor, the Government is

19    trying to demonstrate -- and it will in other

20    ways -- that Mr. Patel was aware of the contents of

21    the box, and so the evidence is being offered for

22    the idea or for the statement that no one told him

23    this, and so they'll later say he was aware, he had

24    knowledge of the offense because no one at the

25    arrest scene told him, and so the silence, or the

1    nonstatement, the lack thereof, is in itself a

2    statement.

3              THE COURT:  Objection sustained.

4              All right.  What else do we need to take

5    up?

6              MR. WEINHOEFT:  Your exhibit list

7    objection.

8              MS. FRETER:  Why don't we do that later.

9    I mean, we don't -- Judge, there's a -- the JERS,

10   which is an Excel sheet that goes back to the jury,

11   has descriptions on the exhibits.  So like for

12   Exhibit 3, there is a description of it so they can

13   find it because they may not know what they're

14   looking for.

15             THE COURT:  Are the descriptions neutral

16   or are they loaded?

17             MS. FRETER:  In my opinion some of them

18   are not neutral.  I have marked it up.  I've sent

19   it to the Government.  They disagree.  However,

20   this is something that's on the back end.  I don't

21   know -- I mean, we can take it up now, but I don't

22   know that we need to take it up now.  We can, you

23   know, deal with it closer to time when they'll

24   actually see it.  They don't actually see that

25   sheet until --

Vol. 1 - 18

1         THE COURT:  So your objection is not to

2    the admissibility of the evidence.  It is the

3    descriptive language that would be on the list that

4    goes back with them when they deliberate?

5              MS. FRETER:  Yes, Your Honor.

6              THE COURT:  We can take that up at a later

7    time.

8         All right.  Are you -- do you intend to

9    show the jury any exhibits during the -- your

10   opening statement?

11             MR. REED:  Judge, no exhibits.  There is

12   one map that we'll show the jury during opening.

13   Ms. Freter has no objection.  We'll take that up at

14   lunch.

15             THE COURT:  And you have no objection?

16             MS. FRETER:  No objection.

17             THE COURT:  All right.  Have we been given

18   the list of prospective jurors and the binders?

19   They're being distributed right now?

20             COURTROOM DEPUTY:  Yes.

21             THE COURT:  Okay.

22        All right.  Mr. Patel, we are -- all

23   right.  Mr. Patel, we are about to start trial in

24   this case, and it's very important that you

25   understand your rights and your responsibilities in

Vol. 1 - 19

1    this case.  This is your case and your defense

2    against the charges brought by the Government.

3    It's very important that you have good

4    communications with your attorney about how to

5    proceed to trial.  Some decisions pertaining to

6    what the United States Supreme Court calls your

7    fundamental rights are yours and yours alone to

8    make.  Your attorney can give you advice on what

9    decisions you should make as to these fundamental

10   rights, but in the end, it is up to you to have the

11   final say.

12           For example, it is your decision whether

13   to plead guilty or not guilty, whether to testify

14   or not to testify, and whether to submit what is

15   called lesser included offense instructions.  A

16   lesser included offense would be to give the jury

17   instruction -- or instruction to the jury that they

18   could find you guilty of a lesser charge, and I

19   don't know if that's applicable in this case or

20   not, but if we get to that point, we will address

21   that with you.

22           I cannot and will not express any opinions

23   on what decisions you should make with respect to

24   these fundamental rights; however, from time to

25   time a judge will speak to a defendant directly to

1    make sure the record is clear that the defendant

2    understands his rights and that the defendant is

3    making decisions with respect to those rights in a

4    knowing and voluntary manner.  I do urge you to

5    speak to your attorney about the decisions that you

6    make.

7            Has there been any plea offer that has

8    been made that has not been extended to the

9    defense -- the defendant?

10           MR. REED:  No, Judge.

11           MS. FRETER:  No, Your Honor.  As the Court

12   has noted, we were here two times previously for

13   Mr. Patel to plead guilty pursuant to a written

14   plea agreement wherein the Government would

15   recommend a guideline sentence, however, left open

16   the possibility that should circumstances happen --

17   rather than we seal this portion of the

18   transcript -- if Mr. Patel cooperated, that they

19   would consider either a 5K or Rule 35, and that

20   he's been conveyed those offers.

21           THE COURT:  All right.  Mr. Patel, other

22   decisions such as decisions regarding tactics or

23   strategy pertaining to your defense belong to your

24   attorney.  For example, the attorney decides what

25   witnesses to call, whether and how to conduct

Vol. 1 - 21

1    cross-examination, what jurors to accept or strike,

2    what trial motions should be made, and what

3    evidence should be presented.  Even though your

4    attorney has the final say with respect to matters

5    of tactics and strategy, I urge you to speak to

6    your attorney about these decisions as well.  You

7    should tell your attorney if you know of any

8    witnesses who you believe may have any information

9    helpful to your case.  You should be candid with

10   your attorney in your discussions about all the

11   facts of the case and the tactics and strategy your

12   attorney believes are appropriate or inappropriate.

13        You should ask questions about things you

14   do not understand.  It's important that you have

15   good communication with your attorney about your

16   case and your defense and the charges brought

17   against you.

18        If you want me to, I will adjourn this

19   case for now and -- to allow you to make

20   arrangements to speak with your attorney about

21   everything I've told you today.  I am going to give

22   you guys 20 minutes to look through the jury data,

23   but I'm also going to give counsel the opportunity

24   to discuss with Mr. Patel the -- whether he should

25   appear before this jury in civilian clothings or

Vol. 1 - 22

1    continue just wearing his prison garb.

2           So I'm going to -- how long do you think

3    that's going to take, Kim?

4           MS. FRETER:  Just five minutes to speak

5    with him.

6           THE COURT:  All right.  So we will -- I'll

7    give you 20 minutes to look at the jury data, an

8    additional 5 minutes to confer with your client.

9    So we'll come back on the record at 5 minutes after

10   10 with the intent of bringing the jury up at that

11   time.

12          Anything else before we adjourn -- or

13   recess, I should say?

14          MR. REED:  No, thank you.

15          MS. FRETER:  No, Your Honor.

16          THE COURT:  We'll be in recess for 25

17   minutes.

18          (Recess at 9:43 a.m. until 10:07 a.m.)

19          THE COURT:  Are you ready for us to bring

20   the jury up?

21          Government?

22          MR. REED:  Yes, Judge.

23          THE COURT:  Are you ready to bring the

24   jury up?

25          MS. FRETER:  Yes, Your Honor.

Vol. 1 - 23

1           THE COURT:  All right.  Let's bring the

2    jurors up.

3           MS. FRETER:  Your Honor, while we're here,

4    I would like the record to reflect that Mr. Patel

5    did change.

6           THE COURT:  All right.

7           Okay.  No one has given me a list of

8    witnesses, so you're going to have to ask -- okay.

9    I have a Government list.

10          Does the defendant have a list of

11   witnesses it intends to call?

12          MS. FRETER:  No, Your Honor, only possibly

13   Mr. Patel.

14          THE COURT:  All right.  For the

15   Government, Witness Number 1, Detective Kody

16   Martin.  Is that someone local or where is he?

17          MR. REED:  He's Indiana based, Judge.

18          THE COURT:  How about Detective Donald

19   Seubert?

20          MR. REED:  Edwardsville.

21          THE COURT:  Who of the other witnesses

22   that you have are local?  Danny Allison?

23          MR. REED:  Danny Allison, Judge,

24   Caseyville.

25          THE COURT:  How about Anar Bhatt?

Vol. 1 - 24

1          MR. REED:  Not local.  The only other

2     locals would be Virginia Bryan and Elizabeth

3     Surmeier.

4          THE COURT:  All right.  So Virginia Bryan

5     is from where?

6          MR. REED:  Virginia Bryan is from

7     Edwardsville.

8          THE COURT:  Okay.  Elizabeth Surmeier?

9          MR. REED:  I'm not sure.  She's Southern

10     Illinois, St. Clair County.

11          THE COURT:  Okay.  All right.  Thank you.

12          COURTROOM DEPUTY:  All rise for the jury.

13          (Venire present at 10:13 a.m.)

14          (Voir dire proceedings heard and filed

15     under seal.)

16          (Proceedings heard in open court at

17     1:45 p.m.)

18          THE COURT:  All right.  Will you swear in

19     the jurors?

20          COURTROOM DEPUTY:  Please raise your right

21     hand.

22          (Jury sworn.)

23          THE COURT:  All right.  Ladies and

24     gentlemen of the jury, we are about to begin the

25     trial of this case about which you've heard some

1    details during the process of jury selection.

2    Before the trial begins, however, there are certain

3    instructions you have in order to better understand

4    what will be presented before you and how you

5    should conduct yourself during the trial.

6          The party that has brought this case, the

7    United States Government.  The party against whom

8    this case has been brought is the Defendant, Nirav

9    Patel.  The charges against Mr. Patel are in a

10   document called an indictment.  The indictment in

11   this case charges that Mr. Patel committed the

12   crime of one count of conspiracy to commit wire

13   fraud in violation of federal law and three counts

14   of wire fraud in violation of federal law and one

15   count of illegal entry in violation of federal law.

16   Mr. Patel has pled not guilty to the charges.

17         The indictment is simply the formal way of

18   telling Defendant Patel what crimes he is accused

19   of committing.  It is not evidence that the --

20   Defendant Patel is guilty.  In fact, it does not

21   even raise a suspicion of guilt.

22         Mr. Patel is presumed innocent of these

23   charges.  This presumption continues throughout the

24   case including during your deliberations.  It is

25   not overcome unless, from all the evidence in the

Vol. 1 - 26

1    case, you are convinced beyond a reasonable doubt

2    that Mr. Patel is guilty as charged.  The

3    Government has the burden of proving Mr. Patel's

4    guilt beyond a reasonable doubt.  This burden of

5    proof stays with the Government throughout the

6    case.

7            By your verdict, you will decide disputed

8    issues of fact.  I will decide all questions of law

9    that arise during the trial; and before you retire

10   to deliberate at the close of this case, I will

11   instruct you on the law, and you must follow and

12   apply that in deciding upon your verdict.  Because

13   you'll be called upon to decide the facts of this

14   case, you should give careful attention to the

15   testimony and evidence presented for your

16   consideration bearing in mind that I will instruct

17   you at the end of the trial concerning the manner

18   in which you should determine the credibility or

19   believability of each witness and the weight to

20   give -- or the weight to be given to his or her

21   testimony.

22           During the trial, however, you should keep

23   an open mind and should not form or express any

24   opinion about the case one way or the other until

25   you have heard all of the testimony and evidence,

Vol. 1 - 27

1    the closing arguments of the parties and my

2    instructions to you on the applicable law.

3            I had a bench trial once where I was the

4    decider of both questions of law and fact, and I

5    thought the case was going to go one direction.  It

6    was a several-day trial, and it wasn't until the

7    answer to the last question asked of the last

8    witness that turned the outcome of that case.  So

9    that's why it's important, that, you know, it's --

10   it's like a good movie, a mystery thing.  There is

11   plot twists and turns, and so you have to keep an

12   open mind until you hear all the evidence.

13           While the trial is in progress, you must

14   not discuss the case in any manner among yourselves

15   or with anyone else nor should you permit anyone to

16   discuss it in your presence.  During the trial, I

17   may be called upon to make rulings on law, on

18   objections or motions made by the lawyers.  It is

19   the duty of the attorneys on each side of the case

20   to object when the other side offers testimony or

21   other evidence that the attorney believes is not

22   properly admissible.

23           You should not show prejudice against an

24   attorney or his or her client because the attorney

25   has made objections.  You should not infer or

1   conclude from any ruling or other comment I may

2   make that I have any opinion as to the merits of

3   the case favoring one side or the other; and if I

4   sustain an objection to a question that goes

5   unanswered by the witness, you should not draw any

6   inference or conclusions from the question itself.

7        During the trial I may confer with lawyers

8   out of your hearing with regard to questions of law

9   or procedure that require consideration by the

10  Court alone.  On some occasions, you'll be excused

11  from the courtroom for the same reason.  I'll try

12  to limit those interruptions, but you should

13  remember the importance of the matter that you're

14  here on and to determine and should be patient even

15  though the case may seem to go slowly.

16       This case will proceed in the following

17  order:  First, the Government may make an opening

18  statement outlining its case.  Mr. Patel may also

19  make an opening statement, or he may defer the

20  making of his opening statement until the

21  conclusion of the Government's case.  Neither of

22  the parties is required to make an opening

23  statement.  What is said in opening statement is

24  not evidence.  It is simply designed to provide you

25  with an introduction as to the evidence that the

Vol. 1 - 29

1    party making the statement intends to produce.

2          Second, the Government will introduce

3    evidence in support of its case.  At the conclusion

4    of the Government's case, Mr. Patel may introduce

5    evidence.  Mr. Patel, however, is not obliged to

6    introduce any evidence or call any witnesses.  If

7    Mr. Patel introduces evidence, the Government may

8    then introduce what is known as rebuttal evidence.

9          Third, I will instruct you on the law you

10   are to apply in reaching your verdict.

11         Fourth, the parties may present closing

12   arguments to you as to what they consider the

13   evidence has shown and as the inferences -- and as

14   to the inferences they contend that you should draw

15   from the evidence.  What is said in closing

16   argument, just as what is said in opening

17   statement, is not evidence.  The arguments are

18   designed to present to you the contentions of the

19   parties based on the evidence introduced.  The

20   Government has the right to open and to close the

21   argument.

22         The evidence in this case will consist of

23   sworn testimony of witnesses regardless of who may

24   have called them, and all exhibits received in

25   evidence regardless of who may have produced them

Vol. 1 - 30

1   and all facts which may have been judicially

2   noticed and which I instructed you to take as true

3   for purposes of this case.

4           Statements and arguments of counsel are

5   not evidence in the case.  Any evidence as to which

6   an objection is sustained by the Court and any

7   evidence ordered stricken by the Court must be

8   entirely disregarded.

9           Anything you may have seen or heard

10  outside of the courtroom is not evidence and must

11  be entirely disregarded.  You are to consider only

12  the evidence in the case; but in your consideration

13  of the evidence, you are not limited to the bald

14  statements of witnesses.  In other words, you are

15  not limited solely to what you see and hear as the

16  witness testified.  You are permitted to draw from

17  the facts which you find have been proven such

18  reasonable inferences as you feel are justified in

19  light of your experience.

20          At the end of the trial, you will have to

21  make your decision based on what you recall of the

22  evidence.  You will not have a written transcript

23  to consult, and it is difficult and time consuming

24  for the reporter to read back lengthy testimony, so

25  I urge you to pay close attention to the testimony

Vol. 1 - 31

1   as its given.

2         After the evidence has been heard and

3   arguments and instructions are concluded, you will

4   retire to consider your verdict.  You will

5   determine the facts from all the testimony that you

6   have heard and the other evidence that is

7   submitted.  You are the sole and exclusive judges

8   of the facts; and in that field, neither I nor

9   anyone else may invade your province.  On the other

10  hand, and with equal emphasis, I instruct you that

11  you are bound to accept the rules of law I give you

12  whether you agree with them or not.

13        The law of the United States permits the

14  Judge to comment on the evidence in the case during

15  the trial or instructing the jury.  Such comments

16  are only expressions of the Judge's opinion of the

17  facts, and the jury may disregard them entirely

18  because the jurors are the sole judges of the

19  facts.

20        During the trial, I will permit you to

21  take notes; but a word of caution, there is always

22  a tendency to attach undue importance to matters

23  one has written down.  Some testimony considered

24  unimportant at the time presented, thus not written

25  down, takes on a greater importance later in the

Vol. 1 - 32

1    trial in light of all the evidence presented.  So

2    keep in mind that your notes are only a tool to aid

3    your own individual memory.  You should not compare

4    your notes with other jurors in determining the

5    content of anyone's testimony or in evaluating the

6    importance of any evidence.  Your notes are not

7    evidence and by no means a complete outline of the

8    proceedings or a list of the highlights of the

9    trial.  Above all your memory is your greatest

10   asset when it comes time to deliberate and render a

11   decision in this case.

12        Counsel, opening statement.

13        MR. REED:  Vonda Lutz had worked as a

14   nurse for 40-some years.  After a lifetime of work,

15   she was finally ready to enjoy retirement.  Vonda

16   and her husband bought a home in Arizona away from

17   the daily grind, a chance to enjoy what they had

18   worked so hard for, and tragically her husband fell

19   ill in early 2022, and that summer he passed away.

20        About the time Vonda's spouse fell ill in

21   early 2022, the Defendant, Nirav Patel, snuck

22   across the border from Vancouver into Washington

23   after traveling from India to Canada.  From there,

24   he bounced around.  He stayed in Georgia for a

25   while where he had a cousin named Danny and other

Vol. 1 - 33

1     relatives.  He stayed in Tennessee.  He landed in

2     the Chicago area in late summer of 2022.

3            About the time Patel landed in Chicago,

4     Vonda sold everything, put her life savings in the

5     bank and moved to Franklin, Indiana, outside

6     Indianapolis, to be closer to her daughter.  It was

7     the sensible thing to do.  Grieving and unsure of

8     her long-term plans, Vonda moved into an elder care

9     facility called Christina Place in September of

10    2022.  That's when a new nightmare began.

11           The next month she was contacted by a

12    scammer who claimed to be a government agent.  He

13    had bad news.  Her personal financial information

14    had been compromised he said.  Vonda needed to get

15    all of her money out of the bank and put somewhere

16    safe.  The scammer could help.  She just had to

17    send the money to him.  Grieving and scared, Vonda,

18    unfortunately, fell for the scam.

19           She sent money out by UPS.  She kept the

20    whole thing secret, didn't tell a soul, just as

21    they had told her to do; but they told her it

22    wasn't enough.  She had to move big money.  So they

23    convinced her to buy $188,000 in gold bars from a

24    company in Oklahoma.  She put those gold bars in a

25    shoebox and packaged it up.  The scammer said he

1    would send someone to pick them up in the morning.

2    It was the day before Thanksgiving.  Why wait until

3    the next day?  Because the Defendant, Nirav Patel,

4    was busy somewhere else.  That same day, November

5    23rd, Nirav Patel had driven from his home near

6    Chicago all the way up to Merrill, Wisconsin.

7    There should be a map on your screen showing you

8    where it is.  It's about 280 miles.

9            THE COURT:  What Exhibit Number is it?

10            MR. REED:  It's just a demonstrative,

11    Judge.

12            It's about 280 miles north of Chicago.  In

13    Merrill, Nirav Patel pulled up after dark near the

14    house of a 68-year-old-woman named Karen Endres.

15    Endres was herself emotionally vulnerable because

16    she herself had just been through a difficult

17    divorce.  Like Vonda, Karen was also contacted by

18    phone and told a story by a purported federal agent

19    about how her bank accounts had been compromised.

20    She ultimately fell for the same scam, and she was

21    tricked into withdrawing large sums of money from

22    her bank.  So that night the scammer directed her

23    to walk across the snow and ice after dark and put

24    a taped shoebox containing $29,000 in cash in the

25    back of a car parked on the street.  It was in the

Vol. 1 - 35

1  back of Nirav Patel's car.

2          Patel turned around, drove all the way

3  back to Chicago, but his work wasn't done.  Another

4  assignment came in around 2:30 a.m.  This time he

5  needed to drive 230 miles southeast to Franklin,

6  Indiana, to visit Christina Place and Vonda Lutz.

7          With each assignment, Mr. Patel followed

8  the same set pattern.  He would take screenshots of

9  his map program as he went showing his estimated

10  arrival time; and when he got there, he would take

11  a picture showing he'd arrived.  Afterwards he'd

12  take a video of the box that was now in his

13  possession.

14          So it was that Thanksgiving morning Vonda

15  walked out the front door of Christina Place with a

16  taped box containing $188,000 in gold bars.  At age

17  77, Vonda was in rough physical shape.  She had

18  trouble walking very far.  She was on oxygen.  She

19  was using a walker.  So it took her a while to walk

20  down the sidewalk to the waiting vehicle.  When she

21  finally got there, the driver said nothing.  Just

22  rolled the back window down.  Vonda placed the box

23  in the back seat of the defendant's car and

24  tottered back inside.

25          With $188,000 in gold from Vonda and

Vol. 1 - 36

1   $29,000 in cash from Karen, Nirav Patel was on the

2   road again by 9 a.m.; but his work still was not

3   done.  He made two more stops in the course of the

4   day dropping off portions of the trip's haul before

5   returning home.  Back home, Nirav Patel

6   meticulously deleted from his phone many of the

7   photos and videos that might connect him to

8   Merrill, Wisconsin, or Franklin, Indiana.

9        A week later on December 1st, Mr. Patel

10  was at it again.  Leaving about 5 a.m., he again

11  drove to Christina Place, arriving early that

12  morning.  The whole scene repeated itself.  He took

13  screenshots of his map program showing his expected

14  time of arrival.  He took a picture of the building

15  once he had parked near the end of the parking lot.

16  77-year-old Vonda Lutz, still on oxygen, slowly

17  walked down the sidewalk, taped package in hand, to

18  where Patel was waiting in his vehicle.  When she

19  reached the car, Patel, again, couldn't bring

20  himself to acknowledge the old woman outside his

21  car window.

22        MS. FRETER:  Objection.  This is

23  argumentative.

24        THE COURT:  Overruled.

25        MR. REED:  Vonda again put the box in the

1    back seat and faltered back inside Christina Place.

2    Then Mr. Patel turned around and went home,

3    stopping to take a video of the box along the way.

4         It's at this point we start getting more

5    of the picture.  Why does Patel take a picture -- a

6    video of the package?  Who was he communicating

7    with?  Well, he's sending those videos to his

8    cousin Danny, the one in Atlanta where Patel lived

9    before coming to Chicago.

10         The next day, December 2nd, Patel gets a

11   message in the middle of the night from a number in

12   India, contact is listed in Patel's phone simply as

13   KKT, the letters, K-K-T.  KKT is telling Patel

14   about another pickup.  Patel's next destination is

15   forwarded later that morning.  He is being sent

16   back to Merrill, Wisconsin, to take more money from

17   Karen Endres.  Patel hops in the car; and on his

18   way, he is in regular communication with KKT and

19   with his cousin Danny sending him screenshots of

20   his estimated arrival time as he goes.

21         Something is off this time though.  KKT

22   urges Patel to drive fast and hurry up.  The drop

23   might fall through.  Patel is on the phone with KKT

24   as he pulls onto Karen Endres' street, and he pulls

25   to the curb, and that's when he saw them flashing

Vol. 1 - 38

1    lights in his rearview mirror as a police car pulls

2    in behind him.  Patel starts pulling away but an

3    SUV comes down the street and blocks him in.  An

4    officer approaches his window and tells him to get

5    out of the car.  They take him to the back of the

6    vehicle, he is told to put his hands on the trunk,

7    and he's checked for weapons.

8            It turns out Karen had gone to the police,

9    and the police had set up a sting to grab whoever

10   came to take Karen's money.  Now, this was the

11   chance for Patel to come clean and denounce the

12   people he'd been working for, but that's not what

13   he did.  Officers asked him what he was doing in

14   Merrill, and he tried to talk his way out.

15   Officers seized Patel's phone and when KKT kept

16   calling and they asked Patel who KKT was, Patel

17   refused to identify him; instead, falsely insisting

18   that he had only just started speaking with KKT.

19           Officers allowed Patel to drive home to

20   Chicago that night while they checked out his story

21   and the investigation continued.  It appeared Patel

22   may have laid low for a while; but by March 2023,

23   Patel and Danny are back in touch and back at work

24   together.

25           So on April 10 of 2023, Nirav Patel drove

240 miles south to Edwardsville, Illinois, pulling
up after dark outside the house of a new victim, an
85-year-old woman named Virginia Bryan.  Virginia
was a retired SIUE professor, taught chemistry for
a long time.  She'd recently lost her spouse during
COVID, settled his estate, and so she had an
unusually large amount of cash in the bank.
Virginia, too, was contacted by somebody pretending
to be a federal officer.  She, too, was told she
needed to hand over her money because her identity
had been stolen.  She had initially been convinced
to deposit some money through a Bitcoin ATM, and
now that fake federal agent had sent someone
directly to her house for even more.

So Patel made the four-hour trip south and
parked on the street.  Virginia walks down to his
vehicle and placed a taped box with $51,900 cash in
the car through an open window.  Patel drove home,
stopping at a gas station outside of Edwardsville
to fill up and take a video of the box.  Throughout
the day, he followed the same pattern he did
before.  First taking a screenshot showing how far
it would take to get to Edwardsville, then
screenshots of his estimated arrival time, and then
a video showing he had the victim's money in that

1   package.

2          But these scammers weren't done with

3   Virginia.  Ten days later, April 20, 2023, Patel

4   again drove the 240 miles south to Edwardsville.

5   He, again, parked on the street outside of

6   Virginia's house.  Virginia, again, walked slowly

7   down to the street and put a taped box containing

8   cash in the back of Patel's car through an open

9   window; but as Patel starts pulling away, the

10  police showed up, carrying Virginia to safety and

11  placing Patel under arrest.

12         It turns out Virginia, too, had realized

13  she'd been scammed and gone to the police just like

14  Karen had done in Wisconsin.  The *deja vu* hit Patel

15  hard.  He urinated himself upon arrest by apparent

16  fear and anxiety.  Placed in the back seat of a

17  police cruiser, though, Patel tried the same tricks

18  he tried in Wisconsin.  "This is my first time

19  doing this," he claims over and over.  "I had no

20  idea."  Nonsense, because the evidence will show

21  this is far from Mr. Patel's first time doing this,

22  telling them exactly why he was there.

23         So a couple months later, Patel is charged

24  in this case.  Because of the defendant's actions,

25  he'd been charged with five crimes.  One count of

Vol. 1 - 41

1      conspiracy to commit wire and mail fraud, three

2      counts of wire fraud, and one count of illegal

3      entry into the U.S.  The Judge will instruct you on

4      the law, but here are a few basics so you can

5      listen for it as the -- to the evidence as it comes

6      in.

7              So the law of conspiracy means that if

8      people commit a crime together that they are

9      responsible for each other's actions.  The charge

10     here is that Mr. Patel expressly or impliedly

11     agreed to do something illegal.  Doesn't have to

12     understand what specific laws he broke or the full

13     scope of --

14             MS. FRETER:  Your Honor, I'm going to

15     object in terms of this is a rephrasing of the

16     instructions that the jury hasn't been given yet

17     and is inappropriate for opening statement.

18             THE COURT:  Sustained.

19             MR. REED:  So the other counts, Counts 2

20     through 4, are substantive wire fraud.  The first

21     is conspiracy, 2 through 4 are wire fraud, and the

22     fifth is the immigration charge, and you'll hear

23     from the Judge the elements of those crimes, and

24     you can listen to them carefully as conspiracy is

25     defined and what that terminology means.  Listen to

1   it as you think about the evidence and as you

2   decide this case.

3          So let me finish telling you what

4   happened.  After he was charged, Patel was arrested

5   and federal officials purposefully assigned an

6   agent who was born in India and who shared a native

7   language and cultural understanding with this

8   defendant, Agent Kaur sitting at the table with us.

9   You'll hear her interview with the defendant

10  conducted largely in Hindi, and you will see a

11  translation as well.  As you listen to that, you'll

12  hear Patel spin more lies.  Sometimes it's hard to

13  follow.

14         He says he drove down to Madison County to

15  do some work on a woman's house, but the problem

16  with that story, of course, as agents point out, he

17  never got out of the car.  He says he didn't know

18  the names of the people who told him to drive down

19  and pick up that money.  Later he'll admit he's

20  working with his cousin Danny in Atlanta who knows

21  everything, an individual named Abhishek that Patel

22  knew back in India and a person he believed was

23  named Bharat.

24         Patel initially claims in that interview

25  that he did not open any of the packages, then he

Vol. 1 - 43

1    admitted he did open the packages to count the

2    money and pass it on, and finally, he admits he

3    took money from at least one of the victims'

4    packages.

5         So at the end of trial, the Court will

6    instruct you to determine whether Patel acted

7    knowingly.  So as you listen to that interview,

8    you'll hear Patel repeatedly change his story; but

9    as he goes, he finally admits a few things.  He

10   admits he made pickups in Indiana and Wisconsin and

11   Edwardsville, and you'll hear him say these things

12   too.  "I regret what I have done."  "I did wrong."

13   And Patel knew the truth.  "I felt that these

14   people were doing something wrong."

15        If you consider all the evidence using

16   your common sense, there will be no reasonable

17   doubt that Nirav Patel entered the country

18   illegally and participated in each of these crimes

19   as charged, and we are confident that you will do

20   the right thing and find the defendant guilty of

21   all counts.  Thank you.

22            THE COURT:  Do you wish to make argument?

23            MS. FRETER:  Yes, Your Honor.

24            THE COURT:  All right.

25            MS. FRETER:  The evidence in this case

Vol. 1 - 44

1    will show that Nirav Patel, Mr. Patel, when he was

2    in the United States, worked many different kinds

3    of jobs.  He worked for different people, for

4    different employers, he worked doing a variety of

5    things in order to make money.  One of the things

6    that he was tasked with doing was driving to pick

7    up packages, like any other courier, like someone

8    who is doing Uber Eats or any kind of, sort of,

9    self-delivery service; but along the way, just like

10   when Amazon, or whoever leaves a package at your

11   house, they take a picture of it, and that

12   Mr. Patel was reporting to other people where he

13   was going, what he was doing, when he was arriving,

14   at their direction.  In this case Mr. Patel is

15   serving as a courier to drive to some place, pick

16   something up, return it to another place; and the

17   evidence in this case through his phone and other

18   statements and testimony will be that that is the

19   case, and it will be consistent with that.  The

20   evidence in this case will show that as Mr. Patel

21   is picking up packages and driving them back or

22   delivering them to places that he's not the person

23   in charge of the circumstances.

24          In Illinois the police became involved and

25   set up, sort of, a sting-type situation, and

1    there's recordings of that, and you can observe

2    what happened.  The evidence will be that the

3    police, in conjunction here, put together or helped

4    to put together the money that was going to go into

5    the shoebox.  They watched it, there's a dash cam

6    of it, and so you'll be able to see the, sort of,

7    circumstances as those things unfold and that the

8    evidence will be that it's clear that the person

9    who's on the phone communicating is not Mr. Patel.

10   The evidence will show that the person that's

11   giving directions and who's in charge of that,

12   person or persons, is not Mr. Patel and that

13   Mr. Patel is just acting as a courier.

14          The evidence in this case, in terms of how

15   the facts of the case fit into the law, are going

16   to have to do with knowledge and intent, and you'll

17   get pieces of that through the statements that

18   Mr. Patel made to law enforcement and what's on his

19   phone.

20          When Mr. Patel was interviewed, he was

21   interviewed in Hindi.  That is not his native

22   language.  His native language is Gujarati.

23   Although Hindi and Gujarati are both languages that

24   are spoken in India, they are not the same.  The

25   conversations that you'll hear, and the words that

Vol. 1 - 46

1  are used in this translation that occurs is between

2  Mr. Patel speaking in Hindi -- or understanding or

3  interpreting Hindi, and then that also being

4  transcribed by a -- somebody who is transcribing

5  it.

6           The nuances of language, the preciseness

7  of words rather than just an idea or a thought or a

8  generalized meaning don't always translate well

9  between Hindi, Gujarati and English.  They don't

10 always translate well in between just people

11 talking about everyday occurrences, the weather,

12 when it was going to snow, what you were going to

13 do.  You'll be able to hear and receive evidence

14 and listen to questions and answers that have to do

15 with whether or not this is an accurate translation

16 or different ways that you could interpret it or

17 believe it or understand it; and the transcripts

18 and the translations and the language barrier and

19 the cultural barrier, you'll hear evidence how what

20 was actually said supports that Mr. Patel was just

21 a courier in this case.

22           We appreciate all of your time and

23 attention; and like the Judge instructed you, that

24 you keep an open mind until the very last witness

25 and the very last answer.  Thank you.

LUTZ - DIRECT/REED                              Vol. 1 - 47

1          THE COURT:  Call your first witness.

2          MR. REED:  Judge, the Government would

3    call Vonda Lutz.  It may take a moment, Judge, to

4    get her up.

5          THE COURT:  Ma'am, this is kind of tight

6    and steep.  Are you going to be able to get up

7    there?

8          (Off the record.)

9          COURTROOM DEPUTY:  Please raise your right

10   hand.

11         (Witness sworn.)

12         THE WITNESS:  Yes, I do.

13         COURTROOM DEPUTY:  Please state your full

14   name and spell your last name for the Court.

15         THE COURT:  Vonda Gale Lutz, L-u-t-z.

16         COURTROOM DEPUTY:  Thank you.

17         **VONDA LUTZ, GOVERNMENT'S WITNESS,**

18                  **DIRECT EXAMINATION**

19   BY MR. REED:

20   Q.  Good afternoon, Ms. Lutz.  Thank you for being

21   here today.  Can you hear me okay?

22   A.  Yes.

23   Q.  May I call you Vonda?

24   A.  Yes.

25   Q.  Vonda, where do you live?

LUTZ - DIRECT/REED                              Vol. 1 - 48

1    A.  I live in Columbus, Indiana.

2    Q.  And for all of us St. Louis-area people, where

3    is that?

4    A.  That is approximately an hour south of

5    Indianapolis.

6    Q.  Okay.  Do you have kids?

7    A.  Two.

8    Q.  And how old are they?

9    A.  My daughter is 60, and my son would have been

10   63.  He's deceased.

11   Q.  Do you have grandkids?

12   A.  I have two.

13   Q.  Great-grandkids?

14   A.  I have a great-granddaughter.

15   Q.  So how old are you, Vonda?

16   A.  I'm 80.

17   Q.  Where did you grow up?

18   A.  I grew up in the military.  My dad was career

19   Army.

20   Q.  Okay.

21   A.  So I'm an Army brat.

22   Q.  Where are some of the places you bounced around

23   to as a kid?

24   A.  I can recall living in Davenport, Iowa; Fort

25   Carson, Colorado.  My dad's deployment took him

LUTZ - DIRECT/REED                                    Vol. 1 - 49

1  overseas, and we lived in Kirksville, Missouri, for

2  about a year while he was gone; and on his return,

3  we went to California, and that's where I was

4  raised.

5  Q.  Okay.  Is that where you ended up living as an

6  adult as well, in California?

7  A.  Most of my adult life, yes.

8  Q.  Okay.  And Vonda, are you retired?

9  A.  Yes.

10  Q.  What did you do before retirement?

11  A.  Registered nurse.

12  Q.  Okay.  And how long did you work as a

13  registered nurse?

14  A.  Forty-three years.

15  Q.  Okay.  What kind of work did you do?

16  A.  I did many things.  Med/surg, ER, ICU, and I

17  finally landed in physical medicine and

18  rehabilitation, so I did most of my career in that

19  field.

20  Q.  Okay.  And where in California did you live?

21  A.  Near Santa Barbara, California.

22  Q.  Ma'am, were you married?

23  A.  Yes.

24  Q.  When did you get married?

25  A.  1964.

LUTZ - DIRECT/REED                              Vol. 1 - 50

1    Q.  And how long were you married?

2    A.  Fifty-eight years.

3    Q.  What did you do after you retired from

4    nursing?

5    A.  I took care of my granddaughter for three

6    years.

7    Q.  And after that?

8    A.  After that, my husband and I moved to Arizona.

9    We found living in California was going to be very

10   expensive, so to make our retirement last, we moved

11   to a place where we could afford a little more.

12   Q.  Okay.  And where was that in Arizona?

13   A.  That was in Douglas, Arizona.

14   Q.  Where is Douglas, Arizona?

15   A.  It's on the border.

16   Q.  Way down south?

17   A.  Way down south.

18   Q.  Up on the rocks?

19   A.  It's on the border of -- it's on the

20   borderline, yeah.

21   Q.  How long were you in -- well, when did you move

22   to Arizona?

23   A.  We moved in 2017.

24   Q.  Okay.  So how long were you there?

25   A.  My husband passed away in '22, in June of '22;

LUTZ - DIRECT/REED                          Vol. 1 - 51

1  and after that, I realized that I couldn't stay

2  there by myself because the home we purchased was

3  off grid, and we had pumps and waters and

4  generators, and many things that I know nothing

5  about nor could I have done them anyway.

6  Q.  So you said June of 2022 is when he passed

7  away?

8  A.  Yes.

9  Q.  Did you sell the house?

10 A.  I sold the house, everything in it.

11 Q.  Liquidated it all?

12 A.  Yeah, auctioned everything off.

13 Q.  What did you do after that?

14 A.  After that, my daughter came and picked me up

15 and brought me back to Columbus, Arizona -- or

16 Columbus, Indiana.

17 Q.  Okay.  When was that?  When did you move back

18 to Indiana?

19 A.  It was in September of '22.

20 Q.  Okay.  And where did you go?  Where did you

21 live in Indiana?

22 A.  When I first came back, I really didn't want to

23 be burdensome, so I arranged to go to an assisted

24 living in Franklin, Indiana, which is kind of

25 midway between Indianapolis and Columbus.  My

LUTZ - DIRECT/REED                              Vol. 1 - 52

1    sister-in-law lived nearby, so I thought I would be

2    close to family but on my own and be independent.

3    Q.  What was the name of assisted living

4    facility?

5    A.  Christina Place.

6    Q.  Do you still live there?

7    A.  No.

8    Q.  Why not?

9    A.  Well, my money was taken, and I have nothing

10   left to support myself.

11   Q.  When did you move out?

12   A.  I moved out in December of '22.

13   Q.  Okay.  And where did you move to?

14   A.  I live with my daughter in Columbus.

15   Q.  Okay.  So if we can put up on the screen for

16   the witness Exhibit 20, it should appear on the

17   screen in front of you in just a moment.  Tell me

18   when it's there.

19           THE COURT:  Jackie, do you have a list of

20   exhibits?

21           COURTROOM DEPUTY:  Uh-huh.

22           THE COURT:  May I have it?

23   BY MR. REED:

24   Q.  What's pictured here, ma'am?

25   A.  That's the front of the facility that I lived

LUTZ - DIRECT/REED                          Vol. 1 - 53

1   at.  It was called Christina House or Christina
2   Place, an assisted living facility.
3   Q.  Is this what it looked like in 2022 when you
4   lived there?
5   A.  Yes.
6           MR. REED:  Move to admit Exhibit 20.
7           MS. FRETER:  Can I see it?
8           THE COURT:  I can't see anything.
9           MR. REED:  Is it not up?  Can you see it?
10          THE WITNESS:  I see it.
11          COURTROOM DEPUTY:  I only showed it to her
12  because you didn't admit it.
13          MR. REED:  Can you show it to defense as
14  well?
15          COURTROOM DEPUTY:  Yeah.  That goes to the
16  jury.
17          MR. REED:  No, there should be a separate
18  way to put it on their monitor.
19          COURTROOM DEPUTY:  Can you see them?  You
20  guys can see them?
21          MS. FRETER:  No objection.
22          THE COURT:  Exhibit 20 will be admitted
23  without objection.
24          (Government's Exhibit No. 20 was received
25  in evidence.)

LUTZ - DIRECT/REED                          Vol. 1 - 54

1         COURTROOM DEPUTY:  Do you want to publish?

2         MR. REED:  Yes, ma'am.  Thank you.

3    BY MR. REED:

4    Q.  Okay.  So you moved into this place in

5    September of 2022?

6    A.  September 15th -- 17th, I think, 2022, yes.

7    Q.  What happened in October of 2022?

8    A.  I received a text message from Amazon saying,

9    from the order desk, that there was a problem.  And

10   I had recently ordered some things, nothing really

11   important.  So I thought, well, what's this?  So I

12   called, and he asked me if I had ordered a large

13   amount of computer equipment, and it was to be

14   delivered to Albuquerque, New Mexico.

15   Q.  And what did you say?

16   A.  I said, "No, I did not.  That's not correct."

17   Q.  What did he say?

18   A.  He just -- he kind of questioned me a little

19   bit.  I can't remember exactly.  Have you ever been

20   to Mexico and questions like that.  And I said,

21   "No, it's nothing to do with me.  It's not mine.

22   Cancel it."  And he says, "Well, it sounds like

23   there's a problem.  Would you like to report this?"

24   And I said, "Absolutely."

25   Q.  What happened then?

LUTZ - DIRECT/REED                                    Vol. 1 - 55

1    A.  There was telephone transfers and holding, and

2    then a man came on the line, and he stated that his

3    name was Noah, and he represented the Government

4    with the FBI and the Department of Treasury, and

5    they were trying to catch people who were doing

6    orders like this.

7    Q.  So what did this Noah from the Treasury say had

8    happened?

9    A.  Well, he stated that he could help me protect

10   my money.

11   Q.  Why did your money need to be protected

12   according to him?

13   A.  According to him, my name had been found on --

14   when he was researching, my name had been

15   identified on the dark web.

16   Q.  Okay.

17   A.  And that there were 17 accounts open in my name

18   and that they were after my money.

19   Q.  So --

20   A.  They were after my -- going to my bank to take

21   my money away.

22   Q.  Did Noah have a solution for this problem?

23   A.  Yes.

24   Q.  What did he say needed to be done?

25   A.  That if I agreed to help this -- his department

LUTZ - DIRECT/REED                           Vol. 1 - 56

1    that they would protect that money and that banks

2    don't want to close out accounts so that I needed

3    to work with him on collecting the money out of the

4    bank accounts, and we needed to start with an

5    amount that was -- I don't remember the percentage.

6    It was small.  I needed to withdraw this amount of

7    money to secure his department to take that money

8    and hold it in an account and that when it was all

9    finished, that money would be returned to me.

10   Q.  Okay.  Did it sound to you like Noah could help

11   you?

12   A.  Yeah.

13   Q.  What did he sound like?  Your impressions of

14   him.

15   A.  He sounded knowledgeable, and he was very clear

16   about what we needed to do to protect my money and

17   that there would be two agents that would come to

18   me with a certified check when this was done, and

19   I'd be finished with it.

20   Q.  Was there ever any noise in the background when

21   you talked to Noah?

22   A.  Once in a great while.  Mostly not.

23   Q.  Okay.

24   A.  But once in a great while I would get a sense

25   of an office setting around him.

LUTZ - DIRECT/REED                           Vol. 1 - 57

1    Q.  Background noise?

2    A.  Yeah, background.  Not very often.  It was

3    mostly quiet.

4    Q.  Okay.  So when did Noah call you back next?

5    A.  The next day.

6    Q.  All right.  So he had told you you needed a

7    certain amount of money --

8    A.  Uh-huh.

9    Q.  -- from your accounts?  What did you tell him

10   when he said you need to get this money?

11   A.  Well, he said I had to get this money, and I

12   said, "There is no way I can go get this money."

13   Q.  Did you have a car?

14   A.  I don't have a car.  I can barely walk.  I'm on

15   oxygen.

16   Q.  You told him all that.

17   A.  I told him all that, and I said, "I can't go to

18   the bank.  There's no transportation at this place

19   I'm living."

20   Q.  So what did he say?

21   A.  I just said, "I can't go."

22   Q.  So you tell him you can't go.  Does Noah have

23   an answer for that?

24   A.  Yes.  He said, "We'll make arrangements for

25   getting transportation for you to take you to the

LUTZ - DIRECT/REED                          Vol. 1 - 58

1   bank."

2   Q. Did Noah do that?

3   A. It took him a couple of days.  He called me

4   every day, but he was having trouble finding

5   transportation.

6   Q. Did he say he had -- tried to get you an Uber

7   or a cab?

8   A. No.

9   Q. No?  So was he able to find you

10  transportation?

11  A. He was.  He found -- I guess it was a cab

12  service out of Columbus, Indiana -- not Columbus.

13  I'm sorry.

14  Q. Richmond?

15  A. Richmond, Indiana, which is on the far right

16  side of the state, and I thought, well, that's --

17  but not knowing the state of Indiana that well, I

18  thought, well, maybe it's closer to go that way

19  than it is Indianapolis, so I didn't really

20  question it.

21  Q. How far away is Richmond, Indiana from where

22  you were?

23  A. I really don't know.  I can't tell you.

24  Q. Okay.  So did someone come and show up?

25  A. It took two or three days, and he said, "I

LUTZ - DIRECT/REED                              Vol. 1 - 59

1    found transportation for you, and they're going to

2    come pick you up, but they're coming from Richmond.

3    It's going to take about an hour for them to get

4    there."

5    Q.  Okay.  Did someone show up?

6    A.  Someone showed up.

7    Q.  Who showed up?

8    A.  Two men in a black F-150 pickup truck.

9    Q.  Describe the individuals who were driving the

10   pickup truck.

11   A.  They were a father and son.  They were quite

12   obese and unkempt.  The truck smelled like BO and

13   hamburgers, so I call them the "burger boys."

14   Q.  The truck -- go ahead.

15   A.  The -- the truck.

16   Q.  The truck, the F-150 --

17   A.  Right.

18   Q.  -- did it have any markings, say, Uber or have

19   a cab or anything like that at all?

20   A.  No, it was just a black F-150 pickup truck.

21   Q.  Appeared to be a personal vehicle?

22   A.  Yes.

23   Q.  Did they explain why they were coming in this

24   pickup truck?

25   A.  Well, they explained to me that they have a cab

LUTZ - DIRECT/REED                          Vol. 1 - 60

1    service in Richmond, and they also have a limousine

2    service; but because they were going outside their

3    normal area, they brought the son's truck.

4    Q.  Okay.  So the first time this pickup truck

5    pulls up, are you waiting outside already?

6    A.  No.

7    Q.  How do you know that they're there?

8    A.  No, because it's a locked facility.

9    Q.  Okay.

10   A.  I had to be let out of the facility by someone

11   at the door.

12   Q.  Okay.  How did you know that the pickup truck

13   was ready to go?

14   A.  Noah called me --

15   Q.  Okay.

16   A.  -- and let me know that they were there, they

17   were pulling into the parking lot and that I was to

18   go out the door now.

19   Q.  Okay.  Were they waiting for you when you went

20   out?

21   A.  Yes, they were.

22   Q.  Where did they take you?

23   A.  They took me to my bank.  I gave them the

24   directions to the bank because it was just down the

25   street a ways.

LUTZ - DIRECT/REED                              Vol. 1 - 61

1   Q. Was Noah on the phone with you when you went to

2   the bank?

3   A. No.

4   Q. Did he coach you on what to say at the bank?

5   A. Not the first time.

6   Q. Okay. Later on?

7   A. Later on he did, yeah.

8   Q. What did he say?

9   A. Each time that he had me go to the bank and

10  withdraw moneys or funds, he had a story concocted

11  that I was to tell them that I needed the money for

12  this or that and what I was going to do with it.

13  Q. The stories that he had concocted, were they

14  the stories that he had told you about your account

15  being compromised, or was it a different story?

16  A. Well, he always reinforced it with that.

17  Q. Okay. What kind of stories would he have you

18  tell the bank?

19  A. That I was going to buy a car, and I needed the

20  cash to put a down payment on it. The second time,

21  I believe he told me that --

22  Q. Let me ask you this --

23  A. -- I don't remember exactly.

24  Q. -- so I'll take the example you gave. You go

25  to buy a car. That wasn't why he had told you you

LUTZ - DIRECT/REED                                    Vol. 1 - 62

1   were getting money from the bank?  You weren't

2   buying a car?

3   A.  I wasn't going to buy a car, no.

4   Q.  Did you ask him why not tell the bank that I'm

5   working with the Treasury Department and my account

6   has been compromised?

7   A.  No, I didn't.

8   Q.  Okay.  Did Noah give you any reason not to tell

9   the bank that?

10  A.  He told me not to talk to anyone.

11  Q.  He told you not to talk to anyone?

12  A.  Not to talk to anyone.  Just tell them what you

13  need and --

14  Q.  Get out of there?

15  A.  -- get out of there, yeah.

16  Q.  So you say -- you're told don't talk to anyone

17  at the bank.  Did that apply to everybody?

18  A.  Uh-huh.

19  Q.  Did you tell anybody about this until after the

20  fact?

21  A.  No.

22  Q.  Not family?

23  A.  No.

24  Q.  And who told you not to talk to anybody?

25  A.  Noah.

LUTZ - DIRECT/REED                        Vol. 1 - 63

1  Q.  Okay.  So back at the bank, you go in.  Were

2  you able to get the money out that you needed to

3  get out?

4          THE COURT:  Counselor, let me stop you

5  right there.

6          All right.

7  BY MR. REED:

8  Q.  Okay.  I think we were at the bank.  Truck

9  drops you off at the bank.  You get your money.  Is

10  the truck waiting for you when you come out?

11  A.  Yeah.

12  Q.  Did you ask the truck to wait for you?

13  A.  No -- well -- no, I didn't, because Noah said,

14  "They will take you to the bank, and then they will

15  take you home."

16  Q.  Okay.  So did they take you back home?

17  A.  Yes.

18  Q.  What did you do when you got back with the

19  money?

20  A.  When I got back, as soon as I got in the room,

21  I guess -- well, I don't know.

22  Q.  As soon as you got back, what happened?

23  A.  As soon as I got back in the room, Noah called,

24  and he wanted me to go back to my room, package

25  this money up in a box with a pair of shoes or

1    something heavy to give it weight.  He wanted me to

2    put a stack of magazines, but being new to the

3    facility, I didn't have magazines, so that didn't

4    work.  So he said, "Put a pair of shoes in there."

5    Q.  Did you do that?

6    A.  I did that.

7    Q.  And I caught something you just said right now.

8    How did you Noah know that you were back at

9    Christina Place?  Did you tell him?

10   A.  Unh-unh.

11   Q.  But he knew because he called when you got

12   there?

13   A.  He knew.

14   Q.  So you packaged it up with the shoes?

15   A.  Yes, and magazine or other things just to give

16   it weight.

17   Q.  Give it some weight?

18   A.  Yeah.

19   Q.  Are you still on the phone with Noah during

20   this process?

21   A.  Constantly.

22   Q.  What did he tell you to do next?

23   A.  He told me where to mail it.

24   Q.  Where were you supposed to go?

25   A.  I was supposed to send it to an attorney, I

LUTZ - DIRECT/REED                          Vol. 1 - 65

1   believe --

2   Q.  Okay.

3   A.  -- in California.

4   Q.  He gave you a name?

5   A.  He gave me a name and address, and he had me go

6   to the UPS store in Franklin.

7   Q.  How did you get to the UPS store?

8   A.  The boys took me.

9   Q.  Were they waiting for you that whole time you

10  were packaging the box?

11  A.  Yes, they were waiting.

12  Q.  Sitting outside the front of Christina House?

13  A.  Yes.

14  Q.  Okay.  So you went back out and got back in the

15  truck --

16  A.  Uh-huh.

17  Q.  -- and went to UPS?

18  A.  Yes.

19  Q.  Did you tell them to go to UPS?

20  A.  I don't recall if I did or not.

21  Q.  Okay.  But they --

22  A.  I think I said maybe UPS, but I had no idea

23  where it was.

24  Q.  Okay.  Did they take you there anyway?

25  A.  Yeah.

LUTZ - DIRECT/REED                            Vol. 1 - 66

1  Q.  So they were able to figure out where it was?

2  A.  Right.

3  Q.  Okay.  So did you mail the package by UPS?

4  A.  Yes.

5  Q.  To the address in California?

6  A.  Yes.

7         MR. REED:  All right.  So if we could put

8  up for the witness only Exhibit 24, if we could

9  zoom in on the top part of that.

10 BY MR. REED:

11 Q.  Okay.  Ma'am, did you save your receipts from

12 UPS?

13 A.  I did.

14 Q.  And you showed them to us when we met with

15 you?

16 A.  Yes.

17 Q.  Okay.  So are these pictures of those

18 receipts?

19 A.  Yes.

20        MR. REED:  Move to admit 24.

21        MS. FRETER:  No objection.

22        THE COURT:  24 will be admitted without

23 objection and may be published to the jury.

24        (Government's Exhibit No. 24 was received

25 in evidence.)

LUTZ - DIRECT/REED                           Vol. 1 - 67

1        MR. REED:  Thank you, Judge.

2   BY MR. REED:

3   Q.  Can you see that, Vonda?  Up at the top on the

4   right where it says date?

5   A.  Yeah, it says 10-27.

6   Q.  The first package was October 27 of 2022?

7   A.  Yes.

8   Q.  If we could go to page 2 here, please.

9   A.  There.

10        MR. REED:  And just zoom in on the left

11  side.

12  BY MR. REED:

13  Q.  All right.  That first address at the top,

14  Vonda Lutz, 1435 Christian Boulevard, Franklin

15  Indiana, is that Christina Place?

16  A.  Yes.

17  Q.  And the ship to address here:  Kory Lawson in

18  California?

19  A.  Yes.

20  Q.  Is that the address --

21  A.  Yes.

22  Q.  -- that Noah gave you?

23        MR. REED:  If you could put up Exhibit 28

24  for the witness, please.

25  BY MR. REED:

LUTZ - DIRECT/REED                          Vol. 1 - 68

1   Q.  Flip through those briefly.  Are these pictures

2   of the box of money that you sent through UPS on

3   October 27th?

4   A.  Yes, it is.

5          MR. REED:  More to admit Exhibit 28 and

6   publish.

7          MS. FRETER:  No objection.

8          THE COURT:  28 will be admitted without

9   objection and may be published.

10          (Government's Exhibit No. 28 was received

11   in evidence.)

12   BY MR. REED:

13   Q.  Okay.  So this is the top of the box on page 1

14   here?

15   A.  Uh-huh.

16   Q.  If we can scroll down to page 2, page 3, page

17   4, page 5.  Is this how you packaged the box?

18   A.  Yes.

19   Q.  Like you were describing for us earlier?

20   A.  Yes, it is.

21   Q.  And what's in the paper towels here?

22   A.  That's bundles of money.

23          MR. REED:  Go down to the next picture,

24   and the next one and the next one.

25   BY MR. REED:

LUTZ - DIRECT/REED                              Vol. 1 - 69

1    Q.  Bundled like that?

2    A.  Yes.

3              MR. REED:  Okay.  Next picture.  Just flip

4    down through the bottom there.

5              Okay.  Thank you.

6    BY MR. REED:

7    Q.  Let's go back to end of October.  You sent this

8    first package out.  Did Noah contact you again?

9    A.  Yes.

10   Q.  How often would he call?

11   A.  Every day.

12   Q.  What kind of things did he talk about?

13   A.  Oh, he tried -- he befriended me.  He asked

14   about losing my husband, and I guess I told him my

15   story.  I don't know.  But he told me that his

16   sister had been scammed so he knew what this was

17   like, and he sympathized and reinforced that they

18   were going to help me get my money back.

19   Q.  Did he ask about your family?

20   A.  A little bit.

21   Q.  Did he ask whether you have family nearby?

22   A.  Yes.

23   Q.  What kind of questions did he ask about that?

24   A.  Well, he told me not to even tell my daughter

25   because you never know when somebody is going to

LUTZ - DIRECT/REED                          Vol. 1 - 70

1   tell a story or -- and then that information could

2   get back to the wrong people.

3   Q.  Would he ask when your daughter would be

4   visiting you and when she would be around?

5   A.  You know, I think I probably volunteered that

6   because he knew that she lived some way away and

7   that she only came up to visit when she had her

8   days off.

9   Q.  Did he ask for more money?

10  A.  Yes.

11  Q.  How did Noah ask for the money?  What format

12  did he want the money in this time?

13  A.  This time we needed another percentage of the

14  money, and we needed to send -- I don't recall the

15  amount -- 35,000, I think, something like that.

16  Q.  Cashier's check?

17  A.  And this was a cashier's check that was to go

18  to someone in Wisconsin.

19  Q.  So he gave you a name for this check?

20  A.  Yeah, and this was supposed to be an attorney

21  or something liking that.

22  Q.  He had some story for who the person was in

23  Wisconsin?

24  A.  Yes.

25  Q.  How did you get the cashier's check?

LUTZ - DIRECT/REED                          Vol. 1 - 71

1    A.  I went to the bank again with the boys.

2    Q.  Same thing as before?  The F-150 with the two

3    guys?

4    A.  Same guys, same two guys.

5    Q.  Was it the same thing where they showed up, and

6    then Noah called you and said they were outside?

7    A.  Uh-huh.

8    Q.  And you said earlier that these two guys had

9    told you, Oh, we're only taking the pickup truck

10   because -- for today?

11   A.  Their other vehicles are out.

12   Q.  But did they come back in the same pickup

13   truck?

14   A.  Yes.

15   Q.  Still no markings suggesting a cab company or

16   Uber or anything like that?

17   A.  No, nothing.  Just the story they told me.

18   Q.  Said they'd take you to the bank?

19   A.  Uh-huh.

20   Q.  Were you able to get the cashier's check?

21   A.  Yes.

22   Q.  They took you back home?

23   A.  Took me back home.

24   Q.  What did you do when you got back with the

25   cashier's check?

LUTZ - DIRECT/REED                                    Vol. 1 - 72

1    A.  Noah called me.

2    Q.  He knew when you were --

3    A.  When I was back in the building, he called me,

4    had me, again, prepare an envelope.  I think it was

5    an envelope.

6    Q.  To the guy in Wisconsin?

7    A.  To the guy in Wisconsin.  He gave me an

8    address, same sort of thing.

9    Q.  How did you send that cashier's check?

10   A.  I think it was another UPS.

11   Q.  Went back to the UPS store?

12   A.  I think so.

13   Q.  Who took you to the UPS store this time?

14   A.  Same guys.

15   Q.  Same guys.

16          MR. REED:  If we go back to Exhibit 24,

17   which was previously admitted, page 3, just zoom in

18   on the top there.

19   BY MR. REED:

20   Q.  You see where the date is listed on the right

21   there?

22   A.  Yes.

23   Q.  Up at the top?

24   A.  Yes.

25   Q.  When was this package sent?

1    A.  That was October the -- or November the 2nd.

2              MR. REED:  If we go to page 4, the left

3    side of the packaging label here, just that part

4    there at the addresses.

5    BY MR. REED:

6    Q.  November 2nd of 2022?

7    A.  Yes.

8              MR. REED:  And Sandra, if we can look at

9    the "To" and "From" on that shipping label.

10   BY MR. REED:

11   Q.  Okay.  See where it says "Ship To" up in the

12   left?

13   A.  Yes.

14   Q.  Is this the name and address that Noah gave to

15   you for the cashier's check?

16   A.  Yes, it is.

17   Q.  And you sent it there?

18   A.  Yes.

19   Q.  So as the "burger boys," as you call them, are

20   providing you transportation, do you have to pay

21   them?

22   A.  Yes.  When that -- that first bundle of money

23   that I put in the shoes, Noah had me take out

24   $5,000, and he said use that money to pay for the

25   taxis and any other things you need to pay for.

1    Q.  Okay.  So how much would you pay these guys

2    each time they took you to the bank?

3    A.  Well, since I only had bundles of hundreds, and

4    I didn't go shopping, so I didn't have any way

5    of -- to break those bills, I would pay them with

6    hundred dollar bills.

7    Q.  About how much would you give them each time?

8    A.  Well, they would tell me like 150.  Well, all I

9    had was hundreds, so that's what they got.

10   Q.  Okay.  Two hundred?  Three hundred?

11   A.  Usually three hundred.

12   Q.  Usually three hundred each trip?

13   A.  Yeah, I think the story was that, you know,

14   they came from Richmond, so it was going to be --

15   it was over two hundred, probably 250, and I had to

16   give them three.

17   Q.  A lot of money for a trip --

18   A.  Too much.

19   Q.  Okay.  So after this second package drop-off on

20   November 2nd, did Noah keep calling you?

21   A.  Oh, yeah.

22   Q.  Was there a stretch where he stopped calling

23   briefly?

24   A.  There was.  He said he had to go on a different

25   assignment, and he needed to be away from the

LUTZ - DIRECT/REED                          Vol. 1 - 75

1    office, and he would call me back in about a

2    week.

3    Q.  Did he do that?

4    A.  He did that.

5    Q.  What did he say when he called you back in a

6    week?

7    A.  He said we need to get this finished up, so now

8    we need to withdraw -- no.  He started talking

9    about gold.

10   Q.  About gold?

11   A.  About gold.  We wanted to purchase gold, gold

12   coins -- or gold --

13   Q.  Bars?

14   A.  Bars.

15   Q.  How much -- or rather, how did Noah say you

16   were going to get this gold to him?  Did he have an

17   idea for that too?

18   A.  Yeah, he did.  He said there's a place in

19   Oklahoma.

20   Q.  APMEX, A-P-M-E-X?

21   A.  APMEX, yeah, it was American Metal --

22   Q.  Precious Metals something-something?

23   A.  Something like that, yeah.

24   Q.  Okay.  Were you able to open an account with

25   this?

LUTZ - DIRECT/REED                                    Vol. 1 - 76

1    A.  I was.  He put me in touch with an agent at

2    that business, and she helped me open an account to

3    purchase gold.

4    Q.  Did Noah ever call APMEX on your behalf?

5    A.  I believe he did.

6    Q.  What was going on there?

7    A.  Well, I was -- I'm not real computer savvy, and

8    he was giving me all these instructions, and I

9    couldn't do it, and I think he made a call on my

10   behalf and posed as my nephew --

11   Q.  Okay.

12   A.  -- to help me get started on this, opening this

13   account.

14   Q.  Eventually are you able to get the account

15   opened?

16   A.  I got the account opened.

17   Q.  So how did you pay for the gold?

18   A.  I needed to go to the bank and get a transfer

19   arranged to purchase the gold.

20   Q.  How did you get to the bank this time?

21   A.  The boys.

22   Q.  They came and picked you up again and took you

23   to the bank?

24   A.  Came and picked me up.

25   Q.  Do you remember how much money you wired to

LUTZ - DIRECT/REED                         Vol. 1 - 77

1    this APMEX?

2    A.  I think it was $188,000, something like that.

3    Q.  188,000?

4    A.  It was a large amount.

5    Q.  Okay.  So did you get the gold?

6    A.  I did.

7    Q.  How did it arrive?

8    A.  It came in four boxes, kind of, shoebox-size

9    boxes.

10   Q.  What'd you do when the money (sic) came in?

11   A.  I let it sit there.

12   Q.  Did Noah call?

13   A.  He called, and he had me open it, and he talked

14   me through opening the box, taking out the gold,

15   laying out the gold, counting the gold, taking a

16   picture of the gold.

17   Q.  He wanted pictures of the gold?

18   A.  He wanted pictures of the gold, and we did that

19   with each box.

20   Q.  So you got all these gold bars laid out and

21   sent him pictures?

22   A.  Well, I put them back in the box and then --

23   Q.  Took out the next box?

24   A.  -- each box at a time, yeah.

25   Q.  What did you do with the pictures?  Did you

LUTZ - DIRECT/REED                              Vol. 1 - 78

1    send them to him?

2    A.  Yes.

3    Q.  Do you still have those pictures on your

4    phone?

5    A.  No, he wanted me to delete them.

6    Q.  Did you do that?

7    A.  I did.  I'm kicking myself now, but --

8    Q.  Hindsight, right?  Hindsight, yeah.

9            You took pictures of the bars?  You

10   deleted the pictures of the bars.  What did Noah

11   have you do next?

12   A.  He had me package them back up into two

13   boxes.

14   Q.  Okay.  Consolidate them a little?

15   A.  Yeah, consolidate them into two boxes.

16   Q.  So how did Noah get the gold bars?

17   A.  He told me that a courier would come to pick up

18   the bars and that he would be driving a maroon or a

19   dark brown car.

20   Q.  Okay.

21   A.  And I was to take the boxes out to the car, and

22   he would open the trunk of the car, and I was to

23   set the boxes in there and go back to my room.

24   Q.  Did the courier come that same day when you got

25   all the gold bars?

LUTZ - DIRECT/REED                          Vol. 1 - 79

1   A.  Yes -- no.  I think that was the next day.

2   Q.  The next day after --

3   A.  Yeah, that the car came, and Noah had called me

4   that he was arriving in the parking lot and that I

5   was to get ready to take the bars to the car.

6   Q.  Did he tell you where the car was parked when

7   the courier pulled in?

8   A.  That the car would be parked in the front of

9   the building on the far right-hand side facing the

10  building.

11          MR. REED:  If we go back to Exhibit 20, if

12  you can pull that back up.

13  BY MR. REED:

14  Q.  Now, of course, that white car isn't -- wasn't

15  there that day --

16  A.  No.

17  Q.  -- but compared to where that white car is

18  parked, where did he tell you the car would be?

19  A.  At the very first parking spot.

20  Q.  Over here?

21  A.  Yeah, basically, about where the white car

22  is.

23  Q.  Okay.

24  A.  That morning there were no cars there.  Just

25  his car.

LUTZ - DIRECT/REED                         Vol. 1 - 80

1    Q. But he parked at the far right side of the

2    screen?

3    A. Yes.

4    Q. So Noah calls you and tells you he's parked

5    down there?

6    A. That the courier has arrived, go out to the

7    front of the building with the gold, that he would

8    open the trunk, and that I was to drop the boxes

9    into the trunk of the car.

10   Q. Now, we haven't talked about this.  It was a

11   lot of gold, right?  $188,000 of gold, right?

12   A. Yes.

13   Q. What would you -- five pounds?

14   A. Easily.

15   Q. Easily.  Like a bag of flour or heavier?

16   A. Yeah.

17   Q. Were you able to carry all that weight?

18   A. No, no, no, no.

19   Q. So what did you do?

20   A. Well, when I moved, my husband had a walker

21   when he was ill, and I thought, you know, maybe I

22   should take it with me because the day is going to

23   come when I'm going to need it.  So I took it with

24   me, and so I had it in my room, and so I just used

25   the wheelchair -- or the -- not a wheelchair, but

LUTZ - DIRECT/REED                          Vol. 1 - 81

1    the walker was the one where the seat flips down

2    and you can sit on it.

3    Q.  Okay.

4    A.  So I put the boxes on it and my oxygen on it,

5    and I wheeled it to the front of the door and out

6    to the car.

7    Q.  How long would it take you to get from your

8    room to the front door?

9    A.  It took about 15 minutes from my room to the

10   front door.

11   Q.  And how long do you think it would have taken

12   you to get from the front door here to where

13   Mr. Patel was parked?

14   A.  A couple of minutes at least.

15   Q.  Did you see the car when you walked out the

16   door?

17   A.  Yes.

18   Q.  What color was it?

19   A.  Maroon.

20   Q.  What else did you notice about the car --

21   A.  I noticed that the emblem on the car was a

22   Nissan emblem.

23   Q.  And what else did you notice about the car?

24   A.  I noticed that the license plate was from

25   Illinois.

LUTZ - DIRECT/REED                               Vol. 1 - 82

1    Q. As you're walking down the sidewalk, what did

2    you notice about the driver of the vehicle?

3    A.  It was cold that day, and he had like a

4    ski-mask thing on half of his face and kind of a

5    beanie type knit cap on.  That's what I noticed.

6    Q. When you walked out the front door, were you on

7    the phone?

8    A.  Unh-unh.

9    Q.  Did you notice whether the driver was on the

10   phone as you came?

11   A.  I kind of thought he was.

12   Q.  Okay.

13   A.  That thought crossed my mind, yeah.

14   Q.  What did you do when you got to the car?

15   A.  Well, when I got to the car, I headed towards

16   the trunk.

17   Q.  Okay.

18   A.  And he rolled down his side window and he

19   looked -- glanced back at me and pointed -- rolled

20   down his back window.

21   Q.  The back --

22   A.  The back window of the car.

23   Q.  The back, rear passenger window?

24   A.  Yeah, and then rolled down the driver's side

25   maybe a quarter of the way and glanced at me and

1    pointed to the back seat, and I said, "In the

2    seat?"  He didn't say anything, but he just

3    motioned the seat, so I dropped it in the window

4    and went back to my room.

5    Q.  Did the driver say anything at all to you?

6    A.  No.

7    Q.  Did he give you a receipt?

8    A.  No.

9    Q.  Were there any markings on the car suggesting

10   it was an Uber or a Lyft or a FedEx or anything

11   like that?

12   A.  No.

13   Q.  Where did the driver look as you're approaching

14   the car?  Is he looking towards you?

15   A.  He was looking straight ahead.

16   Q.  So as you got back to your room, what stood out

17   to you about this interaction with the driver?

18   A.  I thought it was strange.

19   Q.  Why?

20   A.  Well, I thought he should have been a little

21   friendlier.  Yeah, it started me thinking something

22   doesn't feel right.

23   Q.  This guy is being sent by the Treasury

24   Department according to Noah?

25   A.  Yeah, and he's a courier.  Why would he be so

LUTZ - DIRECT/REED                          Vol. 1 - 84

1    unfriendly?

2    Q.  Did you keep talking to Noah after the gold was

3    picked up?

4    A.  He called me right away.

5    Q.  What are you thinking about at this point?

6    A.  I'm thinking something's wrong.

7    Q.  What did Noah say to you at that point?

8    A.  I don't really recall.

9    Q.  Did you express your doubts to him?

10   A.  Well, I think I said at one point, "Are you

11   sure this isn't a scam?"  "No, no, no, no, no, you

12   don't understand.  This is the way we have to do

13   things to get this money through the system and out

14   of the banks and protected on your behalf.  The

15   money that you put in the car is going to go

16   directly to the Treasury Department, and then it

17   will be submitted into your account for a cashier's

18   check to be written for you that will be delivered

19   to you by two agents."

20   Q.  Did you ever ask him where is my cashier's

21   check?  Where's the agents?

22   A.  On the last day I did, yeah.

23   Q.  Did the courier in the maroon car come back a

24   second time?

25   A.  He did.

LUTZ - DIRECT/REED                          Vol. 1 - 85

1    Q.  For more cash?

2    A.  Yeah.

3    Q.  How did you get the cash?

4    A.  That was the final -- final installation.

5    Q.  Did you have to go back to the bank to get the

6    cash?

7    A.  Yes.

8    Q.  Who took you there?

9    A.  The boys.

10   Q.  What did Noah say when you got back to

11   Christina House with the cash this time?

12   A.  He said that the courier was going to return to

13   pick this up, and it would be taken to the Treasury

14   Department office to be processed through the

15   system.

16   Q.  How did you know when the courier had arrived

17   outside the --

18   A.  He called me.

19   Q.  Did you go downstairs and out the door with the

20   box?

21   A.  Yes.

22   Q.  Was the courier there just like Noah said he

23   would be?

24   A.  Yes.

25   Q.  Same car?

LUTZ - DIRECT/REED                              Vol. 1 - 86

1    A.  Same car, same person.

2    Q.  Where was he parked?

3    A.  Same place.

4    Q.  Did you have your oxygen tank with you this

5    time?  The oxygen packet like you do today?

6    A.  Yeah, I always have -- when I walk a great

7    distance, I have to have it.

8    Q.  Did you bring the walker this time?

9    A.  No.

10   Q.  So this time you walk out the door, you have

11   the oxygen tank in the box but not the walker?

12   A.  Right.

13   Q.  How long do you think it took you to get from

14   the front door over to the car?

15   A.  It took a couple of minutes probably.

16   Q.  Did the driver look your way as you're walking

17   down the sidewalk?

18   A.  I don't know.

19   Q.  Any eye contact?

20   A.  No, not the second time.

21   Q.  What did you do when you got to the car?

22   A.  I knew the drill.  Drop it in the back seat.

23   Q.  Did the driver say anything to you?

24   A.  No.

25   Q.  You said the first time that he just looked

LUTZ - DIRECT/REED                          Vol. 1 - 87

1    straight ahead?

2    A.  He was just looking straight ahead.

3    Q.  Same thing again?

4    A.  Same thing.  The only time he looked at me or

5    in my direction is when he motioned that I put it

6    in the back seat.

7    Q.  Did he give you a receipt this time?

8    A.  No.

9    Q.  Were there any markings on the car?

10   A.  No.

11   Q.  Did you sign anything when you turned that

12   money over to him?

13   A.  No.

14   Q.  Any acknowledgement at all from the driver?

15   A.  No.

16   Q.  Okay.  Did you go back inside?

17   A.  I did and Noah called me.

18   Q.  Noah kept calling you?

19   A.  Yes.

20   Q.  Did he ask you about a silver coin collection

21   at some point?

22   A.  Yeah.  In him convincing me to do these things,

23   my husband had been a collector of many things, and

24   he had a coin collection, specifically, some silver

25   coins that date back to the early days, 1800s

1    silver, and I had mentioned that just in

2    conversation.  So he called back and he wanted to

3    talk about the silver coins; and I said, Well,

4    those aren't included because those are separate

5    from my money.  Those are designated for my

6    grandchildren.  That's their inheritance,

7    basically, or part of it.

8    Q.  Did the fact that he was asking about these

9    coins -- was that a red flag for you?

10   A.  Yeah.

11   Q.  Why?

12   A.  I thought why would -- I said you can't have

13   those.

14   Q.  The story was that someone has gotten in your

15   bank accounts, right?

16   A.  Yeah.

17   Q.  Were the coins in your bank account?

18   A.  The coins were in a safe deposit box at the

19   bank.  He kept wanting me to go get them, and I

20   said no, these aren't included in this deal.

21   Q.  What did he say to that?

22   A.  Well, he wanted me to go get them.

23   Q.  Kept going back and forth?

24   A.  Kind of pressuring me, and then, he said,

25   "Here, my partner wants to talk with you."  So this

LUTZ - DIRECT/REED                              Vol. 1 - 89

1   other person, apparently, got on the phone, and he

2   started talking, and I said, "Noah?"

3   Q.  The same guy --

4   A.  It was the same guy.  He was just trying to --

5   and that's when I knew I was in trouble, so I got

6   on the phone and called the sheriff's department.

7   Q.  As you sit here today, do you believe that

8   anything Noah told you was true?

9   A.  No.

10  Q.  Do you believe he worked for the Treasury

11  Department?

12  A.  No.

13  Q.  It was all a scam?

14  A.  It all was a scam.  It's a pretty sneaky

15  scam.

16  Q.  Did you ever get any of your money back?

17  A.  I got a return of the box with the shoes.

18  Q.  The very first one?

19  A.  It was intercepted.  I guess the dogs smelled

20  it.

21  Q.  So the very first box, the one we looked at

22  with the shoes?

23  A.  Yeah --

24  Q.  That's the one that got --

25  A.  I got 25,000 back, yeah.

LUTZ - DIRECT/REED                              Vol. 1 - 90

1    Q. -- intercepted?

2           MR. REED:  Okay.  If we could put up

3    Exhibit 26 for the witness, please.  If we could

4    just look at the second page as well.

5    BY MR. REED:

6    Q. Vonda, do you recognize these pages?

7    A. Yes.

8    Q. Are these pages that you got from where the

9    first box was intercepted?

10   A. Yes.

11          MR. REED:  Move to admit 26, please.

12          MS. FRETER:  No objection.

13          THE COURT:  What's the number?

14          MR. REED:  26, Judge.

15          THE COURT:  26 will be admitted without

16   objection.

17          (Government's Exhibit No. 26 was received

18   in evidence.)

19          MR. REED:  Can we publish that for the

20   jury.

21   BY MR. REED:

22   Q. It says at the top here, Jefferson County

23   Sheriff's Office, Louisville Kentucky?

24   A. Yes.

25   Q. What happened in Louisville, Kentucky?

LUTZ - DIRECT/REED                                    Vol. 1 - 91

1    A.  Apparently, they intercepted the box.  I guess
2    they have dogs that sniff the boxes.
3    Q.  And they found yours?
4    A.  It had money in it.
5    Q.  This letter on the front here, it's dated
6    December 16th of 2022, is this when you heard that
7    your package had been interpreted?
8    A.  Uh-huh.
9           MR. REED:  And then page 2, if you could
10   zoom in at the check on the bottom, please.  Just
11   the check.
12   BY MR. REED:
13   Q.  The 25,000 you got back?
14   A.  Yes.
15   Q.  When did you get your money back?
16   A.  Well, I think it was around the 5th or 6th
17   maybe.
18   Q.  February of 2023?
19   A.  Yeah.
20   Q.  Did you get any other money back other than
21   this 25,000?
22   A.  No.
23           MR. REED:  You can take that down.
24   BY MR. REED:
25   Q.  Vonda, how did this experience impact your

LUTZ - DIRECT/REED                          Vol. 1 - 92

1    life?

2    A.  It destroyed it.

3    Q.  Tell us about that.

4    A.  Well, I had plans of things I'd like to do.  I

5    was hopeful that as -- since I had moved from

6    Arizona, which was high altitude, we lived at

7    almost 5,000 feet, and I could barely -- I was on

8    oxygen 24 hours a day, around the clock.  I was

9    hopeful that when I got to an elevation that I

10   could handle, that things would improve, and I was

11   hopeful I could buy a car and do some things that

12   I'd like to do plus live an independent life and

13   take care of myself and not beholden to others

14   because that's the last thing I wanted in my life,

15   to be dependent on someone.

16   Q.  What about non-financial impacts, how did this

17   impact you in other ways?

18   A.  It makes me very distrustful of people.  Being

19   a nurse, I always liked to talk to people and hear

20   their story and just talk to people, and now I'm

21   afraid to talk to anyone.  I'm embarrassed by this.

22   I don't want to share this information about what

23   happened to me.  I don't want to live this way.

24   I'm really not very happy.

25            MR. REED:  No further questions, Judge.

1    Pass the witness.

2                     **CROSS-EXAMINATION**

3    BY MS. FRETER:

4    Q.  Ms. Lutz -- is it Lutz?

5    A.  Lutz, yes.

6    Q.  About how many times do you think you talked to

7    Noah?

8    A.  Every day.

9    Q.  For --

10   A.  From the time he first contacted me.

11   Q.  And so would that be like a couple of months?

12   A.  Yeah.

13   Q.  Okay.  And did you have a cell phone or a

14   landline or both?

15   A.  Cell phone.

16   Q.  And do you remember, did you give him the

17   number, or how did he get that number?

18   A.  The first call from the Amazon, he had my

19   number.

20   Q.  Did you call in to Amazon or did Amazon call

21   you?

22   A.  I called Amazon help desk or order desk to see

23   why they were questioning my order.

24   Q.  And that was in response to an email you were

25   using?

1    A.  Yes.

2    Q.  And did you look at the email on a computer or

3    on a phone?

4    A.  It was on my phone.

5    Q.  And was it a smartphone like you can --

6    A.  It's an iPhone.

7    Q.  An iPhone, okay.

8           And was it that same phone that you were

9    using then to talk to this Noah person?

10   A.  Yes.

11   Q.  And so every day for a couple of months, what

12   did Noah sound like?  What kind of voice did Noah

13   have?

14   A.  I could tell that he had a foreign accent.

15   Q.  Was it an accent where you couldn't understand

16   what he was saying?

17   A.  No, he spoke English very well.  The accent he

18   had was very slight so that I couldn't really

19   pinpoint what kind of accent it was.

20   Q.  So not Midwestern-type English but some kind of

21   accent, but you weren't exactly sure what it is?

22   A.  Right.  Well, at first I thought, well, is he

23   Spanish, but the more he talked -- and I had worked

24   with Spanish people because I worked in California,

25   so I worked with Mexican people, so I know that

LUTZ - CROSS/FRETER                          Vol. 1 - 95

1    accent pretty well, and it wasn't that.

2    Q.  The time where he pretended to be his partner

3    or somebody else, did he switch up his voice or

4    accent?

5    A.  He tried to, but I could tell it was the same

6    voice.

7    Q.  And so what did he try to make it sound like?

8    A.  I'm not sure.

9    Q.  Just something different?

10   A.  Just different.

11   Q.  Did he get rid of his accent, or was it still

12   there?  Do you remember?

13   A.  He really had a very slight accent, so it was

14   hard to say, and I can't even think about specific

15   words that were more accent prone.  It was very

16   slight.

17   Q.  And -- okay.  And you didn't have any problems

18   communicating with him or understanding?

19   A.  No.

20   Q.  And you guys talked about your family, your

21   kid, your husband?

22   A.  Yeah.  He small talked while we were waiting

23   for things to happen, and he shared family, that he

24   had a daughter and that his sister had been scammed

25   by these people, so he really wanted to catch

LUTZ - CROSS/FRETER                    Vol. 1 - 96

1   people like this.

2   Q. And then he had you take pictures of the box

3   that you sent with the gold bars; is that right?

4   A. Uh-huh.

5   Q. And so for the court reporter, instead of

6   "uh-huh" or "unh-unh," I'm going to get you to say

7   yes or no.

8   A. Oh, yes.  I'm sorry.

9   Q. It's okay.  It's hard to remember.

10          And did you take those with your iPhone?

11  A. Yes.

12  Q. And did you delete those afterwards?

13  A. He told me to delete them.

14  Q. And you did that?

15  A. And I did that.

16  Q. And was that after you put the bars in the car

17  or before?  When did he tell you to delete those?

18  Like in the --

19  A. Right after we boxed them up.

20  Q. Okay.  They came in boxes, right?

21  A. Uh-huh.

22  Q. I got to get you to say --

23  A. Yes.  I'm sorry.

24  Q. It's okay.

25          And then you took them out and looked at

1    them?

2    A.  Yes.

3    Q.  And took pictures at his direction, and did you

4    text them or email them?

5    A.  I sent them to him, yes, text messaging.

6    Q.  Text message.  So you were sending them to a

7    phone number, not an email?

8    A.  To his phone.

9    Q.  Did you save his phone number anywhere?

10   A.  No, but I think I reported it to the police.

11   Q.  So you send him the pictures, and then are you

12   back on the phone with him again?

13   A.  I'm on the phone with him the whole time.

14   Q.  The whole time?

15   A.  Yeah.

16   Q.  You take the pictures, and then he says delete

17   the pictures?

18   A.  Uh-huh.

19   Q.  And did he say why?

20   A.  I think I may have said why are we doing that,

21   and he said something like you really don't need

22   them now.  We've got them in your file.

23   Q.  And --

24   A.  I almost didn't.

25   Q.  You almost didn't?

LUTZ - CROSS/FRETER                        Vol. 1 - 98

1    A.  You almost didn't.

2    Q.  Because why?

3    A.  I was getting suspicious.

4    Q.  Did you have -- with your phone, did you have,

5    like, memory issues or something that, like, if you

6    delete pictures or issues, it gives you more space?

7    Did you have that kind of problem or not really?

8    A.  No.

9    Q.  Did he have you take pictures of anything

10   else?

11   A.  Just the boxes and the receipts and the things

12   through the whole process.

13   Q.  Okay.  So you took pictures -- I don't think I

14   understood that right.

15            You took pictures of more than just the

16   gold bar thing; is that right?

17   A.  Uh-huh.

18   Q.  And I've got to get you to say yes or no.

19   A.  Yes.

20   Q.  Sorry.  And so the very first time the "burger

21   boys" take you to UPS, right?

22   A.  Yes.

23   Q.  Let's talk about those guys.  What did they

24   look like?  You said they were really overweight?

25   A.  Yes.

LUTZ - CROSS/FRETER                        Vol. 1 - 99

1    Q.  Were they white or black, or what did they look
2    like?
3    A.  They were white.  A father and son.  The father
4    was middle-aged, probably in his fifties maybe,
5    fiftyish.  He was over 300 pounds.
6    Q.  Okay.
7    A.  He told me that he recently had a stroke, so
8    his son came with him to drive, and the son was
9    about twenty years old, equally as large or more.
10   Q.  And did they look like each other, or is it
11   just them telling you they were father and son?
12   A.  They acted like a father and a son.
13   Q.  Okay.  Did you guys -- you said it was pretty
14   close between your house and the bank.  Was it a
15   couple miles?
16   A.  Maybe a mile and a half, two miles.
17   Q.  And you guys would talk on the way there, they
18   would wait for you, and then they would bring you
19   back?
20   A.  They would just tell me that they're a cab
21   service, and they have a limousine, and this is why
22   we're using the truck because all their vehicles
23   are out on the road.
24   Q.  And then an F-150, did it have an extended cab
25   where you had to get in the back?  Were you in a

LUTZ - CROSS/FRETER                    Vol. 1 - 100

1   front passenger?  Like where did you sit?

2   A.  Yeah, it had the double cab.

3   Q.  Okay.  Did you sit in the front or the back?

4   A.  Back seat.

5   Q.  It's hard to get in and out of?

6   A.  Very hard to get in and out of.

7   Q.  And you got in and out of that truck, was it,

8   three or four times to go to the bank?

9   A.  Uh-huh.

10  Q.  And then another two or three times to go to

11  UPS?

12  A.  Yes.

13  Q.  And the --

14  A.  It was very difficult to step up into that

15  truck because --

16  Q.  You got to grab the thing and pull up?

17  A.  I had to climb into it.

18  Q.  Right.  Because how tall are you?

19  A.  I'm short.

20  Q.  Me too.

21  A.  I'm 5-3, and so for me to step up on the -- I

22  really had to grab the bar up top and the seat and

23  pretty much pull myself up.

24  Q.  And so did you ever get their names, the

25  "burger boys'" names?

LUTZ - CROSS/FRETER                          Vol. 1 - 101

1    A.  I know that the boy's name was John because I

2    was kind of teasing with him one of the times when

3    we went to the bank, and I said, "Home, James," and

4    he said, "My name is John."  I was teasing him with

5    "Home, James" --

6    Q.  Sure.

7    A.  -- but he didn't get it.  He was too young.

8    Q.  Because that's like a chauffeur kind of joke?

9    A.  Yeah, it's an old term.  You have to be old to

10   understand it.

11   Q.  And they didn't have accents?

12   A.  No, no.

13   Q.  They're just white guys?

14   A.  Yep, yep.

15   Q.  And when they take you to the bank, do you --

16   at any time when you go to the bank, do you talk to

17   any of the bank or the tellers or the folks in the

18   bank other than to just withdraw money and leave?

19   A.  No.  They would ask me, "Are you sure this is

20   okay?"  And I would say, "Yes."

21   Q.  And then the "burger boys" would take you back

22   home, they'd wait for you to package up whatever

23   you had, and then they'd drive you to UPS?

24   A.  Yeah, I believe they were instructed to wait

25   for me.

LUTZ - CROSS/FRETER                    Vol. 1 - 102

1    Q.  And why do you feel that way?

2    A.  Because as soon as I would get out, I would see

3    him pick up his phone.

4            THE COURT:  We're about ready for a break.

5    We're past due for a break.  How much do you have

6    to go?  Do you have a while you think?

7            MS. FRETER:  I wouldn't say a lot but a

8    couple questions probably.

9            THE COURT:  More than five minutes?

10           MS. FRETER:  I can do it in five.

11           THE COURT:  I don't want to rush you.  I'm

12   just trying to figure out.  We need to give

13   breaks.

14   BY MS. FRETER:

15   Q.  Did you take pictures -- the first box that you

16   sent with the shoes, did you take pictures of

17   that?

18   A.  Yes, I did.

19   Q.  Okay.  And did you delete those also?

20   A.  Yes.

21   Q.  Okay.  And that was because Noah told you to do

22   that?

23   A.  Right.

24   Q.  And then was there another -- there was just an

25   envelope with cash in it?

LUTZ - CROSS/FRETER                    Vol. 1 - 103

1    A.  Yes.

2    Q.  And did you take pictures of that?

3    A.  No -- well, for him, yes, and then I deleted

4    it.

5    Q.  And then you deleted it?

6    A.  Right.

7    Q.  And then it was the pictures of the gold bars

8    that got deleted, right?

9    A.  Yes.

10   Q.  And then is there one more?

11   A.  Yes.

12   Q.  And you took pictures of that?

13   A.  Yes.

14   Q.  And you deleted that?

15   A.  Right.

16   Q.  And when you went to the car to talk to -- put

17   the gold bars in, you said you said something to

18   the driver, right?

19   A.  Well, Noah had instructed me to drop it in the

20   trunk; but when I went outside, he didn't flip the

21   trunk open.  He rolled down the back window, and I

22   said, "In the back seat?"  And he motioned yes.

23   Q.  And so because you didn't have conversation,

24   you don't know whether he understood what you were

25   saying or spoke English?  You don't know that?

1    A.  No.

2    Q.  And was it the same person the next back seat

3    delivery that you had --

4    A.  Yes.

5    Q.  -- as the first one?

6    A.  Yes.

7    Q.  And you saw or felt that the driver for that

8    was also on the phone; is that right?

9    A.  Yes.

10   Q.  And both of the times -- in fact, all of the

11   times you were able to go to these cars with

12   difficulty, but you were able to do it on your own;

13   is that right?

14   A.  Yeah, or with my walker, yes.

15   Q.  With your walker, but you didn't have any staff

16   from the house helping you?

17   A.  No.

18   Q.  In fact, you pushed all those gold bars

19   yourself on the walker, right?

20   A.  On the wheeled walker, yes.

21   Q.  They're heavy?

22   A.  Not on the wheels.

23   Q.  Okay.

24   A.  The walker wheels are very easy to push, so

25   no.

LUTZ - CROSS/FRETER                          Vol. 1 - 105

1   Q.  And then other than telling you to put shoes

2   and items in the box, did Noah tell you any other

3   way to package the items?

4   A.  No, just wanted to add weight to the box.

5   Q.  And one of the UPS boxes, it says that there's

6   clothes and miscellaneous items in there and that

7   you declined the insurance?

8   A.  That's what he told me to say.

9   Q.  And that's what you did?

10  A.  Yes.

11  Q.  And then the other one, it says it's

12  miscellaneous medical papers or something?

13  A.  That's what he told me to say.

14  Q.  And that's what you did?

15  A.  Yes.

16       MS. FRETER:  I don't have anything

17  further.

18       MR. REED:  No questions, ma'am.  You're

19  all done.

20       THE COURT:  Mr. Reed, how long do you

21  have?

22       MR. REED:  I'm done with her, Judge.  No

23  questions.

24       THE COURT:  You have no redirect?

25       MR. REED:  No, Judge.

LUTZ - CROSS/FRETER                          Vol. 1 - 106

1          THE COURT:  All right.  Thank you, ma'am.

2     You may step down.

3          (Witness excused.)

4          We're going to take a recess.  Let's come

5     back at 20 minutes to four.  This is your first

6     break, and you will be going this direction into

7     the jury room.  So I need to remind you -- I'm not

8     going to do this every time, but I need to do it

9     regularly and that you may not communicate with

10    anyone about this case on your cell phone, through

11    email, iPhone, text messaging or Twitter or X or

12    through any blog or website, through any Internet

13    chat room or by way of any social networking

14    websites, including Facebook, Instagram, Snapchat

15    LinkedIn or YouTube.

16          If anyone approaches you or tries to talk

17    about the case, do not tell your fellow jurors, but

18    advise me about it immediately.  Do not read or

19    listen to any news reports of this trial.

20          Finally, remember to keep an open mind

21    until all the evidence has been received and you

22    have heard the views of your fellow jurors.  Okay.

23          (Recess at 3:25 p.m. until 3:43 p.m.)

24          (Jury present.)

25          THE COURT:  All right.  Please be seated.

MARTIN - DIRECT/REED                        Vol. 1 - 107

1          All right.  Call your next witness.

2          MR. REED:  Judge, the Government calls

3     Kody Martin, K-o-d-y, Martin.

4          COURTROOM DEPUTY:  Please raise your right

5     hand.

6          (Witness sworn.)

7          COURTROOM DEPUTY:  Please state your full

8     name and spell your last name for the Court.

9          THE COURT:  Kody Martin, last name is

10    M-a-r-t-i-n.

11         COURTROOM DEPUTY:  Thank you so much.

12         **KODY MARTIN, GOVERNMENT'S WITNESS,**

13                 **DIRECT EXAMINATION**

14    BY MR. REED:

15    Q.  Good afternoon, sir.  Thank you for your time

16    today.

17         Where do you work, sir?

18    A.  I work for the City of Franklin Police

19    Department in Franklin, Indiana.

20    Q.  How long have you worked for the Franklin

21    Police Department?

22    A.  It will be nine years at the end of this

23    month.

24    Q.  Before that, did you go to college?

25    A.  I did.  I did a two-year degree in law

MARTIN - DIRECT/REED                          Vol. 1 - 108

1    enforcement in Vincennes University in Vincennes,
2    Indiana.
3    Q.  What did do you after you graduated?
4    A.  After I graduated college, I worked for 19
5    months at a county jail in Montgomery County,
6    Indiana.
7    Q.  Did you complete any training before joining
8    Franklin Police Department?
9    A.  I did the required training to be a special
10   deputy or the basic training to start as a police
11   officer in Indiana prior to being hired by the
12   police department.
13   Q.  What was your role when you started at
14   Franklin?
15   A.  When I got hired with Franklin Police
16   Department, my role was as a patrol officer.
17   Q.  And when was that?
18   A.  That was February 22, 2016.
19   Q.  And how long were you a patrol officer?
20   A.  I was a patrol officer for a little over four
21   years until September of 2020.
22   Q.  And what happened in September of 2020?
23   A.  I became a detective with the police
24   department.
25   Q.  What does a detective do?

MARTIN - DIRECT/REED                    Vol. 1 - 109

1   A.  So we investigate anything that is outside the

2   normal range for patrol officers, so that could be

3   any witnesses or any alleged perpetrators that may

4   not live within our jurisdiction, could be doing

5   follow-up for patrol officers, and then any case

6   that requires any further investigation besides

7   just the basic who, what, when, where, why, talking

8   to two parties and moving on, more serious crimes

9   of that nature.

10  Q.  As a detective, were you assigned a fraud case

11  involving Vonda Lutz?

12  A.  I was.

13  Q.  How did you get involved?

14  A.  So our supervisors, our lieutenant and our

15  sergeant, review cases that are sent to the

16  investigation unit, and they then decide based upon

17  caseload, depending upon what your specialties may

18  be, if there is a specialty required, who gets

19  assigned that case.  I was assigned the case by my

20  supervisor.

21  Q.  How did you start your investigation?

22  A.  Very first thing that I did was I reviewed our

23  patrol officer's report for his initial contact

24  with Ms. Lutz.

25  Q.  Were you able to determine who was talking to

MARTIN - DIRECT/REED                          Vol. 1 - 110

1   Vonda Lutz on the phone?

2   A.  I was never able to actually determine the

3   identity of the person talking to Vonda.

4   Q.  Were there unknown vehicles involved as well?

5   A.  There were.

6   Q.  Let's talk about those.  Did you try to

7   identify the individuals in the black truck who

8   came and picked up Vonda and took her to the

9   bank?

10  A.  I did make attempts to identify them, yes.

11  Q.  What information did you have about those

12  individuals and their vehicle?

13  A.  I knew it that was a four-door, full-size Ford.

14  Other than that, it was very limited in that there

15  was two heavyset, white males that were in the

16  vehicle; and based off of that information, I was

17  not able to identify that truck.

18  Q.  Walk us through the steps that you took to try

19  to identify that vehicle and the people who owned

20  it.

21  A.  Yes.  So there were three different areas where

22  I attempted to obtain camera footage of the truck.

23  The first one was at First Merchants Bank, which is

24  the location where Ms. Lutz banked and withdrew

25  money and a money order from.  The bank did not

MARTIN - DIRECT/REED                    Vol. 1 - 111

1   have any cameras outside of the building except on

2   their ATM, and the location that Vonda had

3   described to me where the truck parked did not get

4   covered by that ATM camera footage.

5          The second one, I obtained a Court-ordered

6   subpoena to UPS, where Vonda had shipped a package

7   from, to try to get any sort of camera footage, and

8   they did not have any footage available inside that

9   store.

10          And then the last and third way, our city

11   has a -- they're license plate camera readers, it's

12   called the Flock system, and in the reported area

13   where that vehicle had traveled, there is one

14   camera that would have potentially have captured

15   that vehicle.  Both based between the fact that

16   those images only last for thirty days, from the

17   time that I got the report, we had already missed a

18   portion of that window, and finding a black,

19   full-size Ford, four-door truck, there was more

20   than just one that popped up.

21   Q.  So no luck at UPS, no luck at First Merchants,

22   no luck with the Flock cameras?

23   A.  Correct.

24   Q.  Did you also ask about cameras at Christina

25   Place where Vonda was staying?

MARTIN - DIRECT/REED                    Vol. 1 - 112

1   A.  Correct.  They have no exterior cameras.

2   Q.  Did you attempt to locate these two individuals

3   in Richmond?

4   A.  I followed all leads that I had, and I had no

5   luck in locating them.

6   Q.  Okay.  What about the other vehicle, did Vonda

7   tell you about another car?

8   A.  Yes.  So Vonda described to me a vehicle that

9   had picked up packages from her on two occasions.

10  It was a maroon Nissan Altima with Illinois license

11  plates.

12  Q.  What did you do to try to identify that vehicle

13  and the individual driving it?

14  A.  Yeah, so I was more limited with what Vonda had

15  reported to me.  That vehicle only came to

16  Christina House.  I already knew that Christina

17  House did not have camera footage on the outside of

18  the building.  I also attempted to utilize our

19  Flock camera system, the license plate reader.

20  Where the Christina House is located, there is no

21  Flock cameras that cover north of that, and that

22  vehicle never came into our town.  I didn't find

23  any Nissan Altima with Illinois license plates.

24  Q.  So no luck at that time identifying that

25  vehicle either?

1   A.  Correct.

2   Q.  Okay.  So let's talk about the packages that

3   Ms. Lutz sent.  After you spoke with Ms. Lutz, did

4   you go to her bank, First Merchants?

5   A.  I contacted them, I went there and then served

6   them with Court-ordered subpoenas at that time as

7   well.

8           MR. REED:  At this time, the Government

9   would move to admit Government's Exhibit 1 pursuant

10  to Rule 902.  It's the bank records if we can pull

11  them up.

12          MS. FRETER:  I think that this witness

13  needs to lay a little bit of foundation for that.

14          THE COURT:  I'm not hearing you.  I'm

15  sorry.  Is this an objection?

16          MS. FRETER:  Foundation.

17          MR. REED:  Judge, I think this was a

18  subject of a motion in limine.

19          THE COURT:  It's already been ruled on?

20          MR. REED:  Yes, Judge.

21          MS. FRETER:  So, Judge, this witness has

22  testified that he went to the bank, and the

23  Government is just saying I'm going to admit

24  Exhibit 1 without, sort of, the intermediary

25  identification and basic foundation questions

MARTIN - DIRECT/REED                    Vol. 1 - 114

1    relevant to an exhibit.

2            THE COURT:  Do a sidebar.

3            (Sidebar proceedings on the record.)

4            THE COURT:  All right.  Was there a -- so

5    there's no agreement ahead of time to admit this?

6            MS. FRETER:  Judge, the Court's ruled for

7    purposes of the banking record.  All I'm asking is

8    that this witness say I went into the bank, I'm

9    looking at Exhibit 1, these are the records I

10   picked up, so that he has some knowledge of it.

11   Not a long thing, but just --

12           THE COURT:  That's fine.

13           MR. REED:  Judge, by way of background,

14   the motion asked was subject to Rule 902, move all

15   the financial records, the gold records into the

16   record.  I can re-lay all that foundation, but I

17   don't think it's required by the rules.  It's

18   already been admitted.  It's already been ruled on

19   without objection.

20           THE COURT:  Just ask the two questions she

21   asked.

22           MR. REED:  All right.

23           (End of proceedings at sidebar.)

24   BY MR. REED:

25   Q.  I'm going to put Exhibit 1 up on the screen for

MARTIN - DIRECT/REED                    Vol. 1 - 115

1    the witness.  Did you subpoena First Merchants Bank
2    for the banking records of Vonda Lutz?
3    A.  I did.
4    Q.  Is that what we're looking here in Exhibit 1?
5    A.  Yes.
6            MR. REED:  Move to admit Exhibit 1.
7            MS. FRETER:  No objection.
8            THE COURT:  Admitted without objection.
9            (Government's Exhibit No. 1 was received
10   in evidence.)
11   BY MR. REED:
12   Q.  So let's start with that first package.  Go to
13   page 3.  What are we looking at here on page 3?
14   A.  So this is a checking account withdrawal slip
15   from First Merchants Bank that was dated October
16   27, 2022.  It's got Vonda Lutz' name and account
17   number on it, and it shows a withdrawal amount of
18   $30,000.
19   Q.  Okay.  And the date on there, I believe, is
20   October 27 of 2022.  Is that date consistent with
21   when Vonda told you she had sent the first
22   package?
23   A.  Yes, that was consistent.
24            MR. REED:  If we can pull up Government's
25   Exhibit 24, previously admitted, page 2.

MARTIN - DIRECT/REED                          Vol. 1 - 116

1    BY MR. REED:

2    Q.  The ship date up in the top left, is that also

3    October 27 of 2022?

4    A.  It is.

5    Q.  What happened to this package?

6    A.  This package was seized by the Jefferson County

7    Sheriff's Office in Kentucky.

8    Q.  On this page 2, this package is being sent to a

9    Kory Lawson with a California address.  Do you see

10   that?

11   A.  Yes.

12   Q.  Were you able to find Kory Lawson at this

13   address?

14   A.  No.  Through all records that I could search

15   through, there was no connection between this

16   address and a Kory Lawson or a Kory Lawson and a

17   close address to that.

18   Q.  Have you seen that before?

19   A.  I have, yes.

20   Q.  Where have you seen that before?

21   A.  The address not matching the name, sir?

22   Q.  Yes, sir.

23   A.  Consistent with somebody who is shipping a

24   package, but they don't want to ship it to their

25   home for whether it's nefarious reasons.  A lot of

1    times we see this in fraud cases or we see this

2    with people who use maybe a stolen credit card to

3    purchase items and have it shipped to maybe a

4    neighbor's address or just a general address where

5    they can go pick it up later.

6    Q.  So let's move on to the second package.  Back

7    to Exhibit 1, page 4.

8         MR. REED:  If you could zoom in on the

9    front part of that check, please.

10   BY MR. REED:

11   Q.  What are we looking at here?

12   A.  This is an official check that was drawn from

13   First Merchants Bank for Vonda Lutz in the amount

14   of $95,200.

15   Q.  And when was this check dated?

16   A.  November 2, 2022.

17   Q.  Who is it written to?

18   A.  The check is written to David Witkowski.

19         MR. REED:  If we can jump back out and

20   jump to the back of this check.

21   BY MR. REED:

22   Q.  Is the check endorsed?

23   A.  It is.

24   Q.  Can you tell who it is endorsed by?

25   A.  It appears that it is endorsed by David

MARTIN - DIRECT/REED                    Vol. 1 - 118

1    Witkowski.

2    Q.  Does that indicate to you that it was, in fact,

3    cashed?

4    A.  Yes.

5    Q.  Page 5, what are we looking at here?

6    A.  That is the official checking account

7    withdrawal slip for that previous check for $95,200

8    drawn from Vonda's checking account.

9    Q.  Okay.  So this is dated November 2, 2022?

10   A.  Correct.

11   Q.  Go back to Exhibit 24, please, page 4.  Up at

12   the top, there is a ship date.  Is it also November

13   2nd of 2022?

14   A.  It is.

15   Q.  Same date the check -- cashier's check was

16   drafted?

17   A.  Yes.

18   Q.  It says here that this was sent to this David

19   Witkowski in Couderay, Wisconsin.  Were you able to

20   figure anything out about David Wisconsin?

21   A.  I was not.  That address is actually a CVS.

22              THE COURT:  I'm sorry?  A what?

23              THE WITNESS:  A CVS Pharmacy.

24   BY MR. REED:

25   Q.  So the package was shipped to a CVS?

MARTIN - DIRECT/REED                    Vol. 1 - 119

1    A.  Yes.

2    Q.  To a desk?

3    A.  I don't know where it went to there.  I just --

4    to that location.

5    Q.  Let's move on to the third package that

6    contained the gold.

7         MR. REED:  If we can go back to Exhibit 1,

8    page 16, if you could zoom in there on the

9    transactions.

10   BY MR. REED:

11   Q.  Okay.  Let's see here.  It looks like November

12   18 of 2022 there's a wire out.  Do you see that?

13   A.  Yes, sir.

14   Q.  What was the amount of the wire?

15   A.  $188,318.66.

16   Q.  Were you able to determine where this wire

17   went?

18   A.  Yes.

19        MR. REED:  So page 17 of this exhibit, I

20   think it's the last page, okay.  Can we zoom in on

21   just the top half of this page?  There we go.

22   BY MR. REED:

23   Q.  Is this a record of that wire?

24   A.  It is, yes.

25   Q.  Okay.  Where did this wire originate?  Who is

MARTIN - DIRECT/REED                    Vol. 1 - 120

1    the sending bank and originator?

2    A.  From First Merchants Bank.

3    Q.  In Muncie, Indiana?

4    A.  Yes, sir.

5    Q.  And who is the originator?  Who is sending the

6    money?

7    A.  Vonda Lutz.

8    Q.  Okay.  What's the receiving bank?

9    A.  The receiving bank is listed as the BOKF NA out

10   of Tulsa, Oklahoma.

11   Q.  And who is the beneficiary of this $180,000?

12   A.  Yes, it's A-P-M-E-X.

13   Q.  And where is that BOKF NA?  You may have said

14   that?  Tulsa, Oklahoma?

15   A.  Yes, sir.

16           MR. REED:  All right.  If we could show

17   Exhibit 23 for the witness.

18           BY MR. REED:

19   Q.  Did you subpoena this APMEX -- I'll ask it this

20   way.  Do these appear to be records from APMEX?

21   A.  Yes.

22   Q.  And on page 1 here -- if we could zoom in on

23   the top part here -- do these appear to be records

24   for Vonda Lutz?

25   A.  Yes.

1          MR. REED:  Move to admit Exhibit 23.

2          MS. FRETER:  No objection.

3          THE COURT:  Admitted without objection.

4          (Government's Exhibit No. 23 was received

5    in evidence.)

6    BY MR. REED:

7    Q.  Go down to page 3.  See all those calls there?

8    This first record on 11-21, can you just read the

9    note in there?

10   A.  CID2940 at 389 called in asking about 0ID No.

11   2695576.  Stated that his grandmother placed the

12   order and is waiting a status -- wanting a status.

13   I apologize.

14   Q.  So someone asking about Vonda's order?

15          MS. FRETER:  Objection.  Calls for

16   speculation.

17          THE COURT:  What's your response?

18          MR. REED:  Judge, as you can see from the

19   face of it, there's a list of calls about Vonda's

20   records as he previously testified.

21          THE COURT:  All right.  So the document

22   speaks for itself.  Your question is -- what was

23   your question?

24          MR. REED:  Is this someone calling in

25   about Vonda's order?

1           THE COURT:  All right.  Sustained.

2           MR. REED:  Zoom back out, please.

3           THE COURT:  You have the bank record, and

4    this is with respect to only this transaction,

5    correct?

6           MR. REED:  Yes, Judge.  Absolutely.

7    BY MR. REED:

8    Q.  Okay.  Page 4, it's the next page down.  Is it

9    an order summary?

10   A.  Yes.

11   Q.  What's being purchased in the description?

12   A.  Yes, it is 2022 1-ounce American Gold Eagle

13   BU.

14   Q.  And how many of these are being purchased?

15   What is the quantity on the left side?

16   A.  Ninety-four.

17   Q.  So 94 pieces at 1 ounce each?

18   A.  According to this, yes, sir.

19   Q.  Sixteen ounces to a pound, so something like 5

20   pounds?

21   A.  Not great at math, sir.

22   Q.  Okay.  Sixteen ounces to a pound.  Ninety-four

23   total ounces?

24   A.  Yes.

25   Q.  How did this gold get from Vonda Lutz to the

1    bad guys?

2    A.  So Vonda reported to me in talking --

3          MS. FRETER:  Objection.  Hearsay.

4    BY MR. REED:

5    Q.  How did you know to look for the Nissan

6    Altima?

7    A.  I knew to look for the Nissan Altima because

8    that was the vehicle that was described to me as

9    the suspect vehicle picking packages up for both

10   this package of the gold and for another package

11   afterwards.

12         MR. REED:  Back to Exhibit No. 1, please,

13   if we could, page 1.

14   BY MR. REED:

15   Q.  What is this?

16   A.  This is a checking account withdrawal slip.

17   It's from First Merchants Bank.  It's signed by

18   Vonda Lutz, but there is a different account name,

19   and it was in the total of $10,000.

20   Q.  What's the date on this $10,000 withdrawal?

21   A.  November 30, 2022.

22   Q.  And then, page 2 as well, what are we looking

23   at here?

24   A.  It is also a checking account withdrawal on

25   November 30, 2022, in the amount of $14,500. It was

MARTIN - DIRECT/REED                    Vol. 1 - 124

1    signed for by Vonda Lutz.

2    Q.  Okay.  24,500 in total withdrawals?

3    A.  Yes, sir.

4    Q.  So these two withdrawals are in two different

5    accounts, right?

6    A.  Pardon me?

7    Q.  These two withdrawals, are they on different

8    accounts?  And we can look at it.  This is drawn

9    on -- 6674 is the account number?

10   A.  Yes.

11   Q.  If we go back up to page 1, and this account

12   number ends in 6666?

13   A.  Yes, sir.

14   Q.  Two different accounts?

15   A.  Yes.

16   Q.  Did Vonda tell you there would be a fourth

17   package somewhere around December 30th?

18   A.  Yes, sir.

19   Q.  You said earlier that you had tried to identify

20   that Nissan with Illinois plates, but you couldn't

21   find it?

22   A.  Correct, I did not find it.

23   Q.  Was that the end of the story with the Nissan

24   Altima?

25   A.  It was not.

MARTIN - DIRECT/REED                    Vol. 1 - 125

1    Q.  What happened?

2    A.  After putting my investigation together, I was

3    later contacted by another agency.  They informed

4    me that they had located a Nissan Altima that was

5    maroon in color with Illinois plates, and the

6    subject that was related to that, they found photos

7    of packages that Ms. Vonda had sent on that

8    subject's phone.

9           MR. REED:  So if we could go back here to

10   Exhibit 1 and start on page 14.  Okay.  I think

11   that's page 14 if we can just zoom in on the

12   account transaction information, and if you can

13   grab the account number as well, Sandra.  I

14   apologize.

15   BY MR. REED:

16   Q.  This is that account ending in 6666?

17   A.  Yes.

18           THE COURT:  What exhibit are we on?

19           MR. REED:  Exhibit 1, Judge.

20   BY MR. REED:

21   Q.  What's the balance at the top of this table?

22   A.  The balance from the deposit on October 13th,

23   2022, is $60,000.

24   Q.  And what's the final balance after that last

25   check?

MARTIN - CROSS/FRETER                    Vol. 1 - 126

1    A.  The current balance at the time that this was

2    given to me was $1,220.13.

3    Q.  Okay.  If we can move to the next page, and the

4    same account, and the number you just gave us is

5    the final current balance, $1,220.13?

6    A.  Yes.

7              MR. REED:  Page 16 if we could.

8    BY MR. REED:

9    Q.  This is the other account, the one ending in

10   6674?

11   A.  Correct.

12   Q.  What was the beginning balance here on October

13   13th?

14   A.  It's beginning balance October 13th, 2022, was

15   $299,250.47.

16   Q.  And what was left by the end?

17   A.  The final balance when this given to me was

18   $1,496.27.

19   Q.  So between the two accounts, about $360,000 to

20   less than $3,000 in those two months?

21   A.  Correct.

22             MR. REED:  No further questions.

23             MS. FRETER:  If the Government could put

24   back up that Exhibit 1.

25                      **CROSS-EXAMINATION**

1    BY MS. FRETER:

2    Q.  And the -- Detective, the page that we were

3    just on was page 16 of that exhibit; and so while

4    we're getting there, these are bank records that

5    you subpoenaed; is that right?

6    A.  Yes, ma'am.

7    Q.  And there's 17 pages contained in this exhibit.

8    Did you get more than 17 pages?

9    A.  I -- everything that I would have received was

10   prepared and put into my paperwork.

11   Q.  As you sit here today, do you remember how

12   much -- was it -- did you get electronic or on

13   paper?

14   A.  I got it electronically.

15   Q.  Do you remember how many pages you got?

16   A.  I printed it out.  So if you like, I have it in

17   here, so I can count and see if there is a

18   discrepancy.

19   Q.  Well --

20   A.  I don't recall.

21   Q.  But like there when you look at it, is it like

22   50 pages?  You've got it in your folder, right?

23   A.  This is my entire case file, so it's not just

24   the forms that are in front of us from Exhibit 1.

25   Q.  You subpoenaed bank records from two different

1    accounts?

2    A.  Correct.

3    Q.  And did you get more than 17 pages' worth of

4    records?

5    A.  I don't believe so.

6    Q.  Did you get bank statements for both of these

7    accounts?

8    A.  There are -- I don't believe specifically

9    labeled "Bank Statements."  I worked with the bank

10   to get records from the transactions that took

11   place and these records showing those

12   transactions.

13   Q.  Did you get the statements?

14   A.  Everything that I have is in the 17 pages

15   that's here.

16   Q.  Okay.  On page -- what is that -- 14, on

17   October 13th of '22, it says there's a deposit of

18   $60,000; is that right?

19   A.  Yes.

20   Q.  And then there's another deposit of $446 on

21   October 25th; is that right?

22   A.  Correct.

23   Q.  And then there's some checks written:  one for

24   $30,000 and one for $4,000; is that right?

25   A.  So the $30,000 would have coincided with the

MARTIN - CROSS/FRETER                    Vol. 1 - 129

1    $30,000 withdrawal.

2    Q.  Okay.  In this document from the bank on page

3    14, it says a check, right?

4    A.  Correct.

5    Q.  And then the next one down says check, right?

6    A.  Correct.

7    Q.  Okay.  And that's for $4,020, right?

8    A.  Correct.

9    Q.  And then it looks like -- when it says ACH,

10   does that mean it's like a transfer, electronic

11   transfer?

12   A.  For most banks, yes, that is either a transfer

13   or some sort of a transaction.

14   Q.  Okay.  And that went to Chase credit card?

15   A.  Yes, according to what the records say.

16   Q.  And then there's a $4,530 transfer to

17   Menards?

18   A.  Correct.

19   Q.  And then two more checks, one for $2,500?

20   A.  Yep.

21   Q.  And one for $1,500?

22   A.  Yes, ma'am.

23   Q.  One for a 1,101?

24   A.  Yes, ma'am.

25   Q.  And then on the next page, page 15, there is a

MARTIN - CROSS/FRETER                    Vol. 1 - 130

1    check for $120?

2    A.  Yes, ma'am.

3    Q.  A check for -- or it looks like ACH again, so

4    electronic transfer to Verizon for $330?

5    A.  And 98 cents, yes, ma'am.

6    Q.  And then a check for $10,000?

7    A.  Yes.

8    Q.  And then one for $4,154?

9    A.  Yes, ma'am.

10   Q.  And then on Government's 23, did you subpoena

11   these records?

12   A.  I did not subpoena these records.

13   Q.  And did you review these records?

14   A.  I did, yes.

15   Q.  Okay.  In preparation of your testimony here?

16   A.  Yes.

17          MS. FRETER:  I don't have anything

18   further.

19          MR. REED:  No redirect, Judge.

20          THE COURT:  All right.  You may step down.

21          (Witness excused.)

22          THE COURT:  All right.  Ladies and

23   gentlemen, it's ten after four, so we are going to

24   adjourn for the day.

25          Anybody going to have a problem by being

1    here by 9 a.m. to start?

2         All right.  So when you get home tonight,

3    people are going to ask you about this case.  Did

4    you get picked for the jury?  What kind of case is

5    it?  You can tell them that you have been picked

6    for jury duty.  It's a criminal matter.  It's

7    expected to take all week, and that other than

8    that, you can't discuss the case with them.  You

9    can't discuss the specifics.

10        And so each of you are going to invest a

11   significant number of time in this case, and the

12   reason we -- and I'll sound like a broken record.

13   I'm telling you not to do research, to go outside

14   of what you learn in this courtroom to find out

15   more about any of the parties, any of the things

16   you've heard, because if you do that, it could be

17   grounds for a mistrial.  So you wouldn't only waste

18   your time but you would waste the time of your

19   fellow jurors, and so we don't want that.

20        So don't communicate with anybody about

21   this case.  Don't text about it.  Don't blog about

22   it.  You'd be surprised how many people in jury

23   duty will go home, and they have some blog, and

24   they go through the events of the day, and they

25   talk about -- all about the case, and they talk

MARTIN - CROSS/FRETER                    Vol. 1 - 132

1    about the judge, the lawyers, the people.  Don't do

2    that.  It's just going to create problems.

3            At the end, you're going to be asked to

4    judge this case based upon the evidence that's

5    admitted here, and so we go through great lengths

6    to make sure that the evidence you get is evidence

7    that is proper for you to evaluate in determining

8    whether the Government has proved its allegations

9    beyond a reasonable doubt.

10           So you can't talk to each other about it.

11   If anybody attempts to talk to you about this case,

12   you're not to talk to them, but let me know first

13   thing tomorrow when you get in.

14           All right.  So we will see you back

15   here -- try to get here by 5 till, 10 till so that

16   we can start on time.  If there is a problem, you

17   get stopped by one of our very slow trains in East

18   St. Louis, don't panic.  You do have a number, you

19   can call Jackie, and we can help you out.  We don't

20   have inclement weather, but there are times we have

21   inclement weather and people are rushing to get

22   here.  I don't want you to take risks to get here

23   on time.  If there is a problem, let us know.  We

24   can deal with it.  So we will see you tomorrow.

25   Thank you.

MARTIN - CROSS/FRETER                    Vol. 1 - 133

1          (Proceedings recessed at 4:15 p.m. until

2    9:00 a.m. February 4, 2025.)

3

4                  * * * * * * * * * * * *

5

6                CERTIFICATE OF COURT REPORTER

7

8        I, Erin M. Materkowski, hereby certify that

9    the foregoing is a true and correct transcript from

10   reported proceedings in the above-entitled matter.

11

12   /s/ Erin M. Materkowski        Date: 06/30/2025
     ERIN M. MATERKOWSKI, RPR, CRR
13   Official Court Reporter
     Southern District of Illinois
14   East St. Louis Division

15

16

17

18

19

20

21

22

23

24

25