UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                ) Cause No.
     vs.                        ) 3:23-cr-30076-SPM-1
                                ) East St. Louis, IL
NIRAV B. PATEL,                 ) February 6, 2025
                                ) 9:08 a.m.
          Defendant.            )


Before the
HONORABLE JUDGE STEPHEN P. MCGYLNN

**TRANSCRIPT OF JURY TRIAL
VOLUME 4**


FOR PLAINTIFF:    Mr. Peter T. Reed
                  Mr. Steven D. Weinhoeft
                  United States Attorney's Office
                  9 Executive Drive
                  Fairview Heights, Illinois  62208
                  peter.reed@usdoj.gov
                  steven.weinhoeft@usdoj.gov


FOR DEFENDANT:    Ms. Kim C. Freter
                  Federal Public Defender's Office
                  650 Missouri Avenue, Suite G10A
                  East St. Louis, Illinois  62201
                  kim_freter@fd.org


INTERPRETERS:     Nita Shah and Chetan Vyas


COURT REPORTER:   Erin M. Materkowski, RPR, CRR
                  erin_materkowski@ilsd.uscourts.gov
                  750 Missouri Avenue
                  East St. Louis, IL  62201

(Proceedings taken by machine shorthand; transcript
produced by computer-aided transcription)

1

**INDEX**

2

**WITNESSES INDEX**

3      **PLAINTIFF'S WITNESSES**                                          **PAGE**

4      CONOR HOYLAND

5         Continued Direct By Mr. Reed........................ 676

6         Cross By Ms. Freter ................................. 703

7         Redirect By Mr. Reed................................ 718

8         Recross By Ms. Freter ............................... 722

9      GURDEEP KESAR

10        Direct By Mr. Reed.................................. 724

11        Cross By Ms. Freter ................................. 731

12        Redirect By Mr. Reed................................ 736

13     HARLEEN KAUR

14        Direct By Mr. Reed.................................. 737

15        Cross By Ms. Freter ................................. 761

16        Redirect By Mr. Reed................................ 800

17        Recross By Ms. Freter ............................... 804

18

19     **DEFENDANT'S WITNESSES**                                          **PAGE**

20     NIRAV PATEL

21        Direct By Ms. Freter................................ 819

22

23

24

25

1                       **INDEX**

2                   **EXHIBITS INDEX**

3  **EXHIBITS**                                **EVIDENCE**

4  Government's No. 4.................................. 745

5  Government's No. 5.................................. 757

6  Government's No. 6.................................. 731

7  Government's No. 70 ................................ 695

8  Government's No. 71 ................................ 695

9  Government's No. 72 ................................ 695

10  Government's No. 151................................ 685

11  Government's No. 152................................ 685

12  Government's No. 153................................ 685

13  Government's No. 154................................ 685

14  Government's No. 155................................ 685

15  Government's No. 156................................ 686

16  Government's No. 157................................ 686

17  Government's No. 158................................ 686

18  Government's No. 159................................ 701

19  Government's No. 160................................ 701

20  Government's No. 161................................ 678

21  Government's No. 162................................ 678

22  Government's No. 164................................ 678

23  Government's No. 165................................ 678

24  Government's No. 166................................ 681

25

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 676

1          (In open court.)

2          (Jury present at 9:08 a.m.)

3          THE COURT:  All right.  So we are still in

4    the direct examination of Mr. Hoyland.

5          Sir, you are still under oath.

6          **CONOR HOYLAND, GOVERNMENT'S WITNESS,**

7                **PREVIOUSLY SWORN**

8          **CONTINUED DIRECT EXAMINATION**

9    BY MR. REED:

10   Q.  Good morning, sir.

11   A.  Good morning.

12   Q.  Yesterday, I think, we left off with the

13   attempted interview of Mr. Patel?

14   A.  Yes.

15   Q.  And at some point that stopped before you asked

16   any substantive questions?

17   A.  That's correct.

18   Q.  But Mr. Patel made some voluntary statements?

19   A.  He did.

20   Q.  What were those?

21   A.  He spoke about 5 to $10,000, he also mentioned

22   it was his first time, and he said he was not

23   involved in this.

24   Q.  Okay.  After you left the interview room, later

25   that week, what did you do about -- excuse me.  Let

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 677

1    me start -- what did you do after seizing

2    Mr. Patel's phones?

3    A.  When they were initially taken from the car,

4    they were placed in what's called airplane mode.

5    That's to prevent anybody from remotely wiping them

6    to preserve the evidence.  I then obtained search

7    warrants for the devices.

8    Q.  Did you eventually make an extraction copy of

9    those two phones?

10   A.  Yes, I did.

11          MR. REED:  Can we put up Government's

12   Exhibit 161 for the witness.

13   BY MR. REED:

14   Q.  Is this call data you extracted from

15   Mr. Patel's iPhone?

16   A.  Yes, it is.

17   Q.  Does it include calls made through the WhatsApp

18   application?

19   A.  Yes, it does.

20          MR. REED:  Put up 162, please.

21   BY MR. REED:

22   Q.  Is this the Apple Map's data you extracted from

23   Mr. Patel's phone?

24   A.  Yes, it is.

25          MR. REED:  Put up 164, please.

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 678

1    BY MR. REED:

2    Q.  Is this the call data you extracted from the

3    other phone, the Android?

4    A.  Yes, it is.

5              MR. REED:  And 165, please.

6    BY MR. REED:

7    Q.  Is this the contacts data you extracted from

8    the Android phone?

9    A.  Yes, it is.

10   Q.  All of these documents, to the best of your

11   knowledge, do they truly and accurately report the

12   data from the Android and iPhone?

13   A.  Yes, they do.

14             MR. REED:  I move to admit 161, 162, 164,

15   165.

16             MS. FRETER:  No objection.

17             THE COURT:  Admitted without objection.

18             (Government's Exhibit Nos. 161, 162, 164

19   and 165 received in evidence.)

20             MR. REED:  Okay.  If we could publish 165

21   for the jury, page 47.

22   BY MR. REED:

23   Q.  Now, this is one of the phones seized in

24   Edwardsville, not Wisconsin, right?

25   A.  That is correct.

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 679

1    Q.  But if I direct your attention to Entry 234,

2    who is the contact in 234?

3    A.  Contact name is KTK with a mobile phone number

4    of (905) 437-10 -- or 0138.

5    Q.  During the course of your investigations, did

6    you contact law enforcement in Wisconsin?

7    A.  Yes, I did.

8    Q.  Did you read the Wisconsin police report?

9    A.  Yes, I did.

10   Q.  Did a KKT communicate with Patel about the

11   pickups up there?

12   A.  Yes, he did.

13   Q.  Does the phone number here on the other phone

14   for KTK match the phone number for KKT in the

15   Wisconsin phone?

16   A.  Yes, it does.

17            MR. REED:  Go to page 30 of this same

18   document.

19   BY MR. REED:

20   Q.  And just to -- KTK and KKT, same number?

21   A.  That's correct.

22   Q.  So the same number is in two different phones

23   under slightly different names?

24   A.  That is correct.

25   Q.  So on this page, is there an entry for a

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 680

1    Danny?

2    A.  Yes, there is.

3    Q.  And what's the phone number there?

4    A.  302 -- (302) 407-2090.

5    Q.  Same Danny that he was communicating with in

6    Wisconsin?

7    A.  Yes.

8              MR. REED:  If we could show Government's

9    Exhibit 166 for the witness.

10   BY MR. REED:

11   Q.  All those extraction reports we just moved into

12   evidence just now, fair to say they are many, many

13   pages long because of the amount of information in

14   Patel's phone?

15   A.  Yes.

16   Q.  Have you seen the chart that's on the screen

17   before?

18   A.  Yes, I have.

19   Q.  Does it accurately summarize call and map

20   information from those large PDFs we just looked

21   at?

22   A.  Yes, it does.

23             MR. REED:  Move to admit Exhibit 166 under

24   Rule 1006 as a summary to prove content.

25             MS. FRETER:  No objection.

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 681

1       THE COURT:  166 is admitted.

2       MR. REED:  If we could publish that for

3   the jury.

4       (Government's Exhibit No. 166 was received

5   in evidence.)

6   BY MR. REED:

7   Q.  All right.  What information is in the far left

8   column here on this sheet?

9   A.  That is going to be the call number which

10  corresponds to the previous summaries that were

11  shown.

12  Q.  And Android and iPhone, those are the two

13  phones recovered from Mr. Patel?

14  A.  That is correct.

15  Q.  And the next two columns, what are they going

16  to contain?

17  A.  That is going to be the date and time of the

18  call.

19  Q.  And also the duration?

20  A.  And the duration.

21  Q.  And the "from" and "to," is self-explanatory;

22  it is who made the call and who received the

23  call?

24  A.  That is correct.

25  Q.  Were some of these calls made through

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 682

1    WhatsApp?

2    A.  Yes, they were.

3    Q.  So let's start with the very first call here.

4    What happened?

5    A.  That is a call from Nirav Patel to the contact

6    Danny with a duration of 0 seconds, which would

7    mean that it did not connect.

8    Q.  Okay.  This was the day Nirav Patel was

9    arrested -- or was stopped in Wisconsin; is that

10   right?

11   A.  That is correct.

12   Q.  When does Danny reach back out again to Patel

13   after the stop in Wisconsin?

14   A.  March 2, 2023, at 4:53 p.m.

15   Q.  So the next several calls are in March?

16   A.  That is correct.

17   Q.  Who's on those calls in March of 2023?

18   A.  That will be Nirav and the contact Danny.

19            MR. REED:  If you can zoom back out.

20   BY MR. REED:

21   Q.  Okay.  Call No. 7, what date does this call

22   occur?

23   A.  It occurred on April 10, 2023, at 7:46 a.m.

24            MR. REED:  If we can zoom back up and pop

25   up all the 4-10 calls.

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 683

1  BY MR. REED:

2  Q.  What happened on April 10th?

3  A.  That would be the day of the first pickup from

4  Virginia Bryan's residence on Hollyhock Lane by the

5  scammers.

6  Q.  So after Danny contacts Nirav, is there another

7  call from another number?

8  A.  Yes, there's another call from the contact

9  "Pickup."

10  Q.  Is this how it was entered in Patel's phone?

11  A.  Yes, it was.

12  Q.  There's no name attached?  Just "Pickup"?

13  A.  No.  He created the contact with the name

14  "Pickup."

15  Q.  And let's see.  There are a number of contacts

16  with "Pickup" throughout the course of the day on

17  April 10th; is that fair?

18  A.  Yes.

19  Q.  One, two, three, four, five, six, seven, eight,

20  nine.  They're going back and forth all day long?

21  A.  Yes.

22  Q.  And the first set of calls -- well, Call 8, 9

23  and 10, about when do those happen?

24  A.  They all occurred between 3 and 3:30 p.m.

25  Q.  And then calls 11 through, say, 16, when are

1  those calls occurring?

2  A.  They all occurred between approximately 7:30

3  and 9:00 p.m.

4  Q.  When was -- approximately when did that pickup

5  occur on April 10th?  Was it dark outside?

6  A.  It was.  I don't recall the exact time.

7  Q.  Okay.  So a whole bunch of calls that

8  evening?

9  A.  Yes.

10  Q.  All right.  And then as we move down, Calls 17

11  and 18, he's still communicating with "Pickup"?

12  A.  Yes.

13  Q.  And now it's after ten?

14  A.  Correct.

15          MR. REED:  And then 19, 20 and 21, if we

16  can look at those as well.

17  BY MR. REED:

18  Q.  When are these calls occurring?

19  A.  Between 12:00 and 12:30 a.m.

20  Q.  Same night --

21  A.  Yes.

22  Q.  -- just after midnight?

23          Did you find any photos on Patel's phones

24  that were taken this same date, April 10th?

25  A.  Yes, I did.

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 685

1        MR. REED:  If we could show Government's

2    Exhibit 151 for the witness, please.  151, sorry.

3    BY MR. REED:

4    Q.  Is this one of those photos?

5    A.  Yes, it is.

6        MR. REED:  And 152 for the witness.

7    BY MR. REED:

8    Q.  Another April 10th photo?

9    A.  Yes, it is.

10   Q.  153, 154 and 155, all those photos were taken

11   on April 10th?

12   A.  Yes, they were.

13       MR. REED:  Move to admit 151 through

14   155.

15       MS. FRETER:  No objection.

16       THE COURT:  Be admitted.

17       (Government's Exhibit Nos. 151 through 155

18   received in evidence.)

19   BY MR. REED:

20   Q.  And then 156 is a video.  Was there also a

21   video taken on April 10th?

22   A.  There was.

23       MR. REED:  If we could show the witness

24   157.  We can stay in this, 157.

25   BY MR. REED:

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 686

1    Q.  What is this?

2    A.  That is the metadata associated with the video

3    in question.

4    Q.  And then 158, is this the next day, April

5    11th?

6    A.  Yes.

7              MR. REED:  So move to admit 156, the

8    video; 157, the metadata; and 158, the photo on the

9    screen.

10             MS. FRETER:  No objection.

11             THE COURT:  Admitted without objection.

12             (Government's Exhibit Nos. 156 through 158

13   were received in evidence.)

14             MR. REED:  If we could go back to 151 and

15   publish to the jury.

16   BY MR. REED:

17   Q.  What are we looking at here?

18   A.  That is a photo of the app -- or a mapping

19   application on a phone showing directions from

20   somewhere in northern Illinois, probably Chicago

21   area, down towards somewhere in the area of

22   Edwardsville, Illinois.

23             MR. REED:  Go to page 2 of this exhibit.

24   BY MR. REED:

25   Q.  Is this the metadata for the photo?

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 687

1    A. Yes, it is.

2    Q. When was this screenshot for directions down to

3    Edwardsville created?

4    A. April 10, 2023, at 3:42 p.m.

5    Q. And what was used to create this photo?  What

6    camera?

7    A. So it's going to be the camera on an Apple

8    iPhone XR.

9    Q. Is that the kind of iPhone you seized from

10   Mr. Patel?

11   A. Yes, it is.

12   Q. So in context of those calls earlier, 3:42

13   p.m., is that soon after Patel starts receiving

14   calls from "Pickup"?

15   A. Yes, it is.

16           MR. REED:  152 for the jury.

17   BY MR. REED:

18   Q. What are we looking at here?

19   A. This is another photo of a mapping application

20   showing I-55 southbound, about 1 hour and 23

21   minutes away from a destination, and showing to get

22   off in 26 miles at an exit for St. Louis.

23   Q. And 7:36 arrival time?

24   A. That is correct.

25   Q. Look at the metadata for this one.  When was

HOYLAND - CONTINUED DIRECT/REED        Vol. 4 - 688

1  this photo taken?

2  A.  This photo was taken on April 10, 2023, at

3  6:14 p.m.

4  Q.  Do you see underneath an entry for "move to

5  trash"?

6  A.  Yes.

7  Q.  What does that mean?

8  A.  The user deleted that photo on April 12, 2023,

9  at 11:39 a.m.

10            MR. REED:  Exhibit 153 for the jury.

11  BY MR. REED:

12  Q.  What does this photo show?

13  A.  This photo shows a shoebox that has been taped

14  shut.  It is the same shoebox located -- that was

15  used by Virginia Bryan in the first scam on April

16  10th.

17  Q.  So when we looked yesterday at Virginia Bryan's

18  phone, there was a picture taken on April 10th of a

19  shoebox in her house?

20  A.  That is correct.

21  Q.  And it appears to match the description of the

22  box that is pictured here?

23  A.  Yes, it does.

24  Q.  And this is from Mr. Patel's phone?

25  A.  Yes, it is.

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 689

1    Q.  Does it appear to be taken in a vehicle?

2    A.  Yes.

3    Q.  Page 2, when is this photo taken?

4    A.  This photo was taken April 10, 2023, at

5    7:53 p.m.

6    Q.  Was this moved to trash as well?

7    A.  Yes, it was, on April 12th.

8              MR. REED:  154 for the jury.

9    BY MR. REED:

10   Q.  Another picture of the box?

11   A.  Yes.

12   Q.  Was this photo deleted too?

13             MR. REED:  We'll go down to page 2.

14             THE WITNESS:  Yes, it was.

15   BY MR. REED:

16   Q.  155, what's this?

17   A.  Another photo of the box.

18   Q.  Page 2, was this photo deleted?

19   A.  Yes, it was.

20             MR. REED:  Now 156, which is the video,

21   Sandra.

22             (The video was played at this time.)

23   BY MR. REED:

24   Q.  Just briefly, yesterday we looked at some

25   photos of the inside of that vehicle --

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 690

1    A.  Yes.

2    Q.  -- do you recall that?

3              The inside of the vehicle stopped on April

4    20th.

5    A.  That is correct.

6    Q.  When you look at this video, does the interior

7    of the vehicle from the April 10th video appear to

8    match the vehicle you took pictures of on April

9    20th?

10   A.  Yes, it does.

11   Q.  Okay.  157, what is this?

12   A.  That is the metadata associated with that

13   video.

14   Q.  When was this video taken?

15   A.  April 10, 2023, at 7:53 p.m.

16   Q.  And was this video also deleted at a later

17   time?

18   A.  Yes, it was, on April 12th.

19             MR. REED:  Zoom out to the full page here.

20   BY MR. REED:

21   Q.  Why would Patel be taking these pictures and

22   this video?

23             MS. FRETER:  Objection.  Calls for

24   speculation.

25   BY MR. REED:

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 691

1    Q.  Why were these -- why would these photos and

2    videos be taken?

3              MS. FRETER:  I'm sorry.  I didn't hear

4    that.

5              THE COURT:  She's saying you're -- how do

6    you respond, that the question is asking him to

7    speculate?

8              MR. REED:  Well, are you asking whether it

9    was Patel?  Are you picking at that part of it?

10             MS. FRETER:  Your question was:  Why did

11   Mr. Patel take these pictures?  My objection is

12   you're asking this witness to speculate.

13             MR. REED:  Oh, about the "why" part.

14             MS. FRETER:  Yeah.

15   BY MR. REED:

16   Q.  I'll ask it this way:  Looking at this sheet,

17   can you tell me what app was used to take this?

18   A.  Yes, the bundle ID associated with it and the

19   bundle name show WhatsApp.

20   Q.  And is this an album listed at the top as well,

21   second line?

22   A.  Yes, it's the album "WhatsApp."

23   Q.  What does that indicate to you?

24   A.  That would indicate that these photos were

25   taken using the camera through the application

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 692

1   WhatsApp.

2   Q.  And what is WhatsApp?

3   A.  WhatsApp is a messaging and call service that's

4   available for download on both Android and iPhone

5   devices in their stores, and it allows you to

6   communicate with people around the world via text

7   or call or even video chat.

8   Q.  So why would you be taking photos and video in

9   the WhatsApp app?

10  A.  It would be to send them to other people.

11          MR. REED:  Exhibit 158 for the witness,

12  please -- or for the jury.

13  BY MR. REED:

14  Q.  What are we looking at here?

15  A.  The photo of a $1 bill.

16  Q.  And page 2 of this exhibit, when was this photo

17  taken?

18  A.  April 11, 2023, at 12:33 a.m.

19  Q.  About four-and-a-half hours after the photos of

20  the box that we looked at earlier?

21  A.  Correct.

22          MR. REED:  If we could put this side by

23  side with 166.

24  BY MR. REED:

25  Q.  Okay.  So this photo was taken early in the

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 693

1    morning on the 11th, 12:33 a.m.  What was also

2    happening at about that same time?

3    A.  At approximately that same time, he had

4    called -- Nirav Patel had called "Pickup."

5    Q.  And that's Call No. 20 at 12:15 a.m., Call 21

6    at 12:25 a.m.?

7    A.  Correct.

8             MR. REED:  If we can go to the second page

9    of 166, please.

10   BY MR. REED:

11   Q.  And then is there a third call earlier in the

12   morning under entry 22?

13   A.  Yes, there is.

14   Q.  When is that call?

15   A.  It occurred at 12:33 a.m.

16   Q.  How long was it?

17   A.  One minute and 3 seconds.

18   Q.  So the photo of the bill, is it taken while

19   he's on the phone with "Pickup"?

20   A.  Yes, it is.

21             MR. REED:  This photo of the bill number,

22   if we can go back to that.

23   BY MR. REED:

24   Q.  Based on your training and experience as a law

25   enforcement officer, did this photo of the bill

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 694

1    number mean anything to you?

2    A.  Yes, it did.  In these types of scams, in my

3    training and experience, these bills, they use the

4    serial numbers as basically tracking numbers for

5    the money that they're moving through their

6    network.

7              MR. REED:  You can take both of those

8    down.

9    BY MR. REED:

10   Q.  During the course of your investigation, did

11   you cover -- uncover additional evidence that

12   Mr. Patel's vehicle was in Edwardsville on April

13   10, 2023?

14   A.  Yes, I did.

15   Q.  And in fact -- well, what was that evidence?

16   A.  Based on data located within the phone, I found

17   that he had stopped at a gas station just outside

18   of the Edwardsville venue on State Route 143 next

19   to I-55 right outside Edwardsville.

20   Q.  How far is that from Virginia Bryan's house?

21   A.  One, maybe 2 miles approximately.

22   Q.  Did you go to the Phillips 66?

23   A.  Yes, I did.

24   Q.  Were you able to obtain security camera footage

25   there?

1    A.  Yes, I was.

2    Q.  And did that security camera footage have

3    multiple cameras in the course of the gas

4    station?

5    A.  Yes, it did.

6          MR. REED:  Okay.  If we could show the

7    witness Government's Exhibit 70 and then 71 and 72.

8    BY MR. REED:

9    Q.  Are these portions of the videos you obtained

10   from Phillips 66?

11   A.  Yes, they are.

12         MR. REED:  Move to admit 70, 71 and 72.

13         MS. FRETER:  No objection.

14         THE COURT:  Admitted without objection.

15         (Government's Exhibit Nos. 70 through 72

16   were received in evidence.)

17         MR. REED:   If we could go back to Exhibit

18   70, please.

19   BY MR. REED:

20   Q.  Did you see a red Nissan pull into the gas

21   station in this video?

22   A.  Yes, I did.

23   Q.  Tell me when you see it and where it is.

24   A.  It's at that last pump at the left.

25   Q.  Right there?

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 696

1    A.  Yes.

2            MR. REED:  We can go ahead and zoom back

3    out, Sandra.

4    BY MR. REED:

5    Q.  The time stamp up in the right, it says it's

6    the year 2000; is that correct?

7    A.  No, that time stamp is incorrect.

8    Q.  At the bottom in the middle is there also a

9    time stamp?

10   A.  Yes.

11   Q.  That time stamp has the right date and time?

12   A.  Yes, it does.

13   Q.  So it's about 7:53 p.m. on the night of April

14   10th?

15   A.  That is correct.

16   Q.  So we could watch this through, but is it fair

17   to say that he doesn't -- nobody gets out of that

18   car for a while?

19   A.  For several minutes.

20   Q.  And you've seen this all the way through.  How

21   many people get out of the car?

22   A.  One.

23           MR. REED:  So let's go ahead and jump

24   forward to -- one moment.  I lost my time stamp --

25   7:56:20 according to the time stamp at the bottom.

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 697

1      That's pretty close.  Yeah.  That's good.

2              Okay.  Can we go back to 7:56.  I'm sorry,

3      Sandra.  7:56.  You had it.  It was about 4 minutes

4      back, and 7:56 by the clock at the bottom.  There

5      we go.

6      BY MR. REED:

7      Q.  The car door is opening?

8      A.  Yes.

9              MR. REED:  Can we go ahead and zoom back

10     out.

11             (The video was played at this time.)

12     BY MR. REED:

13     Q.  Okay.  So he gets out of the car.  He parked at

14     the pump at, we said, 7:52 and change at the very

15     beginning?

16     A.  Yes.

17     Q.  And now it's 7:56 and change, 7:57?

18     A.  Correct.

19     Q.  So it's about 4 minutes where he simply sits in

20     the car?

21     A.  Correct.

22             MR. REED:  And if we can pause this for a

23     moment, Sandra.  Go back to 157.

24     BY MR. REED:

25     Q.  Okay.  This is the metadata for the video?

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 698

1    A. Correct.

2    Q. So we said 7:52 to 7:56 he's sitting in the

3    car.  When was this video taken?

4    A. 7:53.

5    Q. So the video of the shoebox would be taken

6    during that time between when the car parks and

7    when the driver gets out?

8    A. That is correct.

9            MR. REED:  If we can go back to 70.

10   BY MR. REED:

11   Q. Does -- he pumps gas?

12   A. Yes.

13   Q. All right.  At some point does he move the car

14   forward?

15   A. Yes, he does.

16           MR. REED:  So Sandra, if you could move it

17   forward to eight o'clock and 40 seconds, 8:00:40.

18   Perfect.

19           (The video was played at this time.)

20           MR. REED:  Okay.  Move up to 71.

21           (The video was played at this time.)

22   BY MR. REED:

23   Q. This is a different camera, same place?

24   A. Yes.

25   Q. You can see the car pulling in?

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 699

1    A.  Correct.

2            MR. REED:  Let's go ahead and move down to

3    72.

4            (The video was played at this time.)

5    BY MR. REED:

6    Q.  Same place, different camera?

7    A.  Correct.

8    Q.  Pays for his drink and chips and heads back

9    out?

10   A.  Correct.

11           MR. REED:  Go ahead and pull that down.

12   If we could go back to 166.

13           Okay.  So that was all April 10, and then

14   we looked at that part after midnight.  Can we go

15   to page 2 here of 166.

16   BY MR. REED:

17   Q.  Call No. 24, when is the next contact?

18   A.  April 13 at 5:32 p.m.

19   Q.  Now, when we looked at those pictures and that

20   video earlier, they were all deleted, right?

21   A.  Correct.

22   Q.  What day were they deleted; do you recall?

23   A.  The 12th.

24   Q.  Was there any communication from Danny or

25   "Pickup" on April 12th that you could locate in the

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 700

1    phone?

2    A.  No.

3    Q.  The next communication is April 13th?

4    A.  Correct.

5    Q.  And who is that with?

6    A.  That is "Pickup" contacting Nirav Patel.

7    Q.  And then Line 25, what day is it in Line 25?

8    A.  April 20th.

9    Q.  What happened on April 20th?

10   A.  That was the day of the second pickup when we

11   took Mr. Patel into custody.

12   Q.  Who called Patel that day?

13   A.  The contact "Pickup."

14   Q.  And when was this first contact?

15   A.  2:16 p.m.

16          MR. REED:  Go ahead and zoom back out to

17   the full page.

18   BY MR. REED:

19   Q.  There's a series of calls at about that time,

20   right, 25, 26, 27, 28?

21   A.  Correct.

22   Q.  And then we admitted earlier some Apple Maps

23   data.  Was there a search in Apple Maps?

24   A.  There was.  At 2:34 p.m. on the 20th, Nirav

25   Patel searched for the add -- directions from his

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 701

1  location to 118 Hollyhock Lane in Edwardsville,

2  Illinois.

3  Q. Who lives at 118 Hollyhock?

4  A. Virginia Bryan.

5          MR. REED:  If we could put -- we'll move

6  all these in at the same time.

7          If we could have 159 for the witness,

8  please.

9  BY MR. REED:

10  Q. Is this a photo recovered from Mr. Patel's

11  phone?

12  A. Yes, it is.

13  Q. And then 160, another photo from Mr. Patel's

14  phone?

15  A. Yes, it is.

16          MR. REED:  Move to admit 159 and 160.

17          MS. FRETER:  No objection.

18          THE COURT:  Be admitted.

19          (Government's Exhibit Nos. 159 and 160

20  were received in evidence.)

21          MR. REED:  Go back to 159.

22  BY MR. REED:

23  Q. What does this photo show?

24  A. This photo shows the Apple Maps application

25  open to directions from the user's current location

HOYLAND - CONTINUED DIRECT/REED          Vol. 4 - 702

1    to 118 Hollyhock Lane.

2    Q.  Is the current location up by Chicago?

3    A.  Yes, it is.

4    Q.  Page 2 here, when is this screenshot taken?

5    A.  It's taken at about 2:34 p.m. on April 20th.

6          MR. REED:  Can we go back to the call

7    summary, which is 166, page 2.

8    BY MR. REED:

9    Q.  So, you know, within 60 seconds of when he

10   makes the search?

11   A.  Correct.

12         MR. REED:  If we can go to the -- that

13   next photo, 160.

14   BY MR. REED:

15   Q.  What's shown here?

16   A.  That is a photo of a phone with directions open

17   to the Google Maps application showing an exit in

18   57 miles to St. Louis with an arrival of

19   approximately 7:40 p.m.

20   Q.  When did Mr. Patel arrive in Edwardsville that

21   night?

22   A.  Approximately 7:45.

23         MR. REED:  If we could go to page 2 of

24   this.

25   BY MR. REED:

HOYLAND - CROSS/FRETER                    Vol. 4 - 703

1    Q.  This photo is also taken on April 20th?

2    A.  Correct.

3    Q.  And that's when he was arrested, that night?

4    A.  Correct.

5           MR. REED:  No further questions.  Thank

6    you, sir.

7           THE WITNESS:  Thank you.

8                    **CROSS-EXAMINATION**

9    BY MS. FRETER:

10   Q.  Detective?

11   A.  Yes.

12   Q.  Okay, good.  So you were here yesterday, so I'm

13   going to sort of go back and remind us of some of

14   the things we talked about yesterday, and then

15   we'll do today.

16           You went through yesterday and then you've

17   gone through some today -- we'll do yesterday.

18           With Ms. Bryan, you looked at her phone,

19   right?

20   A.  Correct.

21   Q.  Did you do an extraction on her phone, or did

22   you just look through it?

23   A.  I did an extraction of it.

24   Q.  Okay.  And what software did you use for

25   extraction?

HOYLAND - CROSS/FRETER                    Vol. 4 - 704

1    A.  For her phone, we used the Cellebrite UFED

2    extraction.

3    Q.  Did you use a different program for Mr. Patel's

4    phones?

5    A.  His phones were done with extractions --

6    ultimately, we had an extraction from GrayKey on

7    his devices; however, initially we did do

8    extractions on his phones with the Cellebrite UFED,

9    I believe.  I'd have to check.  I don't recall

10    exactly.

11    Q.  How would you check?

12    A.  I'd have to -- I'd have to review my report.  I

13    don't recall.

14    Q.  Do you have your report?

15    A.  I do not.

16    Q.  Okay.  Bummer.  I'll see if I've got it in here

17    in a minute, and then we'll go back around.

18         MS. FRETER:  While we're here, can I show

19    to the witness and the jury defendant -- sorry,

20    Government's Exhibit 161.

21    BY MS. FRETER:

22    Q.  And I think you were just talking to the

23    Government a little bit about this.  What is this,

24    161?

25    A.  This is a summary of calls from one of the

HOYLAND - CROSS/FRETER                    Vol. 4 - 705

1    devices.  It's automatically generated by our

2    forensic software tool based off of whatever

3    section of the data we want to review.

4    Q.  Okay.  And then is your forensic software tool

5    Oxygen Forensic Detective?

6    A.  That is used for the analysis of the

7    extractions, yes.

8    Q.  Okay.  So what is the forensic software tool?

9    What is that?

10   A.  It's a tool that's specially designed to

11   analyze extractions that are created from any tool

12   we use to create the extraction.  There is a wide

13   range of forensic software tools.  Oxygen is the

14   one that we use that's licensed to our police

15   department to basically analyze extractions that we

16   receive no matter what device we use to complete

17   the extraction itself.

18   Q.  And so I'm going to sort of take that a little

19   bit apart.  The Cellebrite hardware, the box that

20   you plug into, you used that for Ms. Bryan's phone,

21   right?

22   A.  Correct.

23   Q.  And Cellebrite has a, sort of, companion

24   software thing that goes with it called Cellebrite

25   Reader?  Are you familiar with that?

HOYLAND - CROSS/FRETER                    Vol. 4 - 706

1   A.  Yes, it does.

2   Q.  And have you used that before?

3   A.  Yes, I have.

4   Q.  And that's a tool that you can use -- a

5   software tool you can use to analyze the data that

6   you extract; is that correct?

7   A.  Yes, you can.

8   Q.  And then for Mr. Patel's phone, you used

9   something called GrayKey; is that right?

10  A.  Correct.

11  Q.  And GrayKey, for whatever reasons, works better

12  with iPhones than Androids?

13  A.  Yes, it does.

14  Q.  And so it was your choice in this case to use

15  the GrayKey hardware to extract Mr. Patel's iPhone

16  data; is that right?

17  A.  Yes.

18  Q.  But then in analyzing it, you used this Oxygen

19  Forensic Detective instead of something like

20  Cellebrite Reader or some other product?

21  A.  Correct.

22  Q.  And this Oxygen Forensic Detective enables you

23  to -- after you do the extraction -- which is

24  mostly like making a copy?  Is that fair to say?

25  A.  Yes.

HOYLAND - CROSS/FRETER                    Vol. 4 - 707

1    Q.  It allows you to go in and tag things; is that
2    right?
3    A.  Correct.
4    Q.  And then you can put all of those tags together
5    in any different way you want into a report?
6    A.  Into a summary, yes.
7    Q.  A summary?
8    A.  Yes.
9    Q.  Okay.  And that summary or report is what we're
10   looking at here in Exhibit 161; is that right?
11   A.  Correct, except these aren't based specifically
12   off the tags I created during the investigation.
13   Q.  Okay.  But meaning that there's more data in
14   this 161 than just the tag part?
15   A.  Correct.
16   Q.  Okay.  And so if we look down here -- I think
17   there's one on this -- the Cellebrite Reader
18   reporter looks differently than this Oxygen
19   Forensic Detective does; is that right?
20   A.  If I -- are you asking if I'd had the summary
21   generated by Cellebrite, if it would've looked
22   different?
23   Q.  Yeah, it's just like a different format --
24   A.  Format, yes.
25   Q.  It just looks differently.

HOYLAND - CROSS/FRETER                    Vol. 4 - 708

1   A.  Yes.
2   Q.  They're essentially the same thing, but they
3   view differently?
4   A.  Correct.
5   Q.  And they have -- Cellebrite sometimes puts the
6   call part or the text part in one place and then
7   the metadata in a separate place; is that right?
8   It's just like the format is different.  Here we
9   can see it's all put together, right, so you've got
10  the call and then you've got all the stuff
11  associated with it, that it was in WhatsApp, all of
12  it is all together in one piece?
13  A.  Yes.
14  Q.  And it's just a formatting change based on
15  their software?
16  A.  Correct.
17  Q.  Okay.  I don't know if this is one of the right
18  ones, but there are -- in some of the exhibits that
19  we looked at, at the bottom of it, it does say,
20  like, "tag," and it says "tag" is an actual note
21  and then it says "suspect's phone."  Do you
22  remember that?
23  A.  Yes.
24  Q.  Okay.  And that tag and the identification of
25  "suspect's phone" was something that you put in?

HOYLAND - CROSS/FRETER                    Vol. 4 - 709

1    A.  That is correct.

2    Q.  And you either had the software search or you

3    searched by hand a certain phone number that you

4    were interested in and you tagged that as

5    "suspect's phone"?

6    A.  Correct.

7    Q.  And then you had the software pull up all the

8    ones that had that number, and it compiled it into

9    a report?

10   A.  Yes.

11          MS. FRETER:  And we can take this down.

12   BY Ms. FRETER:

13   Q.  In talking about the calls and the texts and

14   the time that Ms. Bryan's phone was on with this

15   suspect phone yesterday, I can't remember the

16   number of hours, but it was a lot.  It was 10 or 20

17   hours.  Wasn't it a lot of hours?

18   A.  It was a significant number of hours.

19   Q.  And you testified that it was, in your training

20   and experience, that one of the reasons somebody

21   would do that -- and I want to make sure I got it

22   right -- is to maintain control to ensure no one

23   else could interfere with the scam?

24   A.  Correct.

25   Q.  And can you explain a little bit more, based on

HOYLAND - CROSS/FRETER                    Vol. 4 - 710

1    your training, what that means?  Fill that out for

2    us a little bit.

3    A.  Yes.  One of the ways these scams operate is

4    they try and isolate the victim from people around

5    her who might identify that it's a scam.  They try

6    and shorten the amount of time in the bank where

7    the bank may ask her a lot of questions.  They try

8    and ensure she's not talking to family too much,

9    who might start questioning her financial decisions

10   or why she's moving large quantities of money,

11   things like that.

12   Q.  I'm going to have you move that mic, just the

13   whole stand, just a little closer to you because

14   when you turn toward them, we lose you a little

15   bit.

16   A.  I apologize.

17   Q.  That's okay.  And so there's this piece of

18   isolation, if I keep you on the phone for three

19   hours, you're not able to talk to anybody else,

20   right?

21   A.  Yes.

22   Q.  There's also this sort of sense, when you look

23   at Ms. Bryan's records and what was happening, it's

24   like text, call, text?  It's just this sort of

25   barrage of pushed communications; is that right?

HOYLAND - CROSS/FRETER                    Vol. 4 - 711

1    A. Correct.

2    Q. And then also, at the same time, there's the

3    request or demand for her to do stuff, go to the

4    bank, go to the Bitcoin, and then send all these

5    pictures, right?

6    A. Correct.

7    Q. And then within her phone, they're saying, you

8    know, send us a picture of the cash or send us a

9    picture of the box; is that right?

10   A. Yes.

11   Q. And it keeps the person who that's directed to

12   busy with these tasks all the time; is that

13   right?

14   A. Correct.

15   Q. And in her phone you can tell that some of the

16   stuff that she was sending wasn't even read; is

17   that correct?

18   A. I don't recall.

19   Q. Okay.  But it's possible, if you go back

20   through the records, that the person who is

21   demanding all this stuff may not even be reading

22   these messages, that the purpose is just to push

23   her to do all this stuff all the time?

24   A. Yes.

25   Q. Not that they really need it, they just want

1    her being active in this fraud situation, right?

2    A.  That's fair to say.

3    Q.  And that's part of this isolation?

4    A.  Yes.

5    Q.  When you were looking at Mr. Patel's phones,

6    you just went through with the Government -- I

7    think it was --

8         MS. FRETER:  If we can have up, from my

9    computer again, Government's 166.

10   BY MS. FRETER:

11   Q.  Which, this is that summary that -- you did

12   this summary, right?

13   A.  This summary was put together by the

14   prosecution.  I reviewed it.

15   Q.  You reviewed it, and it's based on the phone

16   records that you looked at --

17   A.  Yes.

18   Q.  -- when you did the extraction?

19   A.  That is correct.

20   Q.  And this is accurate?

21   A.  Yes.

22   Q.  And what you did is you took the calls on -- or

23   texts from important dates relative to this case?

24   So, for example, April 10th is an important date in

25   this case because that's when Ms. Bryan gave the

HOYLAND - CROSS/FRETER                    Vol. 4 - 713

1    box, right?

2    A.  Correct.

3    Q.  And then, also, if we go down here, April 20th

4    is an important date in this case because that's

5    the day that Mr. Patel gets arrested?

6    A.  Correct.

7    Q.  And so you took those important dates and you

8    -- or the Government did, but you saw it.  All

9    these calls and texts and WhatsApp, you put it all

10   into the summary chart to show how many there were

11   and when they were; is that right?

12   A.  Correct.

13   Q.  And in this summary, there's 39 calls or texts

14   or communications; is that right?

15   A.  Correct.

16   Q.  And they're happening, I think you testified

17   to, like every couple of minutes or sort of

18   continuously; is that right?

19   A.  In some instances, there's an hour, or longer,

20   gaps between several of them.

21   Q.  And then we can go to -- this is Government's

22   Exhibit 159.  We just looked at this.  This is the

23   driving directions to Hollyhock Lane; is that

24   right?

25   A.  Correct.

HOYLAND - CROSS/FRETER                      Vol. 4 - 714

1    Q.  And this is from the April 20th, so the date of

2    the arrest day; is that right?

3    A.  Can I see the metadata on the second page?

4    Q.  Sure.  I'll zoom out a little bit.

5    A.  That's correct.

6    Q.  Okay.  So this is the second -- down here, this

7    April 20th date, that's the day of the arrest,

8    right?

9    A.  Correct.

10   Q.  And this is a screenshot that's taken and

11   stored in the phone; is that right?

12   A.  Correct.

13   Q.  So it's not that you're looking through the

14   phone -- or when you extract data, it's not like

15   the Maps application is still open?

16   A.  No, not for this specific instant -- I'm sorry.

17   Can you ask it again.

18   Q.  The Maps application may be open, but that's

19   not where this comes from?

20   A.  No.  That is a screenshot that was taken at

21   approximately 2:34 of the app.

22   Q.  Most people know, but a screenshot, most

23   phones, you just, like, press the camera button and

24   the volume button down, and it captures whatever is

25   on the screen of the phone, right?

HOYLAND - CROSS/FRETER                    Vol. 4 - 715

1    A.  Yes.

2    Q.  And then you can tell, when you analyze the

3    phone, that this picture, this screenshot, was then

4    sent back out, right?

5    A.  Scroll back down in the metadata if you would,

6    please.  This one specifically I cannot say that

7    based off of this photo data.

8    Q.  You saw within the phone that there were map

9    screenshots in this whole thing that were sent

10   out?

11   A.  That is correct.

12   Q.  Okay.  And for this one, particularly, there's

13   maps, and we looked at gas station videos, that

14   indicate that Mr. Patel was at or near this

15   Hollyhock address on April 10th of 2022, right?

16   A.  That is correct.

17   Q.  And this one, again, is on April 20th of

18   2022?

19   A.  That is correct.

20   Q.  So, but -- okay.

21        MS. FRETER:  That's good.  And then -- we

22   can take this down.

23   BY MS. FRETER:

24   Q.  There's also a video that we looked at from

25   that April 10th that had that shoebox in it that

HOYLAND - CROSS/FRETER                    Vol. 4 - 716

1    Ms. Bryan said that she had put cash into; is that

2    right?

3    A.  That is correct.

4    Q.  And do you recall that video was sent out; is

5    that right?

6    A.  I'd have to review the metadata for that

7    again.

8    Q.  Does it sound familiar that that's the one you

9    went through with the Government when he's at the

10   gas station?

11   A.  I believe so.  I believe that that was

12   associated with the WhatsApp bundle ID.

13   Q.  And so WhatsApp is a -- well, it's an

14   application, right, that you can -- it's like

15   Snapchat, which is also an application, where you

16   can send text and video, right?

17   A.  Correct.

18   Q.  WhatsApp you can also make phone calls

19   through?

20   A.  Correct.

21   Q.  It's the same kind of -- type of program you

22   might get a text message app on your phone, it

23   might be a different sort of one, but it's just an

24   application where you can do a whole bunch of

25   communication with?  Is that fair to say?

HOYLAND - CROSS/FRETER                    Vol. 4 - 717

1    A.  That's fair to say.

2    Q.  And there's other ones.  Facebook Messenger you

3    can send videos and texts; and by texts, I mean

4    writing, right?

5    A.  Correct.

6    Q.  And so in this WhatsApp on Mr. Patel's phone

7    you could tell there was both written, text-type

8    communication, right?

9    A.  Correct.

10   Q.  And then also phone, talking communication?

11   A.  Correct.

12   Q.  And sending of videos and pictures also?

13   A.  Correct.

14   Q.  And the ones that you looked at at the gas

15   station, those were from April 10th of 2022,

16   right?

17   A.  Correct.

18   Q.  And there was both phone calls and texts and

19   video on that day?

20   A.  Correct.

21   Q.  And that -- I think that you said with the

22   Government that that was -- that those -- you could

23   tell from the metadata that those were taken on

24   April the 10th; is that right?

25   A.  Correct.

HOYLAND - REDIRECT/REED                     Vol. 4 - 718

1   Q. And then they were deleted on April the 12th?

2   A. Correct.

3   Q. So two days later those got put into the delete

4   folder; is that right?

5   A. Yes, they were moved to the trash.

6   Q. And then you were able to extract them later

7   even though they were in the delete folder?

8   A. Correct.

9   Q. What color was Mr. Patel's car?

10  A. Maroon.

11  Q. And that's -- you saw it both in person at the

12  time of the arrest, right?

13  A. Correct.

14  Q. And you also saw it on this gas station

15  video?

16  A. Correct.

17  Q. And if you had to call it in, you would say

18  maroon car with Illinois plates?

19  A. Correct.

20        MS. FRETER:  I don't have anything

21  further.

22        MR. REED:  Just briefly, Judge.

23              **REDIRECT EXAMINATION**

24  BY MR. REED:

25  Q. Defense counsel asked you about different phone

HOYLAND - REDIRECT/REED                    Vol. 4 - 719

1    extraction programs; is that fair?

2    A.  Correct.

3    Q.  Do you have access, either through your office

4    or other offices, to multiple programs?

5    A.  Yes, I do.

6    Q.  Is it your practice to extract the same phone

7    in different programs?

8    A.  Yes.

9    Q.  Cellebrite is one of those programs?

10   A.  Correct.

11   Q.  GrayKey is one of those programs?

12   A.  Correct.

13   Q.  Okay.  And this Oxygen Forensic, is that

14   related to GrayKey?

15   A.  It's not associated with the company that makes

16   either of those.

17   Q.  Okay.  What's that?

18   A.  Oxygen is a company that makes their own

19   version of a -- both analysis tool and an

20   extraction tool; however, it doesn't have quite the

21   capabilities of Cellebrite or GrayKey for

22   extraction purposes.  For analysis purposes, it

23   does.

24   Q.  Earlier this morning we looked at several

25   photos and videos and call records from Mr. Patel's

HOYLAND - REDIRECT/REED                    Vol. 4 - 720

1    phone.  Is that fair to say?

2    A.  Yeah.

3    Q.  Okay.  Those records that we looked at, they

4    showed up in multiple extractions?

5    A.  Yes.

6    Q.  And of course, the fact that two programs are

7    operating the same way and producing that same

8    information suggests it's pretty good

9    information?

10    A.  Correct.

11    Q.  Defense counsel also asked you about

12    Government's Exhibit 166.

13            MR. REED:  And if we could pull that up.

14    BY MR. REED:

15    Q.  These are the phone calls with those two

16    individuals between Patel and Danny and Patel and

17    "Pickup"?

18    A.  Correct.

19    Q.  Are there a lot of calls on April 10 and April

20    20?

21    A.  There's a fair number, yes.

22    Q.  Fewer calls on other days?

23    A.  Yes.

24    Q.  On Virginia Bryan's phone, we talked about

25    maintaining control and isolation.  How long did

HOYLAND - REDIRECT/REED                    Vol. 4 - 721

1    Ms. Bryan tend to be on the phone in the course of

2    a day?

3    A.  Hours and hours.

4    Q.  Hours and hours?

5    A.  She spent a significant amount of time on the

6    phone with the scammer.

7    Q.  How does that compare to how Nirav Patel is

8    communicating with "Pickup" and Danny?

9    A.  Completely different.  There is a number of

10   calls; however, the duration of most of them is --

11   several of them are less than a minute.  Some of

12   them are a few minutes long, but it's nothing

13   compared to the contact with Ms. Bryan.

14   Q.  Fair to say that the calls also tend to relate

15   to events that are happening?

16   A.  Yes.

17   Q.  Okay.  So one event would be when he starts

18   out?

19   A.  Correct.

20          MS. FRETER:  Objection, Your Honor.  This

21   calls for speculation.

22          THE COURT:  Overruled.

23   BY MR. REED:

24   Q.  One of those would be as he's going?

25   A.  Yes.

HOYLAND - RECROSS/FRETER                    Vol. 4 - 722

1    Q.  Another would be when he gets there?

2    A.  Correct.

3    Q.  And another would be that picture of the dollar

4    bill where he's someplace else?

5    A.  Correct.

6    Q.  And if we look at this, just to be very clear,

7    this 166 does not show any communication on April

8    12 with "Pickup" or Danny, right, on April 12?

9    A.  Correct.

10   Q.  In fact, the whole phone extraction, no phone

11   communication with them on that day?

12   A.  Correct.

13   Q.  But that was the day that Nirav Patel deleted

14   those photos and videos connecting him to

15   Edwardsville on April 10th from his phone?

16   A.  Correct.

17          MR. REED:  No further questions.

18                **RECROSS-EXAMINATION**

19   BY MS. FRETER:

20   Q.  The communications with Ms. Bryan were also

21   associated with events, correct?

22   A.  Not specifically.  They were kind of

23   continuous.  There was the events for, like, going

24   to the bank, things like that; however, there was

25   several calls where she was just at her house, and

HOYLAND - RECROSS/FRETER                    Vol. 4 - 723

1    he just stayed on the phone with her.

2    Q.  But there were calls and messages when she was

3    at the bank?

4    A.  That is true.

5    Q.  There were calls and messages when she was at

6    the Bitcoin?

7    A.  Yes.

8    Q.  There were calls and messages where they were

9    directing her to find the Bitcoin or whatever,

10   right?

11   A.  Yes.

12   Q.  And when she's at her house, she's not driving,

13   correct?

14   A.  Correct.

15           MS. FRETER:  I don't have anything

16   further.

17           MR. REED:  Nothing else, Judge.  Thank

18   you, sir.

19           THE COURT:  All right.  You may step down.

20           (Witness excused.)

21           THE COURT:  Let's take a five-minute

22   recess, and we'll come back with the next witness.

23           (Recess at 10:03 a.m. until 10:14 a.m.)

24           (Jury present.)

25           THE COURT:  Call your next witness.

KESAR - DIRECT/REED                          Vol. 4 - 724

1          MR. REED:  Judge, the Government calls

2     Gurdeep, G-u-r-d-e-e-p, Kesar, K-e-s-a-r.

3          (Witness sworn.)

4          COURTROOM DEPUTY:  Please state your full

5     name and spell your last name for the Court.

6          THE WITNESS:  Gurdeep and last name Kesar,

7     K-e-s-a-r.

8          COURTROOM DEPUTY:  Thank you so much.

9     Have a seat.

10         THE WITNESS:  Thank you.

11         **GURDEEP KESAR, GOVERNMENT'S WITNESS,**

12                   **DIRECT EXAMINATION**

13    BY MR. REED:

14    Q.  Ma'am, if you'll pull in your chair a little

15    bit so you can talk into the microphone.  This

16    ceiling is a sound killer, so the more you can talk

17    into the mic, the better.

18    A.  I'm fine.

19    Q.  Good morning, ma'am.  How are you employed?

20    A.  I'm good.

21    Q.  What do you do for work?

22    A.  I do translation and interpretation.

23    Q.  And Ms. Kesar, where were you born?

24    A.  I was born in India.

25    Q.  Okay.  You're here to testify about

KESAR - DIRECT/REED                    Vol. 4 - 725

1    translations from Hindi into English?

2    A.  Yes.

3    Q.  And how do you know Hindi, ma'am?

4    A.  That is the national language in India, and

5    everybody has to learn it.

6    Q.  Okay.  And you knew it from growing up in

7    India?

8    A.  Correct.

9    Q.  You learned it as a child?

10   A.  Yes.

11   Q.  Do you still have family in India?

12   A.  Yes.

13   Q.  Did you go to college?

14   A.  Yes.

15   Q.  Where did you go to college?

16   A.  In India.

17   Q.  Okay.  Did you obtain a bachelor's degree?

18   A.  Yes.

19   Q.  And what was that degree in?

20   A.  It was in education.

21   Q.  And when was that about?

22   A.  I don't remember.  I'm 74.

23   Q.  1970s or so?

24   A.  Maybe -- yes, in '70s maybe.

25   Q.  Okay.  Did you learn English while you were in

KESAR - DIRECT/REED                          Vol. 4 - 726

1    India?

2    A.  Yes.

3    Q.  What did you do after college?

4    A.  I got married.

5    Q.  You got married?

6    A.  Yes.

7    Q.  Did you stay in India?

8    A.  No, I went to Nigeria.

9    Q.  To Nigeria?

10   A.  Yes.

11   Q.  How long were you in Nigeria?

12   A.  About seven years.

13   Q.  And what language was spoken in the area of

14   Nigeria where you lived?

15   A.  English.

16   Q.  Did you move from Nigeria?

17   A.  Yes.

18   Q.  Where'd you go?

19   A.  USA.

20   Q.  And about -- roughly when was that?

21   A.  1984.

22   Q.  1984?

23   A.  Yes.

24   Q.  So you've been here in the United States for

25   about 40 years?

KESAR - DIRECT/REED                        Vol. 4 - 727

1    A.  Exactly.

2    Q.  Do you have kids?

3    A.  Yes.

4    Q.  Were they born here in the United States?

5    A.  Yes.

6    Q.  And did your family speak English or Hindi at

7    home as they were growing up?

8    A.  I speak Punjabi and my husband, too, but my

9    children, they speak English.

10   Q.  Okay.  When did you begin doing translation

11   work?

12   A.  In 2006.

13   Q.  So about 18, 19 years ago?

14   A.  Yes.

15   Q.  And are you employed somewhere, or are you a

16   freelancer on your own?

17   A.  I'm sorry?

18   Q.  Are you employed with a specific agency, or are

19   you a freelancer?

20   A.  I am a freelancer.

21   Q.  And where are you based, ma'am?  What state?

22   A.  I work for Lionbridge, and I work for many

23   agencies in New York.

24   Q.  Okay.  You mentioned Lionbridge.  How long have

25   you worked for Lionbridge?

KESAR - DIRECT/REED                          Vol. 4 - 728

1    A.  Since 2008 or '6, somewhere like that.

2    Q.  And they're not the only interpretation service

3    you work with?

4    A.  No.

5    Q.  Okay.  Geneva Worldwide, is that another one?

6    A.  Yes.

7    Q.  International Interpreters?

8    A.  Yes.

9    Q.  Legal Interpreting Services?

10   A.  Correct.

11   Q.  Okay.  And what kind of settings -- so we're in

12   a courthouse now.  What other kind of settings have

13   you done translation work in?

14   A.  I do depositions.

15   Q.  Depositions?

16   A.  Yes.

17   Q.  Okay.  And what else?

18   A.  Translations, depositions; many kinds of

19   depositions, I mean, like motor vehicle accidents,

20   slip and fall, trip and fall, all those kind.

21   Q.  Whatever comes in?

22   A.  Yeah, whatever is there.

23   Q.  And do you also do written interpretation -- or

24   written translations?

25   A.  Yes.

KESAR - DIRECT/REED                          Vol. 4 - 729

1   Q.  Documents and that kind of thing?

2   A.  Yes.

3   Q.  From Hindi into English?

4   A.  Punjabi-English, Hindi-English, yes.

5          MR. REED:  Judge, at this time I move to

6   qualify Ms. Kesar as an expert in the translation

7   and interpretation from the Hindi language into the

8   English language.

9          MS. FRETER:  No objection.

10         THE COURT:  You may offer opinions without

11  objection.

12  BY MR. REED:

13  Q.  How did you become involved in this particular

14  case, ma'am?

15  A.  I got this from Lionbridge, this project.

16  Q.  Okay.  So you were retained to do the

17  translation work by Lionbridge?

18  A.  Yes.

19  Q.  And then Lionbridge has a contract with

20  Homeland Security Investigations?

21  A.  Yes.

22  Q.  Okay.  Were you compensated for your work with

23  Lionbridge?

24  A.  Yes.

25  Q.  Okay.  And were you separately retained to

KESAR - DIRECT/REED                     Vol. 4 - 730

1    travel and testify in this trial?

2    A.  Correct.

3    Q.  Okay.  Lionbridge didn't cover that?

4    A.  No.

5    Q.  Okay.  So you were separately retained by my

6    office, the U.S. Attorney's Office?

7    A.  Yes.

8    Q.  And are you being compensated to testify as

9    well?

10   A.  Yes.

11   Q.  So through Lionbridge did you receive a

12   recorded interview of Nirav Patel by HSI agents?

13   A.  Yes.

14   Q.  Was part of that interview conducted in

15   Hindi?

16   A.  Yes.

17   Q.  Did you listen to that interview?

18   A.  Yes.

19   Q.  And created a transcript of the interview?

20   A.  Yes.

21   Q.  And the transcript takes the Hindi -- the

22   spoken Hindi recording and puts it in written

23   English?

24   A.  Correct.

25            MR. REED:  So if we can put up

KESAR - CROSS/FRETER                    Vol. 4 - 731

1    Government's Exhibit 6.

2    BY MR. REED:

3    Q.  Ma'am, are the translations contained in this

4    transcript from Hindi to English true and accurate

5    to the best of your knowledge?

6    A.  Yes.

7           MR. REED:  Move to admit Government's

8    Exhibit 6.

9           MS. FRETER:  No objection.

10          THE COURT:  6 is admitted.

11          (Government's Exhibit No. 6 was received

12   in evidence.)

13          MR. REED:  No further questions, ma'am.

14   Thank you.

15          THE WITNESS:  Thank you.

16          THE COURT:  Ma'am, she has some questions

17   for you.

18          MR. REED:  Please sit back down.  There

19   may be a few more questions for you.

20                   **CROSS-EXAMINATION**

21   BY MS. FRETER:

22   Q.  In India, which is a very large country, there

23   are different regions; is that right?

24   A.  Yes.

25   Q.  And then is it Punjar (ph.), is that --

KESAR - CROSS/FRETER                    Vol. 4 - 732

1   A.  Punjabi.

2   Q.  Punjabi, is that both the region and the local

3   language?

4   A.  Yes.

5   Q.  And then Gujarati is also a language of a

6   different region; is that right?

7   A.  Correct, yes.

8   Q.  And what region does Gujarati go with?

9   A.  Gujarat.

10  Q.  And so Hindi is a -- when you say a national

11  language, it's a language that covers the whole of

12  India; is that right?

13  A.  Yes.

14  Q.  And so I'm sorry.  I can't hear you.  Can you

15  move that?

16  A.  Yes, yes.

17  Q.  And would you say that Hindi is sort of a

18  more -- I don't want to say -- is a more formalized

19  or more official language than Punjabi or

20  Gujarati?

21  A.  That's correct.

22  Q.  And would you say that the difference -- do you

23  speak Gujarati?

24  A.  No.

25  Q.  Can you understand it at all?

KESAR - CROSS/FRETER                        Vol. 4 - 733

1    A.  Few words only.

2    Q.  But not really?

3    A.  No.

4    Q.  But Punjabi you understand very well?

5    A.  Of course, yes.

6    Q.  And would you say the difference between

7    Punjabi and Hindi is the difference between like

8    Italian and Spanish?

9    A.  No, they're a sister language.  Like Hindi and

10   Punjabi, they're sisters.  Like few words are

11   different but mostly 90 percent is the same.

12   Q.  Is that also true for Gujarati?

13   A.  I don't know much about Gujarati, but few

14   words, I think, they're similar like Hindi.

15   Q.  Okay.  When you do your translation work, have

16   you ever come across or had to use Google

17   Translate?

18   A.  No.

19   Q.  Have you ever heard of people having experience

20   with Google Translate?

21   A.  No.

22   Q.  And then, in this case, did you work on this

23   transcript -- when did you do the transcript

24   between the video and the transcript you made?

25   A.  I think sometime in October last year.

KESAR - CROSS/FRETER                    Vol. 4 - 734

1    Q.  October of twenty --

2    A.  Four.

3    Q.  -- four?

4    A.  Correct.

5    Q.  Did you only work on it in October of '24, or

6    did you rework on it sometime later?

7    A.  I think I did some missing translation.  I

8    filled that, yes.

9    Q.  And when did you fill in the missing

10   translation?

11   A.  Maybe by December.

12   Q.  Maybe?  I'm sorry.  I didn't hear you.

13   A.  By December.

14   Q.  December?

15   A.  '24, yes.

16   Q.  So you did a transcript in October of '24 and

17   then later it was communicated to you to sort of

18   fill out the transcript some more; is that right?

19   A.  A little bit, yes.

20   Q.  Is that because the first time that you did it

21   in October it didn't include all of the words that

22   were spoken?

23   A.  Yes.

24   Q.  And then when you went back in December, you

25   added more to the transcript?

KESAR - CROSS/FRETER                    Vol. 4 - 735

1    A.  Correct.

2    Q.  Can you estimate how much you had to add

3    between October and December, how much extra words

4    there were?

5    A.  Maybe 2 percent.

6    Q.  And when you're doing a transcript or a

7    translation from an audio and videotape, it can

8    sometimes be hard to hear or it's mumbly what the

9    person is saying; is that right?

10   A.  Yes.

11   Q.  And you have to go back over it a bunch of

12   times to just try to hear what it is that they're

13   talking about; is that fair?

14   A.  Yes.

15   Q.  And you try your very best to make out what

16   those words are?

17   A.  Correct.

18   Q.  But sometimes you just can't hear it?

19   A.  Yes.

20   Q.  And unlike here, when I can't hear you, I can

21   ask you to speak louder, right?

22   A.  Yes.

23   Q.  But on the tape, you're just stuck with

24   whatever anybody gives you?

25   A.  Yes.

KESAR -  REDIRECT/REED                    Vol. 4 - 736

1    Q. And when you can't hear what the words are, you

2    put into the transcript "UI;" is that right?

3    A. Yes.

4    Q. And that's for "unintelligible"?

5    A. Yes.

6    Q. And how did you learn to put "UI" in there?

7    A. That's a part of the translation.

8    Q. Do you know what the -- the -- the tape that

9    you -- well, that's too far.

10            MS. FRETER:  I don't have anything

11   further.

12                  **REDIRECT EXAMINATION**

13   BY MR. REED:

14   Q. Ma'am, you listened to that recording probably

15   many times, right?

16   A. Yes.

17   Q. You speak Hindi and you've done this a lot of

18   times?

19   A. Yes.

20   Q. Did it seem that the speakers who were speaking

21   in Hindi were fluent in Hindi?

22   A. Yes.

23            MR. REED:  No further questions.

24            THE COURT:  Any recross?

25            MS. FRETER:  No, thank you.

KAUR - DIRECT/REED                          Vol. 4 - 737

1          THE COURT:  You may step down, ma'am.

2          THE WITNESS:  Thank you.

3          (Witness excused.)

4          THE COURT:  Call your next witness.

5          MR. REED:  Judge, the Government calls

6    Harleen Kaur.

7          COURTROOM DEPUTY:  Please raise your right

8    hand.

9          (Witness sworn.)

10         COURTROOM DEPUTY:  Please state your full

11   name and spell your last name for the Court.

12         THE WITNESS:  Full name is Harleen Kaur,

13   K-a-u-r.

14         COURTROOM DEPUTY:  Thank you so much.

15   Have a seat.

16         THE WITNESS:  Thank you.

17         **HARLEEN KAUR, GOVERNMENT'S WITNESS,**

18                  **DIRECT EXAMINATION**

19   BY MR. REED:

20   Q.  Good morning, ma'am.  Where do you work?

21   A.  Good morning.  I work for Homeland Security

22   Investigations, known as HSI.

23   Q.  And how long have you been with HSI?

24   A.  I have been with HSI since September of 2022.

25   Q.  Okay.  And what kind of work does HSI do?

KAUR - DIRECT/REED                          Vol. 4 - 738

1    A.  Homeland Security Investigations is the

2    investigative arm of the Department of Homeland

3    Security.  We investigate a wide range of criminal

4    investigations ranging from narcotics to gangs to

5    violent crime to white-collar crime, financial

6    crimes, elder abuse, trafficking, alien smuggling

7    and whatnot.

8    Q.  Okay.  And what did you do before becoming a

9    Special Agent with HSI?

10   A.  I worked for Enforcement and Removal Operations

11   as a deportation officer.  ERO is responsible for

12   the arrest, detention and, ultimately, the removal

13   of illegal immigrants and individuals that pose a

14   public safety or national security risk to the

15   United States.

16   Q.  I'll ask you to slow down just a little bit for

17   the court reporter.

18   A.  Okay.

19   Q.  How long were you in an enforcement role for

20   borders?

21   A.  2018 until 2022.

22   Q.  Did you go to college, ma'am?

23   A.  I did.

24   Q.  Where did you go to college?

25   A.  I had my bachelor's in criminal justice and law

KAUR - DIRECT/REED                              Vol. 4 - 739

1    -- criminology and law studies at Marquette, and I

2    did my master's in forensic psychology at Walden

3    University.

4    Q.  When did you complete your master's degree?

5    A.  In 2015.

6    Q.  Ma'am, where were you born?

7    A.  I was born in India.

8    Q.  How long did you live in India?

9    A.  Until I was seven years old, and then I came to

10   the United States.

11   Q.  What is your native language?

12   A.  Hindi.

13   Q.  Your family moved to the United States when you

14   were seven?

15   A.  Yes.

16   Q.  Did you grow up in an Indian-American

17   community?

18   A.  I did, yes.

19   Q.  And do you still have family and friends in

20   India?

21   A.  I do.

22   Q.  How often do you go back to India?

23   A.  I try to go back every other year.  The last

24   time I went back was 2022, and I'm actually going

25   again on this Tuesday.

KAUR - DIRECT/REED                           Vol. 4 - 740

1    Q.  Are you still fluent in Hindi?

2    A.  I am.

3    Q.  Is Hindi spoken widely in India?

4    A.  Yes.  India has 22 not national but regional

5    languages, which Hindi is the widespread -- from

6    Northern India all the way to Southern India, it's

7    widely spoken.

8    Q.  Did you review the phone extractions in this

9    case for Nirav Patel?

10   A.  I did.

11   Q.  What languages besides English were the

12   documents in that -- in those phone extractions?

13   A.  They were in Gujarati.

14   Q.  Were there documents in any other language?

15   A.  I believe I recall some documents in Hindi as

16   well.

17   Q.  Were those handwritten?

18   A.  Yes.

19   Q.  Do you speak Gujarati?

20   A.  I cannot.

21   Q.  Okay.  It's a different language?

22   A.  It is.  It is a completely different language

23   than Hindi.  The words -- some of the words are

24   very similar, but other than that, it's a different

25   language.  It's written differently.  The script is

KAUR - DIRECT/REED                        Vol. 4 - 741

1   different from Hindi.

2   Q.  Yesterday we looked at some Gujarati text

3   messages, and we talked about the word "mama."  Do

4   you remember that?

5   A.  I do.

6   Q.  What do your parents call you now that you work

7   for HSI?

8   A.  So "mama" in slang in Hindi, actually, is the

9   same word that we use for a police officer or a

10  cop.  So sometimes when my dad's driving down, he

11  sees a police officers on the side of the road,

12  he's like, Oh, I have to slow down.  I'm like,

13  Yeah, you also have a "mama" sitting right next to

14  you, too, so make sure you slow down.

15  Q.  Do you recall yesterday -- well, maybe it was a

16  couple days ago -- looking at a series of

17  screenshots from Google Translate?

18  A.  Yes.

19              MR. REED:  Can we pull up Government's

20  Exhibit 51.

21  BY MR. REED:

22  Q.  You've done some border work in the past.

23  Would you ever use Google Translate?

24  A.  I would, yes.

25  Q.  And these translations, what language is being

KAUR - DIRECT/REED                          Vol. 4 - 742

1    used here?

2    A.  Hindi.

3    Q.  English to Hindi?

4    A.  Yes, English to Hindi.

5    Q.  You speak both English and Hindi?

6    A.  I do, yes.

7    Q.  If you had been asked the questions that are in

8    Hindi here, would you have understood them to mean

9    the same as the English in these --

10   A.  So this specific screenshot, I cannot read it

11   because I cannot read or write in Hindi, but some

12   of the other ones that had the English phonetics,

13   basically, I can understand that.

14           MR. REED:  Okay.  So if we can go to page

15   2.

16           THE WITNESS:  So, for example, this one,

17   underneath it, it says, "aapake fon ka paasakod kya

18   hai," which conveys, "What is the passcode for your

19   phone?"

20   BY MR. REED:

21   Q.  So as a native Hindi speaker, if you had seen

22   these, you would have understood what is going

23   on?

24   A.  Yes, absolutely.

25   Q.  Okay.  You mentioned earlier that HSI handles

KAUR - DIRECT/REED                        Vol. 4 - 743

1    international cases?

2    A.  Yes, we do.  We have 93 offices in 56

3    countries.

4    Q.  And have you been involved in other cases

5    involving similar India-based fraud schemes?

6    A.  Yes, sir.

7    Q.  We've looked at these dollar bills a handful of

8    times.  In your training and experience working on

9    India-based fraud schemes, is that something you've

10   seen before?

11   A.  Yes, I have.

12   Q.  So let's start by talking about immigration.

13   Under what circumstance can a non-citizen enter the

14   United States?

15   A.  They can enter through multiple ways.  They can

16   enter through by being granted a visa, a

17   non-immigrant visa or immigrant visa.  They can

18   come into the country illegally or through parole

19   or deferred inspections.  There are many ways to

20   enter the United States.

21   Q.  Okay.  So when it comes to statuses, you can

22   have a visa or some other lawful status?

23   A.  Correct.

24   Q.  And where can non-citizens enter the country?

25   A.  They can enter the country through any port of

KAUR - DIRECT/REED                    Vol. 4 - 744

1    entry such as an airport or the border.

2    Q.  And not just anywhere on the border but

3    specific authorized points of entry?

4    A.  Correct.

5    Q.  And why do they need to go through a specific

6    authorized point of entry?

7    A.  Can you repeat that?

8    Q.  Why do they have to go through one of these

9    authorized entry points?

10   A.  They have to be inspected by an immigration

11   officer and be admitted into the U.S.

12   Q.  Okay.  And is part of that process checking to

13   see if they have a visa or a lawful status?

14   A.  Correct.

15   Q.  Okay.  Are records kept of the non-citizens who

16   enter the country through an authorized entry

17   point?

18   A.  They are, yes.

19   Q.  Are you able to access those records?

20   A.  Yes, I am.

21   Q.  Are they searchable?

22   A.  They are, yes.  When you enter the United

23   States, illegally or legally, there is a -- it's a

24   file system.  You get assigned an alien

25   registration number, also known as A number, which

KAUR - DIRECT/REED                          Vol. 4 - 745

1    records all the entry -- which basically records

2    all your immigration status all the way from entry

3    ultimately to when you gain citizenship to the

4    U.S.

5    Q.  So when Edwardsville Police Department reached

6    out to you about this case, did you check Nirav

7    Patel's immigration status?

8    A.  I did.

9    Q.  Did you find that he had any record of a visa

10   or lawful status in the United States?

11   A.  No, he did not.

12   Q.  Did you find any record of entry through an

13   authorized point of entry?

14   A.  No, he did not.

15          MR. REED:  If you could show the witness

16   Government's Exhibit 4, and we'd move to admit

17   Government's Exhibit 4 as a certified public

18   record.

19          MS. FRETER:  No objection.

20          THE COURT:  4 is admitted without

21   objection.

22          (Government's Exhibit No. 4 was received

23   in evidence.)

24          MR. REED:  Go down to page 2.

25   BY MR. REED:

KAUR - DIRECT/REED                        Vol. 4 - 746

1    Q.  All right.  What is this document called?

2    A.  This document is a Certificate of Non-

3    Existence of Record.

4    Q.  And in Paragraph 2 -- if we could look at that

5    briefly -- what does it say here?

6    A.  This says that Citizenship and Immigration

7    Services maintains centralized records relating to

8    immigrant aliens who entered the United States on

9    or after June 30, 1924, to non-immigrant aliens who

10   entered on or after June 30, 1948, and a

11   centralized index of all persons naturalized on or

12   after September 27, 1906.

13   Q.  This is the record system you were talking

14   about?

15   A.  Correct.

16   Q.  Okay.  Paragraph 4, it's just a formal document

17   stating what you said earlier, that nothing was

18   found?

19   A.  Correct.  There is no record -- there's no

20   alien registration number found for Mr. Patel.

21   Q.  Okay.  Are you also able to look through that

22   -- the database in other ways?  Fingerprints?

23   A.  Oh, correct.

24   Q.  Facial recognition?

25   A.  Facial recognition, biometrics, name and date

KAUR - DIRECT/REED                          Vol. 4 - 747

1    of birth.

2    Q.  Did you do those things here?

3    A.  I did, yes.  I ran Mr. Patel's fingerprints

4    through our system, and I was not able to find

5    anything.

6    Q.  Did you ask Mr. Patel about his immigration

7    status when you interviewed him later in June of

8    2022?

9    A.  I interviewed him in June 2023.

10   Q.  June of 2023, thank you, ma'am.  I appreciate

11   the correction.

12          You interviewed him in June of 2023?

13   A.  I did.

14   Q.  Thank you.

15          Did you ask him about his immigration

16   status?

17   A.  I did.

18   Q.  What did he say?

19   A.  He stated that he entered the country illegally

20   by crossing the border from Vancouver into

21   Seattle.

22   Q.  And again, that interview was in June of

23   2023?

24   A.  Correct.

25   Q.  Did he say when he had entered the country from

KAUR - DIRECT/REED                              Vol. 4 - 748

1    Vancouver into Seattle?

2    A.  I recall he stated that he entered the country

3    on or about a year and a half prior to the

4    interview, which would have been on or around

5    January of 2022.

6    Q.  Did he say anything about the weather when he

7    crossed over from Vancouver to Seattle?

8    A.  He stated that there was a lot of floods during

9    that time, a lot of rain, a lot of floods in

10   Vancouver, and I corroborated that through Open

11   Search, and there were -- in fact, there were a lot

12   of rain and floods in Vancouver at that time.

13   Q.  January of 2022?

14   A.  Correct.

15   Q.  Next topic.  We left off with Detective

16   Seubert -- or, I'm sorry, Detective Hoyland with

17   Edwardsville with Nirav Patel in custody; is that

18   right?

19   A.  Correct.

20   Q.  Did he stay in custody there?

21   A.  No, he did not.

22   Q.  What happened?

23   A.  He was released.

24   Q.  On bond?

25   A.  On bond, correct.

KAUR - DIRECT/REED                        Vol. 4 - 749

1    Q. Was law enforcement able to connect that

2    Illinois case with cases in other states?

3    A. Yes, they were.

4    Q. Was he later charged in this case?

5    A. He was, yes.

6    Q. And a warrant issued for his arrest?

7    A. Correct.

8    Q. Did you go to the address that was on his ID?

9    A. I did.  We conducted surveillance on addresses

10   related to Mr. Patel, and we could not locate

11   him.

12   Q. Was he eventually arrested?

13   A. He was, yes.

14   Q. And June 2023, when was that?

15   A. When he was arrested?

16   Q. June 28, 2023?

17   A. June 28, 2023.

18   Q. Okay.  And where did that happen?

19   A. That happened in Schaumburg, which is a suburb

20   close to Chicago.

21   Q. How did you learn about that arrest?

22   A. Schaumburg Police Department called me to

23   confirm the active warrant.  They have -- when I

24   entered the warrant into NCIC, the responding

25   agency has to confirm the warrant, in which they

KAUR - DIRECT/REED                          Vol. 4 - 750

1  called me, they confirmed his name and date of

2  birth, which I confirmed that was the right

3  suspect, and that's how they were able to detain

4  him.

5  Q.  Okay.  At the beginning of the interview we'll

6  listen to and watch, there's a reference to you

7  talking to Mr. Patel about 30 minutes before that

8  interview.  What was that about?

9  A.  Schaumburg Police Department had difficulty

10 speaking with Mr. Patel due to the language barrier

11 in which they asked me if I could place him -- or I

12 could read him his *Miranda* rights over the phone in

13 Hindi.

14 Q.  Did you -- did he understand what you had to

15 say?

16 A.  Fluently, yes.

17 Q.  And did you re-Mirandize him --

18 A.  I did.

19 Q.  -- when he got -- when you got there?

20 A.  I did, yes.

21 Q.  Was that the same day?

22 A.  Yes, it was.

23 Q.  Did you ask him if he knew Hindi?

24 A.  I did.

25 Q.  What did he say?

KAUR - DIRECT/REED                    Vol. 4 - 751

1   A.  He said yes.

2   Q.  And that's on that earlier phone call?

3   A.  Yes, that was on the phone call, correct.

4   Q.  So before we get to that interview, I want to

5   ask you about a few things that will come up in

6   that interview.

7          In Patel's phone there's a contact he

8   listed as Danny.  Do you remember that?

9   A.  Correct.

10  Q.  When you interviewed Patel, who did he say that

11  Danny was?

12  A.  First he stated that Danny was a cousin; then

13  later on in the interview, he stated that he is

14  like a friend of mine; and then, later in the

15  interview again, he stated that he is a distant

16  cousin.

17  Q.  Did Patel say that Danny was involved in this

18  fraud as well?

19  A.  He did.

20  Q.  Were you able to find this Danny?

21  A.  I was, yes.

22  Q.  Okay.  What is Danny's full name?

23  A.  Danny's full name is Dinesh Patel.

24  Q.  And did Danny say where -- or, I'm sorry, did

25  Nirav Patel in the interview say where Danny

KAUR - DIRECT/REED                          Vol. 4 - 752

1    lived?

2    A.  Yes.  He stated that Danny lives in Atlanta,

3    Georgia.

4    Q.  Is that somewhere where Nirav Patel had also

5    lived?

6    A.  Correct.

7    Q.  Were you able to confirm whether Dinesh Patel

8    lived in Atlanta like Nirav Patel said?

9    A.  He did.

10   Q.  And the phone number for Danny in Patel's

11   phone, did it go back to Dinesh Patel?

12   A.  It did.

13   Q.  Did you fly out and interview Dinesh Patel?

14   A.  I did.

15   Q.  Is there still an open investigation against

16   Danny?

17   A.  There is.

18   Q.  During that interview, does Patel give a name

19   for this "Pickup" number that was on his phone in

20   Edwardsville?

21   A.  Just to clarify, Nirav Patel?

22   Q.  I apologize again.  Thank you for the

23   clarification.

24        Nirav Patel, is he asked about this

25   "Pickup" contact that's in his phone?

KAUR - DIRECT/REED                          Vol. 4 - 753

1    A.  He does, yes.

2    Q.  Who does he say that that is?

3    A.  He claims that that is an individual named

4    Bharat.

5              THE DEFENDANT:  Bharat.

6    BY MR. REED:

7    Q.  And when you went and spoke with Dinesh Patel,

8    what did he say?  Did he offer that same name?

9    A.  He did, yes.  Towards the end of the interview,

10   he also claimed that there was a Bharat involved.

11             MS. FRETER:  Just to go back, you said

12   when you spoke with Dinesh Patel?

13             MR. REED:  When she spoke with Dinesh

14   Patel, yes, ma'am.

15             MS. FRETER:  Not Nirav Patel?

16             MR. REED:  Yes, ma'am.

17   BY MR. REED:

18   Q.  They both identified -- both Nirav Patel and

19   Dinesh Patel identified a Bharat --

20   A.  Correct.

21   Q.  -- as being involved?

22   A.  Yes.

23   Q.  And that's the name behind that contact that is

24   saved as "Pickup"?

25   A.  Yes.

KAUR - DIRECT/REED                      Vol. 4 - 754

1    Q.  Okay.  So he corroborated what Nirav Patel said

2    in his interview to you?

3              MS. FRETER:  Objection, Your Honor.

4    Hearsay.

5              THE COURT:  Okay.  Your objection is

6    hearsay?

7              MS. FRETER:  Yes, Your Honor.

8              THE COURT:  And response?

9              MR. REED:  Judge, it's not for the truth

10   of the matter.  I'm just asking if they used the

11   same name.

12             THE COURT:  Well, is Danny alleged to be a

13   coconspirator?

14             MS. FRETER:  Your Honor, can we approach?

15             (Sidebar proceedings on the record.)

16             MS. FRETER:  Your Honor, if the Government

17   is going to get into coconspirator statements, they

18   didn't provide an 801(d)(2) notice.  We didn't have

19   a *Santiago* hearing.  We haven't done any of that

20   work in order to get coconspirators in that we

21   would have needed to do before the trial started,

22   and so I would object at this point.  It's already

23   out because of the miscommunication that I heard

24   when we were having a difference between Nirav and

25   Bharat Patel, so this statement is already out, but

KAUR - DIRECT/REED                        Vol. 4 - 755

1    I'll object to all future statements.

2           MR. REED:  I don't have anything else on

3    this, Judge.  I think it comes in simply -- it's

4    not hearsay.  It was not asked originally for the

5    truth of the matter asserted.

6           THE COURT:  Well, you have her testifying

7    that in an interview with the defendant he

8    identified a Bharat as someone that's involved.  So

9    that's -- I don't know how prejudicial it is, but

10   you're moving on from this?

11          MR. REED:  I'll move on, Judge.

12          Judge, we're fine having stricken -- do we

13   want to just take out the question about Bharat?

14          MR. WEINHOEFT:  We're fine with sustaining

15   the objection and striking that answer just to be

16   on the safe side.

17          MS. FRETER:  I'm not asking for that

18   relief, Judge.  I prefer not to highlight it.

19          MR. WEINHOEFT:  Okay.  That's fine.

20          MS. FRETER:  I misheard the difference

21   between Bharat and Nirav.  It's already out there

22   in front the jury.  I'm objecting going forward.

23   They said we're moving on, move on.

24          MR. WEINHOEFT:  Perfect resolution.

25          THE COURT:  All right.

KAUR - DIRECT/REED                          Vol. 4 - 756

1          (End of proceedings at sidebar.)

2    BY MR. REED:

3    Q.  Okay.  Ma'am, when you interviewed Nirav Patel

4    in Schaumburg, was the room audio-video recorded?

5    A.  It was.

6    Q.  Did Schaumburg Police Department tell you that

7    the audio recording in that room might be a little

8    muffled?

9    A.  Yes.  They informed me that the audio recorder

10   for their interview room was malfunctioning on that

11   day.  So I placed my agency-issued recorder on the

12   table.

13          MR. REED:  Okay.  Government's Exhibit 5

14   for the witness.

15   BY MR. REED:

16   Q.  Have you listened to this Exhibit 5 before?

17   A.  I have.

18   Q.  Is it a true and accurate recording of the

19   interview on June 28?

20   A.  Yes.

21          MR. REED:  Move to admit Government's

22   Exhibit 5.

23          MS. FRETER:  No objection.

24          THE COURT:  Admitted without objection.

25          (Government's Exhibit No. 5 was received

KAUR - DIRECT/REED                          Vol. 4 - 757

1    in evidence.)

2    BY MR. REED:

3    Q.  Ma'am, when we watch this interview, who is

4    initially in the room with Nirav Patel?

5    A.  That is Special Agent Maslanka and Special

6    Agent Considine (ph.).

7    Q.  Why did you initially sit out?

8    A.  I wanted to see if Mr. Patel was able to

9    understand, comprehend English.  When I realized

10   that he couldn't, I went in to translate.

11   Q.  And specifically the *Miranda* warnings?

12   A.  Correct, correct.

13   Q.  During this interview, what language is Nirav

14   Patel primarily speaking?

15   A.  Hindi.

16   Q.  And also some English?

17   A.  Correct.

18   Q.  Okay.  What language are you speaking to

19   Mr. Patel?

20   A.  Hindi.

21   Q.  Based on his answers and his body language, did

22   he seem to understand you?

23   A.  Yes.

24   Q.  Could you understand him?

25   A.  Yes.

KAUR - DIRECT/REED                          Vol. 4 - 758

1    Q.  No problems understanding him?

2    A.  No.  The interview was two hours long, and he

3    did not mention once that he was not able to

4    understand me or comprehend what I was asking

5    him.

6    Q.  And when the agents initially read him his

7    *Miranda* rights in English, does he indicate that

8    he's having trouble understanding some of those

9    concepts?

10   A.  He does.  He tells Special Agent Maslanka very

11   little English at that point that they called me in

12   to translate.

13   Q.  Did he ever say anything like that to you about

14   Hindi?

15   A.  He did not.

16   Q.  All right.  So at some point near the very end

17   of this exhibit, we lose the video.  What's going

18   on there?

19   A.  I believe Schaumburg Police Department turned

20   the video recording off.  At that point the audio

21   recorder was still ongoing.

22   Q.  Okay.  So when we lose the visual, the audio is

23   going to come from that recorder on the table?

24   A.  Correct.

25   Q.  And the video that we do see, that's coming

1    from overhead?  That's Schaumburg's?

2    A.  Correct.

3    Q.  And during the course of this recording, are

4    there times where snippets are harder to hear?

5    A.  Yes.

6    Q.  Okay.  And I think you heard that the

7    translator referred to them as UI, or

8    unintelligible, on the transcript?

9    A.  Yes.

10   Q.  But you were present in the room, right?

11   A.  I was, yes.

12   Q.  During any of those times were you having any

13   trouble understanding what Nirav Patel was saying

14   in Hindi?

15   A.  No.

16   Q.  And did he seem to be having any trouble

17   understanding what you were saying in Hindi?

18   A.  No.

19   Q.  All right.  Finally, for presentation purposes

20   today, you can see this on the screen, does this

21   version of Exhibit 5 that we'll play in court have

22   Ms. Kesar's translated transcript kind of closed

23   captioned at the bottom?

24   A.  It does.

25            MR. REED:  So that's all the questions I

1    have for you right now.  We're going to go ahead

2    and play the recording from the start.

3                   THE COURT:  Okay.  How long is this

4    recording?

5                   MR. REED:  It is quite lengthy, Judge.

6    It's about -- let's see here, about two hours, but

7    there is maybe 15 minutes that we'll cut out.

8                   THE COURT:  All right.  We'll just go

9    until lunchtime.

10                   MR. REED:  All right.  It's going to take

11   a second here.

12                   (The video was played at this time.)

13                   THE COURT:  All right.  It's quarter to

14   twelve.  The jurors' lunches have arrived.  Why

15   don't we -- we'll break here.  Back it up two

16   minutes just to refresh the jurors' recollection

17   when they come back from lunch.  And is 45 minutes

18   going to be enough, or does anybody need more time

19   than that?

20                   Okay.  We will recess for lunch.  We'll

21   come back at 12:30.

22                   (Lunch recess at 11:46 a.m. until

23   12:33 p.m.)

24                   (Jury present.)

25                   THE COURT:  All right.  When we recessed,

KAUR - CROSS/FRETER                    Vol. 4 - 761

1    we were in the middle of watching the interview --
2    recorded interview with Mr. Patel.  We can start
3    where we left off, or you can back it up a minute
4    or two.
5                (The video was played at this time.)
6                MR. REED:  Judge, at this time, we would
7    like to skip ahead five minutes until the agents
8    come back in the room.
9                (The video was played at this time.)
10               MR. REED:  Judge, at this time, we'd like
11   to move forward to the other side of this phone
12   call.
13               (The video was played at this time.)
14               MR. REED:  Judge, at this time, we'd pass
15   the witness.
16               THE COURT:  Do you guys want a quick
17   break?  Seems like they want to hear your
18   questions.
19               MS. FRETER:  I hope I'm worth the skipped
20   break.
21                        **CROSS-EXAMINATION**
22   BY MS. FRETER:
23   Q.  Special Agent?
24   A.  Yes, ma'am.
25   Q.  Okay, great.  And so the other two gentlemen

KAUR - CROSS/FRETER                    Vol. 4 - 762

1    that we saw on the tape, those are -- in addition

2    to Mr. Patel, those were also special agents; is

3    that right?

4    A.  Correct.

5    Q.  And what agency are they with?

6    A.  They were with HSI as well.

7    Q.  HSI?

8    A.  Correct.

9    Q.  And they were -- they're located, stationed in

10   Chicagoland, Schaumburg area?

11   A.  Chicago, correct.

12   Q.  And to sort of back up a little bit, before --

13   when you're doing this interview in Schaumburg,

14   it's in June of 2023; is that right?

15   A.  Correct.

16   Q.  You have some information about the

17   investigation and what's happened before you step

18   into the room; is that right?

19   A.  Correct.

20   Q.  And in this instance, you're sort of playing a

21   dual role?  You're both an agent, right?

22   A.  Correct.

23   Q.  And you're also sort of acting, sort of, as an

24   interpreter; is that right?

25   A.  As an interpreter, yes.

KAUR - CROSS/FRETER                          Vol. 4 - 763

1    Q.  You're not a court-certified interpreter?

2    A.  No.

3    Q.  And in the course of this -- and you can see

4    from the transcript, you're not translating word

5    for word what Mr. Patel is saying back to the other

6    special agents?

7    A.  I was conveying the meaning of what was being

8    said.

9    Q.  And there's times where Mr. Patel may talk and

10   then you talked at him, and you guys go back and

11   forth and have an exchange, a volley of

12   conversation, and then after maybe five or six

13   times, then you might repeat, sort of, the general

14   gist of that back to the other agents in the

15   room?

16   A.  Correct.

17   Q.  Which is different than maybe, say, here in

18   court where they're doing every single word that's

19   getting talked about?

20   A.  Correct.

21   Q.  And part of that is because you were also

22   acting as an agent in addition -- you're not just

23   an interpreter in that room?

24   A.  Correct.

25   Q.  And so before you go to the room, did you guys

KAUR - CROSS/FRETER                    Vol. 4 - 764

1    decide -- who is the decision maker of you three
2    special agents in this group?
3    A.  It was a joint decision by all three of us.
4    Q.  Okay.  And so before you guys go into the room,
5    you guys decided the two guys are going to go in,
6    you're going to hang back and see how his English
7    is?
8    A.  Correct.
9    Q.  And then also, before you guys go into the
10   room, you had information about the previous stops
11   in this case?
12   A.  Correct.
13   Q.  And you had -- had you guys looked through the
14   phone or seen reports from the phone before?
15   A.  I reviewed the extractions.
16   Q.  Okay.  And so we've heard about two different
17   extractions in this case:  one from Madison County
18   in Illinois and then one from the phone in
19   Wisconsin.  Which one had you looked at or both?
20   A.  There was a joint report by Detective Hoyland
21   that -- which he sent me.  I reviewed that report
22   which had both of the information from the
23   extractions on that report.
24   Q.  And Detective Hoyland, again, is from Madison
25   County, Edwardsville, here?

KAUR - CROSS/FRETER                    Vol. 4 - 765

1    A.  Correct.

2    Q.  And he had sent you a report, and you and the

3    other special agents -- and I -- one with an M and

4    Constantine (ph.)?

5    A.  Considine (ph.) and Maslanka.

6    Q.  Okay.  The two other guys in the room had

7    looked at all of that information before you went

8    to go talk to Mr. Patel?

9    A.  Only I had reviewed the report.  They had not.

10   They were assisting me in doing the interview and

11   the transport into federal custody.

12   Q.  Okay.  So then I sort of misunderstood a little

13   bit.  When you say assisting you in the transport,

14   is that because there was a federal warrant out for

15   Mr. Patel?

16   A.  Correct.  He was technically at Schaumburg

17   Police Department.  He needed to be remanded into

18   the Marshals' custody.

19   Q.  And is that relative to this case?

20   A.  Correct.

21   Q.  And so this is in June.  Mr. Patel got arrested

22   in April in Madison County after he was at

23   Ms. Bryan's house; is that right?

24   A.  Correct.

25   Q.  And we watched that tape yesterday?

KAUR - CROSS/FRETER                          Vol. 4 - 766

1    A.  Correct.

2    Q.  And then he was kept in the Madison County jail

3    for a period, he said on the tape, for 21 days; is

4    that right?

5    A.  Correct.

6    Q.  And you were aware of that before you did this

7    interview?

8    A.  Correct.

9    Q.  And you knew that he was brought to court in

10   Madison County on charges, he was arraigned, he was

11   given a public defender there, right?

12   A.  Correct.

13   Q.  And that case was pending still when you talked

14   to him in June?

15   A.  Correct.

16   Q.  In fact, that case is still pending?

17   A.  Correct.

18   Q.  And so when you go to talk to Mr. Patel, first

19   you talk to him on the phone; is that right?

20   A.  Correct.

21   Q.  Because you're -- I didn't understand exactly.

22   You said that the Schaumburg special agents needed

23   help with *Miranda*?  Why did you talk to him on the

24   phone first?

25   A.  So what happens is when a police department

KAUR - CROSS/FRETER                           Vol. 4 - 767

1    takes someone into custody on a federal arrest
2    warrant, they have to confirm with NCIC whether the
3    person that they have in custody --
4    Q.  I've got to get you to slow way down.  Between
5    the court reporter --
6    A.  Okay.
7    Q.  -- and the interpreters.
8    A.  I apologize.
9    Q.  It's okay.
10   A.  When a federal arrest warrant needs to be
11   confirmed, the police department will call NCIC to
12   confirm the suspect that they have in custody is a
13   correct -- is an accurate suspect on the arrest
14   warrant, which is why they called me, and they also
15   called the Law Enforcement Support Center, the
16   LESC, to confirm that the person they had in
17   custody at that time, in fact, was the accurate
18   subject on the federal arrest warrant.
19   Q.  Okay.  And so I want to just sort of make this
20   clear.  Mr. Patel gets arrested in Madison County.
21   He gets a lawyer.  Stays in Madison County.  They
22   release him on bond; is that right?
23   A.  Correct.
24   Q.  He goes back up north to the Aurora,
25   Chicagoland area, right?

KAUR - CROSS/FRETER                    Vol. 4 - 768

1    A.  Correct.

2    Q.  And that's in Aprilish or early May.  Between

3    then and June when we see this interview, a federal

4    arrest warrant is issued for Mr. Patel?

5    A.  Correct.

6    Q.  And you -- special agents don't go pick him up.

7    The local Schaumberg Police Department does?

8    A.  It just happened that they saw his vehicle.  I

9    believe his license plate had an alert, and they

10   noticed that there was a federal arrest warrant on

11   that license plate, the maroon Nissan Altima, with

12   Delta, Quebec, 9947, I believe.

13   Q.  And just to stop you, that's the same car we've

14   talked about brown or maroon in this case?

15   A.  Correct.

16   Q.  Okay.  And so they see there is an arrest

17   warrant, they look at NCIC, someone calls you to

18   verify, and that's when you're on the phone to give

19   him *Miranda*?

20   A.  Correct.

21   Q.  And so how long between that time and then the

22   time that you speak with him with the other special

23   agents?

24   A.  It was about three hours.

25   Q.  Okay.  So short period of time?

KAUR - CROSS/FRETER                    Vol. 4 - 769

1   A. Correct.

2   Q. Okay.  But at that point you know he's got a

3   lawyer here in Madison County, right?

4   A. I don't recall that information.

5   Q. Well, you knew he had been to court?

6   A. Yes.

7   Q. And you knew the case was pending?

8   A. Yes.

9   Q. And so when you read a *Miranda* on the phone,

10  it's messy enough that you guys decide you're going

11  to wait until the special agents are there to talk

12  to him instead of Schaumburg Police Department?

13  A. No, ma'am.  I don't believe it was messy.  The

14  reason I wanted to wait until we got there is

15  because I had the information about the case, and I

16  wanted to interview him.

17  Q. Okay.  Because you are investigating the

18  federal arrest warrant --

19  A. Correct.

20  Q. -- not the Schaumburg --

21  A. Correct.

22  Q. -- Police Department?

23  A. Correct.

24  Q. Okay.  So then -- if we could -- oh, I didn't

25  do that.

KAUR - CROSS/FRETER                          Vol. 4 - 770

1          You give him *Miranda* warnings?  You tell

2     him that he has a right to an attorney, right?

3     A.  Correct.

4     Q.  You don't say that you can call your lawyer

5     that you got in Madison County?

6     A.  Correct.

7     Q.  And you do not call that lawyer in Madison

8     County?

9     A.  No, I do not.

10    Q.  And after you say, you know, you don't have to

11    answer questions now -- at the end of that, you

12    say, Do you understand; is that right -- or no,

13    that's -- sorry.  Let me get to you.

14          You tell him it's not necessary that you

15    have to give an answer to every question without a

16    lawyer, right?

17    A.  Correct.

18    Q.  And then you say to him, Just sign your name

19    here; is that right?

20    A.  Yes.  Print your name and sign.

21    Q.  You don't say, Do you understand that you're

22    waiving your right to lawyer?

23    A.  I believe I said, Do you understand what I've

24    said to you?  I'm sorry.  I don't have the

25    transcript on here.

KAUR - CROSS/FRETER                          Vol. 4 - 771

1          MS. FRETER:  Okay.  And so if we can go to

2     my computer and -- just for the witness.

3          THE WITNESS:  Yes, it says --

4     BY MS. FRETER:

5     Q.  Wait.  Hang on.  Would looking at a transcript

6     help refresh your recollection?

7     A.  Yes.

8     Q.  And so --

9          THE COURT:  Let's do this:  We've been

10    going at it for a little while.  I want to give the

11    court reporter a break.  So I know you've got more

12    questions.  This might be a good place to take a

13    break.  Let's take ten minutes, and we'll come

14    back.

15          (Jury out at 1:46 p.m.)

16          THE COURT:  Counsel, approach.

17          Let the record reflect the jury is not in

18    the courtroom.  The question of whether a search

19    and seizure or a confession is proper or improper

20    is a question of law for the Judge, not for the

21    jury.

22          So where are we going with this?  Is

23    there -- where are we going with this?

24          MS. FRETER:  Sure, Judge.  So in the -- I

25    may be more familiar with the transcript,

1   obviously, than the Court is because the Court just

2   saw it today; but in the course of this

3   conversation, there are things that come up between

4   the agents and Mr. Patel where it is clear, if you

5   have an understanding that he has been to Court and

6   he has a pending case, that he's talking about the

7   Madison County thing.

8          THE COURT:  That's correct.

9          MS. FRETER:  So when he says, I didn't

10  open the box, and I didn't do this, and I learned

11  that this was money laundering, and all of those

12  other kind of things -- when you have an

13  understanding that he's already been presented to a

14  judicial officer who said, You are charged with a

15  crime, his statements make sense in that context as

16  opposed to, I have just arrested you off the

17  street, and I'm having you make this statement, and

18  you're confessing now to money laundering, and

19  you're admitting that you know that you did all of

20  these things wrong when you haven't been told by a

21  court of law or a lawyer or a prosecutor in a prior

22  proceeding, You're now charged with this offense.

23          I didn't move to suppress the statement

24  because they talked to him without a lawyer.

25  There's a lot of reasons why I didn't do that,

KAUR - CROSS/FRETER                          Vol. 4 - 773

1    because there's not an argument that -- I didn't

2    move to suppress it, and --

3            THE COURT:  And I know and that's why --

4            MS. FRETER:  And I have good reasons why,

5    but it's important to set the scene of this

6    statement being made in June when he has already

7    been to court, and he already has a lawyer; and how

8    they're conducting -- and just the questions that

9    they ask him and the miscommunication that happens

10   based on where he's sitting, right; and this agent

11   has testified she didn't know he had a lawyer; and

12   I don't have any reason to doubt that; but if that

13   was her belief at the time, it certainly colors how

14   they asked questions of him to go to -- this agent

15   says to him --

16           THE COURT:  I follow you.

17           MS. FRETER:  Yeah.

18           MR. REED:  Judge, we're way past, Did you

19   have an understanding and how, that was several

20   questions ago, and I don't know why we --

21           THE COURT:  I think it's proper to put in

22   context that when he's saying some of these things,

23   he already appeared before a judge in Madison

24   County who has conveyed to him information about

25   his charges.  He's been arraigned -- was he

KAUR - CROSS/FRETER                          Vol. 4 - 774

1    arraigned?

2         MS. FRETER:  He was arraigned and had an

3    interpreter, the whole deal.  They cut him loose on

4    bond and off he went, and I was done with this

5    section and was going to go on to the next.

6         MR. WEINHOEFT:  This issue of what

7    Mr. Patel knows, doesn't know, what he has been

8    exposed to or anything else in Madison County, this

9    witness doesn't know.

10        THE COURT:  But it seems reasonable that

11   the defense argues that the "money laundering"

12   phrase wasn't something I came up with in

13   conversations with Danny and KKT; it was something

14   that a judge in Madison County told me or a lawyer

15   representing me.

16        MR. WEINHOEFT:  He said where that came

17   from on the transcript.  He does say on the

18   transcript -- they asked him, How do you know it's

19   money laundering; and he said he was told that, and

20   he was either told that by Danny or by the police,

21   and so we -- it's clear --

22        THE COURT:  That's different.

23        MR. WEINHOEFT:  Yeah.

24        THE COURT:  That's different than, We

25   charged you, you have a lawyer, and I don't know

KAUR - CROSS/FRETER                          Vol. 4 - 775

1    who charged him in Madison County.

2            So you are moving on with this witness

3    then?

4            MS. FRETER:  She answered she didn't know.

5    We were going to go on to the next topic.

6            THE COURT:  Let's take a break.  I will --

7    certainly, it's an appropriate area for inquiry,

8    appropriate to argue the context of some of this

9    stuff.

10           MS. FRETER:  Judge, not to get ahead of

11   ourselves, I did want to ask the Court to add a

12   little bit to its admonishment to the jury.  The

13   Belleville News-Democrat is reporting that a

14   different gentleman who happens to have the name

15   "Patel" has been arrested with stealing gold from

16   somebody.

17           MR. WEINHOEFT:  There was a press release

18   out of Columbia PD that was on Facebook.  Somebody

19   sent it to me just as an FYI, and it is a person,

20   last name Patel, scam involved picking up gold.

21           MS. FRETER:  And so I don't want to make

22   it a big -- I mean, there's lots of cases with lots

23   of publicity --

24           THE COURT:  A cousin to brother-in-law to

25   auntie.

KAUR - CROSS/FRETER                          Vol. 4 - 776

1      MS. FRETER:  And this is just very bad

2   timing.  I'm sure the jury will respect the Court's

3   general admonishment, but if you could add a little

4   extra about --

5      THE COURT:  If you draft something up,

6   because I didn't see it.  I don't read the

7   News-Democrat anymore.

8      MS. FRETER:  Not to bring it up, just an

9   extra little bit about, you know, this includes TV

10  and newspaper and just a little extra emphasis on

11  that.

12      THE COURT:  Okay.  We'll do that.

13      MR. WEINHOEFT:  What time are we back,

14  Your Honor?

15      THE COURT:  We -- how long do you need?

16  Ten minutes?

17      MR. WEINHOEFT:  Ten minutes.

18      THE COURT:  We'll come back at two.

19      (Recess at 1:53 p.m. until 2:08 p.m.)

20      (Jury present.)

21      THE COURT:  All right.  We are still with

22  cross-examination of this witness.

23      Ma'am, you are still under oath.

24  BY MS. FRETER:

25  Q.  Okay.  We were at the point, you were looking,

KAUR - CROSS/FRETER                          Vol. 4 - 777

1   just for the witness -- you were refreshing your

2   recollection with the transcript of the

3   interview?

4   A.  Correct.

5   Q.  Okay.  And so does it refresh your recollection

6   that you said, Just print your name, and he said --

7   and you had him sign it; is that right?

8   A.  Yes.  I asked him if he understood what I

9   said.

10  Q.  After you already had him sign it?

11  A.  I don't know if it was simultaneously or after.

12  I don't remember.

13  Q.  And so the tape would be really the best

14  representation of that, right?

15  A.  Yes.

16  Q.  And if it says on the transcript you said, Just

17  print your name here, and then you have some other

18  conversation with him, that's reflected in the

19  transcript also where you say sign, Did you

20  understand what I explained?  Do you remember

21  saying that to him?

22  A.  I do remember saying it.  I just don't know if

23  it was at the time he was signing it or if it was a

24  couple seconds after or before.

25          THE COURT:  Pardon me, sir, in the back of

1    the courtroom, you can sit in here if you wish, but

2    you can't sit in here and look at your cell phone,

3    all right?  If you want to look at your cell phone,

4    you can look at it outside.

5              Please proceed.

6    BY MS. FRETER:

7    Q.  And then we've just seen the interview.  It

8    goes on for a long time.  Two hours, right?

9    A.  It does.

10   Q.  And is it fair to say -- would you categorize

11   it that Mr. Patel was not easy to talk to?

12   A.  No, I would definitely say he was not easy to

13   talk to.

14   Q.  He was frustrating to you?

15   A.  Yes.

16   Q.  He was frustrating to the other agents?

17   A.  Yes.

18   Q.  The conversation would go -- everybody was sort

19   of talking all over, on top of each other for a

20   while; is that right?

21   A.  Yes, I would say so.  There were a couple times

22   where I was translating and Mr. Patel was talking

23   over me and it was just -- yes.

24   Q.  This was not a situation -- even when you're

25   acting solely in the role of an interpreter where

1    he would talk, you would interpret, maybe the other

2    agents would speak, and then it would proceed in an

3    orderly fashion?  It didn't go like this?

4    A.  Correct.

5    Q.  It was just sort of a -- I don't know.  It was

6    a difficult conversation, I guess, is how I

7    categorize it.

8           So it's hard -- in the context of this

9    interview, if we just take the part about the

10   family relationships and who is related to who and

11   what sister-in-law or cousin, that was very

12   confusing to both you and the other agents?

13   A.  Yes.

14   Q.  And at that point in the interview, Mr. Patel

15   is giving you information about the names of these

16   people, right?

17   A.  Yes.

18   Q.  And where they live?

19   A.  Yes.

20   Q.  But the -- it was difficult to figure out who

21   is related to who and how; is that right?

22   A.  I think it came across that way when I was

23   trying to translate back to the agents, but I

24   understood what he was saying and who was referring

25   to and what relationship he was referring to.

1    Q.  Okay.  And is this -- and I don't know if it's

2    a Mr. Patel thing or if it's a language thing or if

3    it's a cultural thing.  Do people sometimes refer

4    to other people as their cousins or their relations

5    or their sisters even if they're not blood

6    relation?

7    A.  Yes, they do, which is why I reminded Mr. Patel

8    in the beginning of the interview that even though

9    him and I understand due to a cultural similarity,

10   the agents might not understand that, so if he

11   could clarify the actual relationship, whether he

12   was related to them by marriage or blood or if they

13   were just strictly friends.

14   Q.  And this -- whether it's just a cultural thing

15   or a colloquialism, we see that happen in terms of

16   when you talked about your dad and the "mama

17   sitting" as a reference to a police officer, right?

18   A.  Yes.

19   Q.  So no one is actually saying it's your mother,

20   right?

21   A.  Correct.

22   Q.  Or I think they had it translated yesterday --

23   A.  Maternal uncle.

24   Q.  Maternal uncle, right?

25   A.  Yes.

KAUR - CROSS/FRETER                          Vol. 4 - 781

1    Q.  It's -- it's even more so this -- they're my
2    cousin, they're my sister.  It's not just slang.
3    It's just how you refer to familiar people.  Is
4    that fair to say?
5    A.  In the Hindi language, we have specific names
6    for specific relationships.  We don't say aunts and
7    uncles.  We have specific names for them if that's
8    what you mean.
9    Q.  I'm not sure.  Have you ever heard somebody use
10   the term "play cousin"?
11   A.  No, I'm not familiar with that.
12   Q.  Okay.  While we're talking about Hindi, which
13   region of India did you grow up in?
14   A.  In Punjab.
15   Q.  And do you speak Punjabi?
16   A.  I do.
17   Q.  And that's similar to the interpreter that we
18   heard from today?
19   A.  Correct.
20   Q.  And did you go back through her transcript to
21   make sure that it was accurate as to the Hindi?
22   A.  Yes, I did.
23   Q.  And there are -- did you go back through and
24   make sure that the transcript was accurate as to
25   what was actually said?

KAUR - CROSS/FRETER                          Vol. 4 - 782

1   A.  Correct.

2   Q.  But there are differences between the

3   transcript and what was said; is that right?

4           MS. FRETER:  So by way of example, if we

5   can show my screen.

6   BY MS. FRETER:

7   Q.  This is Government's Exhibit 6, which is the

8   transcript.  Just on this page, this is where you

9   guys are asking Mr. Patel what his birthday is,

10  right?

11  A.  It says that on the translation; however, I was

12  not in the room at this time.

13  Q.  Okay.  But you've looked back through this

14  transcript?

15  A.  Yes.

16  Q.  And it says 13th of May, right?

17  A.  Yes.

18  Q.  And he says the 30th of May?

19  A.  Yes.

20  Q.  Because that's his birthday.

21  A.  That's his birthday, yes.

22  Q.  Right.  And so whether it's that the translator

23  couldn't hear right because 13th sounds like 30th,

24  right --

25  A.  Yes.

KAUR - CROSS/FRETER                    Vol. 4 - 783

1    Q. -- or maybe she translated it wrong?  We don't

2    know the answer to that, right?

3    A. Yes.

4    Q. But that's one discrepancy between the

5    transcript and what was actually said?

6    A. Yes.

7    Q. And then when you were just following along,

8    maybe -- I don't know how close you paid attention,

9    but did you notice other ones like that just now

10   where maybe you would say something and then it

11   didn't get transcribed exactly the same way that

12   you had said it?

13   A. I was listening more to the audio than the

14   actual English translations.

15   Q. Okay.  Fair enough.

16           MS. FRETER:  And then we can take this

17   down.

18   BY MS. FRETER:

19   Q. In dealing with -- you speak Punjabi and Hindi;

20   is that right?

21   A. Correct.

22   Q. But you don't read the script for Hindi; is

23   that right?

24   A. No, ma'am.

25   Q. You can read the, I guess I would say, the

KAUR - CROSS/FRETER                          Vol. 4 - 784

1    printed?  I guess, in English, there is printing

2    and there's cursive, right?

3    A.  Yes.

4    Q.  And is what I call script, is that sort of like

5    the cursive version of Hindi, or is it totally

6    different?

7    A.  It's a completely different way of writing

8    Hindi.

9    Q.  Okay.  So it's not --

10   A.  It's not -- it's not cursive at all.  It's just

11   different characters.

12           MS. FRETER:  Okay.  So if we can -- sorry,

13   Jackie -- I'll do better -- if can show my computer

14   again, and this is Government's Exhibit 51.

15   BY MS. FRETER:

16   Q.  We saw this earlier.  These are the Google

17   Translate texts that the officers in Wisconsin used

18   with Mr. Patel when they were on the scene; is that

19   right?

20   A.  Correct.

21   Q.  And the Government asked you on this one, What

22   does it say?  Do you remember that?

23   A.  Yes.

24   Q.  And asking you what you said in Hindi, you

25   said, I don't read this --

KAUR - CROSS/FRETER                    Vol. 4 - 785

1   A.  I can't read those characters essentially.

2   Q.  But down here -- here is an example.  This is

3   on page 2.  It has both the script and it has --

4   how would you describe this?

5            THE COURT:  Phonetic.

6            THE WITNESS:  Phonetics.

7   BY MS. FRETER:

8   Q.  Phonetic spelling?

9   A.  Yes, ma'am.

10  Q.  Do people write in Hindi in this phonetic

11  spelling?

12  A.  Yes.

13  Q.  Yes, okay.  And so people write both ways.

14  A.  Yes.

15  Q.  You can read one way but not the other?

16  A.  Yes.

17  Q.  And you don't speak Gujarati at all?

18  A.  No, ma'am.

19  Q.  Or read it?

20  A.  No, ma'am.

21  Q.  Did you talk to Mr. Patel about his education

22  level?

23  A.  No, ma'am.

24  Q.  In these texts -- sorry.

25            When you're talking to Mr. Patel, you ask

1    him how many times he's been arrested; is that
2    right?
3    A.  Yes.
4    Q.  And he says, One time.  Do you remember that?
5    A.  Yes.
6    Q.  And you say, You're lying.  I know you were
7    arrested in Wisconsin?
8    A.  Yes.
9    Q.  But you know -- and let me ask it this way:
10   Did you know then that that wasn't accurate?
11   A.  Yes.
12   Q.  You knew he wasn't arrested?
13   A.  When I said, Have you been arrested, what I
14   meant was how many times have handcuffs physically
15   been placed on you, and that was two times.
16   Q.  But you used the word, "How many times have you
17   been arrested," right?
18   A.  Correct.
19   Q.  When you're talking -- and he said, One time,
20   and you said, I don't believe you.  You're lying.
21   I know about Wisconsin?
22   A.  Correct.
23   Q.  Did you know at that time that the officer in
24   Wisconsin on Google Translate had told him you are
25   100 percent not under arrest?

KAUR - CROSS/FRETER                        Vol. 4 - 787

1    A.  No, I had not seen that.

2    Q.  And so had you known that the officer in

3    Wisconsin had told him, You are 100 percent not

4    under arrest, you maybe wouldn't have said, You're

5    lying; is that right?

6    A.  Yes.

7    Q.  Or alternatively, you maybe would have

8    clarified what you are talking about is how many

9    times have you been in handcuffs versus how many

10   times have you been arrested?

11   A.  Correct.

12   Q.  Because an arrest for you as a special agent

13   has a specific legal meaning to it; is that

14   right?

15   A.  Correct, correct.

16   Q.  Laypeople feel differently, maybe, about what

17   an arrest is?

18   A.  Correct.

19   Q.  And so when you're talking to Mr. Patel, what

20   you mean to say is how many times have you been in

21   handcuffs, but you say arrest?

22   A.  Correct.

23   Q.  So this is at the beginning of the interview

24   with him; is that right?

25   A.  Yes.

KAUR - CROSS/FRETER                           Vol. 4 - 788

1    Q.  And so you've started off this interview with

2    you feel -- and it's a difficult interview anyway.

3    He is not even telling you the truth about how many

4    times he's been arrested; is that right?

5    A.  Correct.

6    Q.  And that's going to color the whole rest of the

7    way that you deal with him in this interview; is

8    that right?

9    A.  Not necessarily.

10   Q.  Okay.  It's a provable thing?  It's a fact

11   about how many times you've been arrested or not,

12   right?

13   A.  I think it depends on the context.  Like we

14   just --

15   Q.  Well, an arrest means a specific thing,

16   right?

17   A.  Right, but to Mr. Patel, it didn't.

18   Q.  But to you, as a law enforcement professional,

19   "arrest" is a very specific thing that -- it's just

20   a very specific legal thing to you, right?

21   A.  Correct.

22   Q.  And that to you is provable, right?

23   A.  Yes.

24   Q.  You run it through a database and people's --

25   how many times people's names come up, right?

1    A. Yes.

2    Q. And so in the very beginning, in your mind, it

3    is a provable fact that he's been arrested in

4    Madison County and he's been arrested in Wisconsin

5    and he's a liar, right?

6    A. I don't think I would have called him a liar.

7    Q. You did in the interview though.  You said,

8    You're lying to me.  I know you were arrested in

9    Wisconsin?

10   A. Yes.

11   Q. And you tell him that throughout the whole rest

12   of the interview to stop lying to me, you're lying

13   to me.  That continues on?

14   A. Correct, because during those times -- in those

15   specific times, I had reviewed the extractions from

16   Edwardsville, and I had known how many times he had

17   been stopped in Madison County and then in Franklin

18   and then in Merrill, Wisconsin.

19   Q. But in the context of this interview -- and,

20   again, the tape speaks for itself, right?

21   A. Yes.

22   Q. But how -- the lens through which you view that

23   interview depends, in part, on context; and so

24   if -- just like when you're talking, you're using

25   the word "arrest," but you're thinking about

1    handcuffs, right?  That comes up in other -- that

2    miscommunication or disconnect comes up other

3    times.  So, for example, in the beginning of the

4    interview, you guys are talking to him about the

5    box, right?  Did you open the box?  You had the

6    box.  Do you remember that part?

7    A.  Yes.

8    Q.  And in the course of this interview, you guys,

9    sort of, use, like, boxes or what's going on -- it

10   seems like, as an English speaker, sort of

11   interchangeably that you are talking about all of

12   this stuff together, right?  Whether it's boxes in

13   Wisconsin or boxes in Indiana.  It's your

14   perception that he is going and getting all these

15   boxes from different places, right?

16   A.  I don't believe it was my perception.  I knew

17   that he was getting the boxes from these different

18   places.

19   Q.  But in the beginning of the interview, it could

20   be read that's just talking about the Madison

21   County box, right, where he says, I didn't open it.

22   I didn't open it; is that right?

23   A.  I would have to take a look at the transcript,

24   ma'am.

25   Q.  All right.  Okay.  I'll go to this part first.

KAUR - CROSS/FRETER                      Vol. 4 - 791

1   Do you remember -- and this is going to be on page
2   21 in the transcript.
3              Do you remember talking to him about money
4   laundering?  Do you remember that?
5   A.  I apologize.  It hasn't shown on my screen
6   yet.
7              COURTROOM DEPUTY:  Do you want me to show
8   it?
9              MS. FRETER:  No, not net.  I was just sort
10  of letting Government know where I was at.
11  BY MS. FRETER:
12  Q.  Do you remember talking to him about money
13  laundering?
14  A.  I do.
15  Q.  Okay.  And so when he -- he's bringing up this
16  term that, like, he knows it's money laundering,
17  and you guys are asking him, How do you know that
18  it's money laundering?  Do you remember that?
19  A.  Yes, I do.
20  Q.  And he says, I just learned that from Madison
21  County.  Do you remember that?
22  A.  Yes, he does state that.
23  Q.  At the time when you're talking to him, does
24  that make sense to you, that he's just learning
25  this from Madison County?

KAUR - CROSS/FRETER                    Vol. 4 - 792

1    A.  Could you repeat the question?

2    Q.  Sure.  Let me rephrase it.  When he's talking

3    about Madison County, that involves -- from the

4    events, that involves both his arrest and all this

5    court stuff, right?

6    A.  Yes.

7    Q.  Okay.  And so do you know about the court stuff

8    when you're interviewing him?

9    A.  I know that he was released on bond from

10   Madison County, yes.

11   Q.  Because money laundering is like a specific --

12   again, it's a specific legal term, right?

13   A.  Yes.

14   Q.  Does it -- you guys sort of go after him about

15   that; like, How do you know it's money laundering;

16   and you kind of drill down into that -- you want

17   him to talk to you about that term; is that

18   right?

19   A.  Yes, because we know from experience that these

20   sorts of scams end up associated with some sort of

21   money laundering, so that's why we asked him about

22   that and why did he choose that specific term.

23   Q.  Right?

24   A.  Because it's not something that we brought

25   up.

KAUR - CROSS/FRETER                          Vol. 4 - 793

1    Q. Okay.  As you sit here now, it's logical to
2    infer, though, that he could have brought that up
3    because he's been to court in Madison County,
4    right?
5    A. Yes.
6    Q. Okay.  But you didn't really have that in your
7    mind at the time you were talking to him; is that
8    right?
9    A. Yes.
10   Q. And so when you guys hear -- and I don't want
11   to say "you guys" because I don't want to speak for
12   the other agents, but you guys sort of acted as a
13   team?  Fair to say, right?
14   A. Yes.
15   Q. And you're all trained sort of the same way?
16   A. Yes.
17   Q. You think kind of the same.
18          When you hear "money laundering," to you
19   that's a signal -- like that's an official sort of
20   legal criminal term.  Why is this guy who is saying
21   he doesn't know nothing about nothing talking about
22   money laundering, right?
23   A. Correct.
24   Q. And it's an indication to you that you feel
25   like he knows more than what he's saying?

KAUR - CROSS/FRETER                    Vol. 4 - 794

1    A.  Correct.

2    Q.  But you don't have in your mind that he's also

3    been through a court process?

4    A.  Correct.

5    Q.  Had you known that at the time more fully, it

6    maybe would have influenced how you talked to

7    him?

8    A.  For that specific topic, yes.

9    Q.  And another example of how things get kind of

10   twisted a little bit, either because Mr. Patel is

11   talking over you or language, whatever the context

12   of the interview is, you guys are trying to figure

13   out who else is involved, right?

14   A.  Correct.

15   Q.  And you're trying to get names, descriptions,

16   whatever information you can get, right?

17   A.  Yes, ma'am.

18   Q.  And at some point he mentioned there is this

19   guy that had a white van.  Do you remember that?

20   A.  Yes, ma'am.

21   Q.  But it morphs into white men.  Do you remember

22   that?

23   A.  Yes, ma'am.

24   Q.  And that you say white van but the other agent

25   says white man, and then you guys get into this

1    whole, long conversation about white men, right?

2    A.  If I understand correctly what you're referring

3    to, Mr. Patel at that time was speaking about the

4    white male that he was dropping the packages off

5    to.  Mr. Patel stated that the white male arrived

6    in a white van.

7              MS. FRETER:  Well, okay, so if we could

8    show the witness and the jury, I guess, this is

9    back to the transcript, Government's 6, and this

10   will be on 28.

11   BY MS. FRETER:

12   Q.  And I don't understand Hindi, so I can only go

13   from what the transcript says, but it says on the

14   transcript that Mr. Patel says, There was this one

15   guy.  He came wearing a cap and had a white-colored

16   van.  And then the agent says, He had a white van?

17   Mr. Patel says, Yes.  And then the other agent

18   says, White man?

19              Is that right?

20   A.  Correct.  I just didn't translate back to him

21   what Mr. Patel had said because I was still

22   speaking with Mr. Patel about further questions.

23   Q.  Right.  And so before this portion, though,

24   there's no description of white guys.  It's just

25   white van, right?

KAUR - CROSS/FRETER                    Vol. 4 - 796

1    A. Yes.

2    Q. Okay. So it's in this little vignette that

3    the -- now we're not talking about vans anymore?

4    Now we're talking about guys, right?

5    A. Which is why I clarified. The next question

6    is: What was the man like? Was he white or was he

7    Indian?

8    Q. And we're done with the van; is that right?

9    A. Yes.

10    Q. Okay. I'm not going to go through each one,

11    but there are other instances of, sort of, this

12    type of thing just due to the complicated nature of

13    the interview? Is that fair to say?

14    A. Correct. To be quite frank, ma'am, I didn't

15    have to translate what Mr. Patel was saying to the

16    agents. I was only doing that for their comfort

17    because I was the case agent. I could have had a

18    conversation with Mr. Patel, and they could have

19    just sat in the interview room. They didn't have

20    to know what I was speaking to Mr. Patel about.

21    Q. Right. And that's because you're acting as

22    both an agent and, sort of, an informal

23    translator?

24    A. Yes, ma'am.

25    Q. But you don't suggest -- in looking at this

KAUR - CROSS/FRETER                        Vol. 4 - 797

1   vignette of the transcript, you don't suggest or

2   insert white guy or white man into this

3   conversation, right?  You don't do that?

4   A. No, I asked Mr. Patel a clarifying question of

5   who was the man.

6   Q. Well, it's the other agent who brings up man,

7   right?

8   A. I believe Special Agent Maslanka and I were

9   speaking at the same time, if I recall correctly,

10  and even though he was speaking, I was already

11  asking Mr. Patel the clarifying, such as, What was

12  the man?  Was he white or was he Indian?

13  Q. Which is a different question than, What did

14  the guy look like?

15  A. Correct.

16  Q. Or what race is the guy?

17  A. Sure.

18  Q. This -- there's additional confusion when you

19  guys are talking about the phone and who's on the

20  phone and Danny and "Pickup."  Do you remember

21  that?

22  A. Correct.

23  Q. And at the time when you're talking to

24  Mr. Patel, do you know that he has saved in his

25  phone a contact called "Pickup"?

KAUR - CROSS/FRETER                    Vol. 4 - 798

1    A. Yes.

2    Q. Okay.

3    A. Not in the specific phone, but I had reviewed

4    the extractions before and he had saved the contact

5    as "Pickup" in his phone.

6    Q. But, I mean, there's a lot of extraction.  I

7    assume it was a big report, right?

8    A. Yes.

9    Q. And so as you're talking in this conversation,

10   do you -- I mean, you don't remember every contact

11   in the phone?

12   A. Correct.

13   Q. Do you remember that there's a contact name

14   called "Pickup" at this point?

15   A. Yes.

16   Q. Okay.  And so when Mr. Patel is talking about

17   "Pickup," are you -- is it clear in the discussion

18   whether he's talking about a person named "Pickup"

19   or he's talking about a pickup, an event?

20   A. The person named "Pickup."

21   Q. In your mind?

22   A. Correct.

23   Q. Okay.  I want to ask you about -- you guys go

24   through with him -- when you're talking about him

25   taking money out of the packages, he says that he

KAUR - CROSS/FRETER                         Vol. 4 - 799

1   does it one time; is that right?

2   A.  Correct.

3   Q.  And you guys say, We don't believe you?

4   A.  I believe we had told him that we don't believe

5   him before he stated that he had taken it only one

6   time.

7   Q.  You guys tell him throughout this interview, We

8   don't believe you?

9   A.  Yes, because he was being evasive.

10  Q.  Well, and you also think that he's lying,

11  right?

12  A.  Correct.

13  Q.  You think he's lying about getting arrested in

14  Wisconsin?

15  A.  Correct.

16  Q.  You think he's lying about all kinds of things,

17  right?

18  A.  Correct.

19  Q.  Which he -- but you tell him, You're lying

20  about being arrested in Wisconsin.  He says, No.

21  You say, Yes.  And then he quits on it, right?

22  A.  Yes.

23  Q.  I mean, there's no way for him sitting there to

24  prove to you that this guy gave him a text that

25  said you're 100 percent not under arrest, is there?

KAUR - REDIRECT/REED                          Vol. 4 - 800

1    I mean, he doesn't have a picture of that with him.

2    How, in the room, can he prove to you that he's

3    right and you're wrong?

4    A.  I don't understand the question.

5    Q.  He is absolutely right that he was not arrested

6    in Wisconsin?

7    A.  Sure.

8    Q.  There's no way for him sitting in that room to

9    prove that to you?

10   A.  That's correct.

11           MS. FRETER:  I don't have anything else.

12                    **REDIRECT EXAMINATION**

13   BY MR. REED:

14   Q.  Agent, let's start with that last question,

15   arrested versus stopped.  What did Nirav Patel say

16   to clarify that he had been stopped and not

17   arrested?

18   A.  If I recall correctly, I believe he said, The

19   police stopped me in Merrill -- or Wisconsin.

20   Q.  Okay.  And so you were able to talk with him

21   and get on the same page.  You both agreed he had

22   been stopped in Wisconsin --

23   A.  Correct.

24   Q.  -- the police had talked to him in Wisconsin,

25   and then he had been let go in Wisconsin?

KAUR - REDIRECT/REED                    Vol. 4 - 801

1    A.  Correct.

2    Q.  Okay.  Earlier defense counsel asked you about

3    the word "cousin."  Do you recall that --

4    A.  Yes.

5    Q.  -- when he refers to somebody as a cousin?

6    A.  Yes.

7    Q.  Cousin comes up a few different times --

8    A.  Yes.

9    Q.  -- with a few different people?

10   A.  Yes.

11   Q.  Okay.  Danny, or Dinesh, Patel, did Nirav Patel

12   say that Danny was, in fact, related to him?

13   A.  Earlier in the interview Mr. Patel stated that

14   Dinesh Patel was a cousin, and then sometime later

15   in the interview he claimed that he was like a

16   friend, and then later in the interview for a third

17   time he said Dinesh Patel was a distant cousin, so

18   he does -- yes.

19   Q.  He uses various terms to indicate that he is

20   related?

21   A.  Correct.

22   Q.  Okay.  Did you feel that Mr. Patel was being

23   honest with you at the beginning of this

24   interview?

25   A.  No.

1   Q.  And there are lots of reasons for that?

2   A.  Yes.

3   Q.  What were some of those reasons?

4   A.  His body language, his lack of eye contact and

5   the fact that when he was stopped in Edwardsville

6   and in Merrill, he was being evasive to the police

7   officers then as well.

8   Q.  Okay.  And is it also true that at times later

9   in the interview he uses a phrase that's

10  interpreted as "to tell you the truth"?

11  A.  Correct.

12  Q.  "To be honest"?

13  A.  Correct.

14  Q.  Indicating he is saying something different?

15  A.  Correct.

16  Q.  Defense counsel, at times, asked you whether

17  Nirav Patel was, at times, talking about Madison

18  County.  Do you remember her asking about that?

19  A.  Correct.

20  Q.  There were times when you were asking him about

21  Madison County?

22  A.  Yes.

23  Q.  And times when he was talking about Madison

24  County?

25  A.  Yes.

KAUR - REDIRECT/REED                          Vol. 4 - 803

1    Q.  There were also times when you said, What about

2    Wisconsin?

3    A.  Yes.

4    Q.  And what about Illinois -- or what about

5    Indiana?

6    A.  Yes.

7    Q.  And so all three of those locations were

8    discussed at different points --

9    A.  Correct.

10   Q.  -- in the course of the interview?

11   A.  Correct.

12   Q.  And the dishonesty about number of pickups and

13   who he saw, did that extend to those portions of

14   the transcript where he's talking about Indiana and

15   Wisconsin?

16   A.  Correct.

17   Q.  And that's part of why you asked him, You got

18   to be honest?  We need to help you here?

19   A.  Yes, sir.

20   Q.  Defense counsel asked you about this contact

21   called "Pickup."  Do you recall that?

22   A.  Yes, sir.

23   Q.  And during that time when you are talking about

24   Madison County, does Mr. Patel say he doesn't know

25   who sent him --

KAUR - RECROSS/FRETER                    Vol. 4 - 804

1    A.  Yes.

2    Q.  -- to Madison County?

3              Okay.  And when we looked at the phone

4    earlier -- you saw that, the phone for Madison

5    County?

6    A.  Yes.

7    Q.  Okay.  It's Danny and "Pickup" who send him to

8    Madison County, right?

9    A.  Correct.

10   Q.  At some point during the course of that

11   conversation, does Nirav Patel acknowledge that he

12   does know the name of the person who is "Pickup"?

13   A.  Correct.

14             MR. REED:  Okay.  No further questions.

15                  **RECROSS-EXAMINATION**

16   BY MS. FRETER:

17   Q.  You just told the Government that because of

18   Mr. Patel's body language and lack of eye contact

19   that made you disbelieve him; is that right?

20   A.  Those weren't the only reasons, ma'am.

21   Q.  But those were some of the reasons?

22   A.  Some of them, yes.

23   Q.  And so when you entered the room, you didn't

24   introduce yourself to Mr. Patel as a special agent;

25   is that right?

KAUR - RECROSS/FRETER                    Vol. 4 - 805

1    A. No, because I had already done that on the

2    phone, and he had already seen me prior to me even

3    entering the room.

4    Q. In this capacity as -- it's possible for him to

5    believe that you're just an interpreter; is that

6    right?

7    A. No, I don't agree with that, because prior to

8    me entering the room, I had actually taken the

9    shackles off his feet when we were transporting him

10   from the cell to the interview room, and I had done

11   that.  So that's -- at that time I had introduced

12   myself.  My name is Special Agent Kaur.  I'm the

13   one that spoke to you on the phone, and we are

14   going to be taking you to the interview room.  So

15   prior to me even entering the room, I had already

16   introduced myself.

17   Q. That's not on the tape; is that correct?

18   A. No, that's not on the tape.

19   Q. And what is on the tape is they say, Well,

20   let's get that lady back here.  Do you remember

21   that?

22   A. Yes.

23   Q. And Mr. Patel, throughout his conversation,

24   looks at those two male agents a lot, doesn't he?

25   A. Yes.

Vol. 4 - 806

1    Q.  And he makes eye contact with them, doesn't

2    he?

3    A.  Yes.

4    Q.  He doesn't make eye contact with you?

5    A.  I would say that's more of a cultural thing

6    than the situation we were placed in.

7    Q.  That's your assumption, right?

8    A.  Yes.

9    Q.  And he continuously says, I want to tell you,

10   sir, I want to explain to you, sir?  It's all about

11   dealing with the two guys, right?

12   A.  Yes, ma'am.

13   Q.  Not dealing with you?

14   A.  Again, I would say that's more of a cultural

15   thing because males only speak to females in

16   position of authority, I guess.  They speak to more

17   males generally.

18   Q.  And so --

19              MS. FRETER:  I don't have anything else.

20              MR. REED:  Nothing else, Judge.

21              THE COURT:  Thank you.

22              THE WITNESS:  Thank you.

23              THE COURT:  All right.  Ladies and

24   gentlemen, you have heard reference to money

25   laundering.  You will be instructed in this case

Vol. 4 - 807

1    what the charges are, what the specific charges

2    are, and you're not to speculate about what's going

3    on in Madison County other than you know that at

4    some point he was detained there.

5            The other thing is -- let's see.  Who do

6    we got left?

7            MR. WEINHOEFT:  We'll need to excuse the

8    jury and take a sidebar after this point.

9            THE COURT:  You will what?

10           MR. WEINHOEFT:  We'll need to have a

11   sidebar outside of the presence of the jury next.

12   That's really our next step.

13           THE COURT:  But you don't have any further

14   witnesses to call?

15           MR. WEINHOEFT:  Correct.

16           THE COURT:  Okay.  Let's talk about that

17   now.  Why don't you take a five-minute break.

18           (Jury out at 2:42 p.m.)

19           THE COURT:  All right.  Let the record

20   reflect that the jury has left the room.

21           MR. WEINHOEFT:  We'll need to double-check

22   to make sure all of our exhibits have been moved

23   in.

24           THE COURT:  Okay.

25           MR. WEINHOEFT:  And then we're out of

Vol. 4 - 808

1    witnesses, we'll rest off the record and take up

2    any motions defense might have, and then rest on

3    the record after the jury comes back.

4         THE COURT:  All right.  Well, one thing I

5    do want to take up now is this interview was

6    conducted at a time when defendant had charges

7    pending against him in Madison County.  He had

8    felony charges pending against him in Madison

9    County.  When he was Mirandized, there was no

10   reference to, You have a lawyer with respect to

11   these charges in Madison County, and we're going to

12   talk to you about those.  There was no evidence

13   that the lawyer was contacted to say, We've picked

14   up your client and we're going to ask him

15   questions.  And there was no motion to suppress

16   that interview, and what I want on the record is

17   that you have made the -- not out of ineffective

18   assistance of counsel that you are not moving to

19   suppress, but you believe that there are strategic

20   reasons why you decided not to raise those

21   objections and allow the interview to be presented

22   to the jury.

23        MS. FRETER:  Would you like me to

24   articulate the reasons or --

25             (Interruption by the court reporter.)

Vol. 4 - 809

1          THE COURT:  You can give me a general

2    thumbnail.  You don't have to go into every detail,

3    but I just want a record that shows -- I don't want

4    you to surrender any advantages you may have, but I

5    just want a record that you're aware of that and

6    you have made a strategic decision not to assert --

7    or try to suppress it.

8          MS. FRETER:  And so, Judge, I think

9    there's multi-prongs to my thinking.  If later on

10   down the road some Monday morning quarterback says

11   I'm wrong, then I'll eat it, but this was my --

12         THE COURT:  I have a whole set of Monday

13   morning quarterbacks.

14         MS. FRETER:  I know, Judge.  Sometimes I'm

15   one of those.

16         This is my thinking, and I stand by it.

17   I -- there is a marked difference to start with

18   between lawyers talking to a represented party and

19   agents talking to a represented party.  Agents, law

20   enforcement, are allowed to talk to a represented

21   party as long as it's on a different topic.

22         So had I moved to suppress this, I think

23   there's a pretty good chance that the Court may

24   have excluded the portions, perhaps, about the

25   Madison County case but allowed the rest of it in.

Vol. 4 - 810

1    Additionally, Mr. Patel -- and we've been to court

2    many times here, both with the Government present

3    and just us in terms of my relationship with him,

4    his desire for a speedy trial.  He has had many

5    communications with the Court.  He has been

6    steadfast in both his court appearances and with me

7    privately about his desire to testify.  I have -- I

8    mean, he could in theory flake out at the last

9    minute, but I don't anticipate that happening.

10   Strategically, to have the statement suppressed, to

11   have Mr. Patel testify and then to have the

12   Government put it on in rebuttal I believe would be

13   devastating to his case.  I think that it would

14   appear as if he was a huge liar.  I think the jury

15   wouldn't have gotten to hear him at all.  I think

16   it would be horrible impeachment for him rather

17   than it going the other way, so I did not want that

18   to happen.

19            THE COURT:  Perfectly acceptable.

20            MS. FRETER:  Additionally, I believe that

21   the statement is exculpatory.  The Government views

22   it one way in that they say when he says, I did

23   something wrong or I knew this was a mistake or

24   money laundering, the Government thinks that it's

25   exculpatory (sic).  I anticipate Mr. Patel is going

Vol. 4 - 811

1    to testify very consistently with that statement,

2    and that, as we've said before, his defense has

3    always been lack of knowledge or intent.  He's

4    never denied being at the places.  The record's

5    reflected that when officers have moved to identify

6    him, he's raised his hand, so that it's my

7    anticipation that his testimony is going to be

8    consistent with the statement and that it's

9    exculpatory.  So even if it was contained in

10   contravention of *Miranda*, it doesn't hurt me any.

11   And so for all of those reasons, I didn't move to

12   suppress it.  Partially, also, because if he didn't

13   testify, I'd want it in.  It's his defense.  I

14   think he is very persuasive even on the tape, so

15   that's why.

16           THE COURT:  All right.  Thank you.

17           MR. WEINHOEFT:  Judge, since we're making

18   a record on that topic, if I may, this is a subject

19   that we, with the U.S. Attorney's Office, discussed

20   in advance and considered as well; and the right to

21   counsel, there's obviously two:  one under the

22   Fifth Amendment, one under the Sixth Amendment.

23           His state public defender would not be

24   permitted to represent him in a federal case to

25   begin with; but the Sixth Amendment right to

Vol. 4 - 812

1    counsel is offense specific; and so the Sixth

2    Amendment right attaches at the course of the

3    initiation of the federal charges.  The Fifth

4    Amendment is the custodial right, and so really it

5    was the Fifth Amendment custodial issue that was

6    paramount.  He was clearly waiving that.  He

7    clearly wanted to speak.  He had a lot to say and

8    wanted to speak, and so we thought there was a

9    valid waiver there and that there was no reason --

10   there certainly -- the attorney in Madison County

11   certainly wouldn't have been able to represent him

12   as a public defender in a federal case outside of

13   that jurisdiction.

14            THE COURT:  All right.  Why don't we

15   get -- we'll check on exhibits, make sure that

16   everything that you need in has been moved in.

17            MR. REED:  Can I check with you to make

18   sure you have it?

19            THE COURT:  Off the record.

20            (Off the record.)

21            THE COURT:  All right.  We're back on the

22   record.

23            Off the record, Counsel, you have checked

24   with the clerk.  Are all the exhibits that you wish

25   to be admitted, have they been admitted?

1          MR. REED:  Yes, Judge.

2          THE COURT:  Does the Government have any

3     more witnesses or evidence to Submit?

4          MR. REED:  No, Judge.  The Government

5     rests at this time.

6                    **GOVERNMENT RESTS**

7          THE COURT:  All right.  Counsel?

8          MS. FRETER:  Your Honor, while we're here

9     outside the presence of the jury, I would make a

10    motion for judgment of acquittal at the close of

11    the Government's case in that they failed to make a

12    submissible case to the jury from which a

13    reasonable juror could make a finding of guilt

14    beyond a reasonable doubt in that they failed to

15    adduce sufficient evidence to show that Mr. Patel

16    engaged in a conspiracy to commit wire fraud and

17    that he personally committed offenses of wire fraud

18    and knowingly illegally entered into the United

19    States.

20         MR. REED:  Judge, the Government would

21    respond that the evidence sufficiently showed that

22    all elements to all offenses were met by the

23    evidence that came in.  As to conspiracy, the

24    Government showed that Mr. Patel was actively

25    involved in what was going on here, showed that the

1    victims was defrauded, that there was a scheme to
2    defraud, and that that was the goal of this
3    conspiracy, and it showed that Mr. Patel knowingly
4    joined that conspiracy in a variety of ways because
5    he had been told by -- in Wisconsin that these
6    victims didn't want them taking their money.  He
7    kept doing it anyway.  Because he saw the
8    victims -- that they were old ladies, he saw the
9    money in the box, the amount of money involved, he
10   saw the distance he was driving, and he knew that
11   this scheme was based overseas.  The evidence
12   showed that he knew his coconspirators, some of
13   them were related to him, and he took action to
14   cover it up by deleting files.

15        As to Counts 2 through 4 -- well, I should
16   go back to Count 1.

17        The evidence showed a number of mailings
18   and wires, not only the packages with the gold with
19   UPS coming into Indiana, but also the wire to
20   Oklahoma to pay for the gold, the bank transaction
21   at U.S. Bank and the bank transaction at Busey
22   Bank, among many other bank transactions, that
23   supports that element of the offense.

24        As to Counts 2 through 4, those three
25   wires were certainly proven up.  As to intent to

Vol. 4 - 815

1     defraud, again, the evidence showed that Mr. Patel

2     continued doing this even after he was stopped in

3     Wisconsin and it was demonstrated that this woman

4     didn't want him taking money and for all the

5     reasons I stated earlier as to knowing conspiracy

6     that he has intent to defraud as well.  The

7     evidence showed that there was a scheme to defraud

8     and that the purpose of that scheme to defraud was

9     to deceive the victims.

10            And as to Count 5, Mr. Patel acknowledged

11    that he had entered the country unlawfully.

12            THE COURT:  All right.  I think the motion

13    is dismissed with respect to all counts.

14            All right.  Mr. Patel, we discussed this a

15    number of times.  The Government has now closed its

16    case.  It's not going to offer any more evidence.

17    It's not going to call any more witnesses.  You

18    heard your lawyer describe to me why she thought

19    this video interview of you was helpful, and it's

20    your decision whether or not you want to take the

21    stand and explain to the jury your side of the

22    story.  It's a --

23            (Defendant started indiscernible

24    speaking.)

25            THE COURT:  No, no.

1           It's a big decision to make and it is --

2     it's one that you should discuss with your lawyer,

3     and I know you've talked to her about it.  She is

4     experienced.  She's watched the way the evidence

5     has rolled out in this case as have I; and from a

6     legal standpoint, she may have -- she's certainly

7     going to have an informed opinion of whether it's

8     strategically advantageous for you to testify or to

9     let the case go to the jury as it is.

10          The jury will be instructed by me -- we'll

11    given them written instructions and I will look

12    them in the eye and tell them it's the Government's

13    duty to prove its allegation that somebody

14    committed a crime; and as you sit here, they are to

15    presume you innocent; and they can only find you

16    guilty if all of them agree unanimously as to each

17    element of any count against you.

18          Okay.  So what's there, seven counts?

19          MR. REED:  Five counts.

20          MR. WEINHOEFT:  Five.

21          THE COURT:  There are five counts.  The

22    jury could find you guilty of some but not all.

23    The jury could find you guilty of being here

24    illegally but nothing else, or they can on all

25    counts.  They will also be told by me that not only

Vol. 4 - 817

1    do you not have to testify, you're not required to

2    offer any evidence, none.  The Government bears the

3    burden of proof.

4         So do you want a little time to talk with

5    your lawyer before you make the final decision?

6    I'll give you a little time to talk with your

7    lawyer because I think -- I do think it's worth

8    talking to her -- now that you've witnessed and

9    she's witnessed how this has all played out, how

10    the cross-examination has gone, okay, what was said

11    and not said, that might impact her opinions as to

12    the strategic value of you testifying on your own

13    behalf or not testifying.

14         So we will recess for -- if he does

15    testify, how long do you think it will take?

16         MS. FRETER:  My portion should be fairly

17    short, maybe 20 minutes.  I expect the Government

18    is going to be up there a long time.

19         THE COURT:  I see a smile on a face, so I

20    think you've read the room right.  We'll just

21    recess.  Let me know when you're done, okay, and

22    then we'll bring the jury back.

23         (Recess at 3:00 p.m. until 3:06 p.m.)

24         (Outside the presence of the jury.)

25         THE COURT:  All right.  Mr. Patel, you had

Vol. 4 - 818

1    enough time to speak with your attorney?

2            THE DEFENDANT:  Yes, yes.

3            THE COURT:  And it's your decision that

4    you wish to testify?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Understanding that not only do

7    you get to tell your side of the story, but the

8    lawyers for the Government get to cross-examine

9    you?  Do you under -- you have to say yes.

10           THE DEFENDANT:  Yes.

11           THE COURT:  All right.  Counsel, that's

12   your understanding, that your client wishes to

13   testify?

14           MS. FRETER:  Yes, Your Honor.

15           THE COURT:  All right.  Bring the jury in.

16           (Jury present at 3:11 p.m.)

17           THE COURT:  For purposes of the record, I

18   think the Government should -- does the Government

19   have any more witnesses to call?

20           MR. REED:  No, Judge.  The Government

21   rests.

22           (Government rests in the presence of the

23   jury.)

24           THE COURT:  All right.  The Government has

25   now presented all its witnesses and exhibits.

PATEL - DIRECT/FRETER                    Vol. 4 - 819

1          Call your first witness.

2          MS. FRETER:  Thank you.  Defense calls

3    Nirav Patel.

4          COURTROOM DEPUTY:  Raise your right hand.

5          (Defendant sworn.)

6          THE DEFENDANT:  Yes, I was tell the truth.

7    I swear by my religious book.

8          COURTROOM DEPUTY:  Please state your full

9    name for the Court and spell your last name.

10          THE DEFENDANT:  My name is Nirav Patel,

11    P-a-t-e-l.

12          THE COURT:  All right.  Let's pull the

13    microphone closer to him.

14          MS. FRETER:  How about for the

15    interpreter.  He doesn't need it.

16                  **NIRAV PATEL, DEFENDANT,**

17                   **DIRECT EXAMINATION**

18    BY MS. FRETER:

19    Q.  Please state your name.

20    A.  Nirav Patel.

21    Q.  And how old are you?

22    A.  I'm 44 years old.

23    Q.  What's your birthday?

24    A.  May 30, 1980.

25    Q.  And where were you born?

PATEL - DIRECT/FRETER                          Vol. 4 - 820

1    A.  In Ahmedabad, India.

2    Q.  And what province of India is that?

3    A.  Gujarat.

4    Q.  And what languages do you speak?

5    A.  Gujarati.

6    Q.  Okay.  And so you speak some English; is that

7    right?

8    A.  Yes.

9    Q.  And you've been in the United States now for a

10   couple of years; is that right?

11   A.  Yes.

12   Q.  And your language -- your English has gotten

13   better?

14   A.  Yes.

15   Q.  So sometimes you can understand the questions

16   that I'm asking and sometimes it's helpful to have

17   the interpreter; is that right?

18   A.  I need an interpreter 70 percent of the time.

19   Q.  Okay.  And so it's better for Court, if you

20   don't answer my questions in English, even if you

21   understand them, that you wait for the interpreter,

22   okay?

23   A.  Yes.

24   Q.  I know it's hard to wait, but it just works

25   better.  We can agree to that, right?

PATEL - DIRECT/FRETER                    Vol. 4 - 821

1    A.  Yes.

2    Q.  Okay.  Mr. Patel, how far did you go to

3    school?

4    A.  I studied up to the tenth grade.

5    Q.  And how -- and was that in India?

6    A.  Yes.

7    Q.  And how old in India is somebody who's in the

8    tenth grade?

9    A.  Seventeen or 18.

10   Q.  And what kinds of things did you study up until

11   the tenth grade?

12   A.  Gujarati, Sanskrit, social studies, Hindi.

13   Q.  Do you know how to read and write in Hindi?

14   A.  I do understand spoken Hindi, but I do have

15   difficulty in reading it.

16   Q.  What about Gujarati, can you read and write in

17   Gujarati?

18   A.  Yes.

19   Q.  And if you had to pick a language you were most

20   comfortable with between Gujarati and Hindi, what

21   would be it?

22   A.  Gujarati.

23   Q.  And if you had to pick a language between

24   Gujarati and English you were most comfortable in,

25   which would it be?

PATEL - DIRECT/FRETER                    Vol. 4 - 822

1    A.  Gujarati.

2    Q.  When did you come into the United States from

3    India?

4    A.  I was in the United States on the 21st of

5    December, 2021.

6    Q.  And how did you get to be in the United

7    States?

8    A.  I was in Vancouver, there was floods there,

9    heavy rains, and I was working with someone, and I

10   was stuck there.

11   Q.  How did you physically move between Vancouver

12   and the United States?

13            Okay.  Mr. Patel, for the interpreter, if

14   you could just talk in a couple of sentences and

15   let her interpret, and then we'll go on.

16   A.  I can't explain it very well, but the thing is,

17   this man put me on his back, and he was -- and then

18   a car came and then I got into a car.

19   Q.  Okay.  So you traveled by car across the border

20   between Canada and the United States?

21   A.  I did not know that I have come from Canada

22   into the United States.

23   Q.  You later learned, when you got out of the car

24   at some point, you were in the U.S.; is that

25   right?

PATEL - DIRECT/FRETER                        Vol. 4 - 823

1   A.  Yes.

2   Q.  And that journey was by car?

3   A.  Yes.

4   Q.  How did you get from India to Canada?

5   A.  I had the visa from before COVID, but I came to

6   Canada after COVID.

7   Q.  Okay.  My question is, like, how did you move?

8   Did you take a plane or a boat?  How did you get

9   from India to Canada?

10  A.  Flight.

11  Q.  And when did you do that?

12  A.  In 2021.  I was in Canada for maybe a couple of

13  months.

14  Q.  And Government's Exhibit 78 is a Canadian visa

15  application.  Do you remember that?

16  A.  Yes.

17  Q.  And did that come off of your phone?

18  A.  Yes.

19  Q.  Who filled that out?

20  A.  That was this agent who did visa work, and he

21  was the one who filled it out.

22  Q.  You didn't sign that one?

23  A.  No.

24  Q.  And is that the one that you turned in to

25  Canada when you came in '21, or was it a different

PATEL - DIRECT/FRETER                    Vol. 4 - 824

1    one?

2    A.  I don't really know because I have problems

3    reading English.

4    Q.  Okay.  If it says on the visa application that

5    you have an MBA from college, is that true?

6    A.  No.

7    Q.  And if it says on the application that you

8    worked in some sort of financial -- I think,

9    Pricewaterhouse, is that true?

10   A.  No.

11   Q.  Is your wife a doctor?

12   A.  No.

13   Q.  What kind of work did you do back in India?

14   A.  I am a technician.  I do TV repairs and air

15   conditioning, cooling systems and all household

16   appliances.

17   Q.  That's what you did in India?

18   A.  Yes.

19   Q.  And what was your reason for going to Canada?

20   A.  There was really no reason for me to go to

21   Canada.  Actually, I was supposed to go to

22   Australia before COVID; but for some reason, the

23   agent made a mistake and put Canada.

24   Q.  Why were you leaving India?

25   A.  Because of COVID, there was no work, and I was

PATEL - DIRECT/FRETER                    Vol. 4 - 825

1   at a loss.

2   Q.  When you realized you're in Canada instead of

3   Australia, why don't you go back to India?

4   A.  Because I was trapped here.  I was trapped here

5   in that house for 15 days.  I'd lost all my flight

6   tickets and everything.

7   Q.  Is that when you got sick?

8   A.  Yes, because in India the weather is warm but

9   Canada was so cold.  My body was literally

10  frozen.

11  Q.  And then when you end up in the United States,

12  why don't you -- instead of Australia or Canada,

13  why don't you go back to India?

14  A.  So I did want to go back, but then the people

15  around here told me that you shouldn't have any

16  problems.  You pay your income tax and all that and

17  later on you'll be able to bring your family

18  here.

19  Q.  Okay.  And so you knew when you were in the

20  United States you didn't go through passport

21  control?

22  A.  I had no idea what to do.

23  Q.  Okay.  But my question was:  You knew you

24  didn't go through passport control where they check

25  your passport?

PATEL - DIRECT/FRETER                    Vol. 4 - 826

1    A.  No.

2    Q.  No?  You were aware no one from the U.S. looked

3    at your passport?  Is that right or not right?

4    A.  Yes.

5    Q.  So you're in the United States, and then where

6    do you go in the U.S.?

7    A.  From Seattle, I went to New Jersey.

8    Q.  How did you get from Seattle to New Jersey?

9    A.  Flight.

10   Q.  How did you get money for a flight from Seattle

11   to New Jersey?

12   A.  That guy helped me.

13   Q.  The guy who put you on his back?

14   A.  Yes.

15   Q.  Why didn't you take the money and go back to

16   India?

17   A.  Because flights to India are very expensive.

18   Q.  Did the guy who put you on his back and then

19   got you a ticket to Jersey, did he tell you to do

20   anything?  Like why is he sending you to Jersey?

21   A.  He was speaking in English, and I really

22   couldn't understand everything that he was saying

23   and neither could he understand what I was

24   saying.

25   Q.  What happens when you get to New Jersey?

PATEL - DIRECT/FRETER                    Vol. 4 - 827

1    A.  I came to New Jersey.  I had a cousin there, a

2    male cousin, and he said there's this liquor store,

3    you could work there, and I was there for a week,

4    but I'm not used to alcohol.  I don't drink.  I

5    don't smoke, no tobacco, nothing, so I wasn't very

6    comfortable in the alcohol store.  I felt like

7    puking, so I didn't work there.

8    Q.  Between the time that you come to the United

9    States and the time you end up in Chicago, what

10   kind of jobs do you do?

11   A.  Through a contact, I was told to go and work in

12   a motel, and I was supposed to do repair work of

13   the lights and stuff like that.

14   Q.  Okay.  Do you end up in Atlanta at some

15   point?

16   A.  I had to go to Atlanta, but only for a week,

17   because in Tennessee I have another cousin, a

18   female, who has -- who runs some business

19   decorating weddings, wedding venues.

20   Q.  Okay.  But you get to Atlanta, right?  You get

21   to Atlanta?

22            THE INTERPRETER:  Yeah, Atlanta.

23            THE DEFENDANT:  I was in Tennessee for

24   five to six months.

25   BY MS. FRETER:

PATEL - DIRECT/FRETER                    Vol. 4 - 828

1    Q.  Do you make it to Atlanta?

2    A.  Yes, I did.

3    Q.  Okay.  What happens -- who do you see that you

4    know in Atlanta?

5    A.  Yes, I have another female cousin in Atlanta.

6    Q.  Okay.  And do you work in Atlanta?

7    A.  Not at that time.

8    Q.  Do you have a cousin named Danny, or Dinesh, in

9    Atlanta?

10   A.  Yes.

11   Q.  Do you see -- is Danny a male or female?

12   A.  Male.

13   Q.  And is this your blood cousin?  Is this Dinesh,

14   this Danny, like a real relative of yours, or is

15   that -- do you just say cousin?

16   A.  He's really not a blood relative, but my female

17   cousin's husband's -- husband's oldest sister's

18   husband.

19   Q.  So he is an in-law family?  He's part of your

20   extended family?

21   A.  Yes.

22   Q.  Married into your family through your cousin's

23   side?

24   A.  Correct.

25   Q.  So you call him "cousin"?

PATEL - DIRECT/FRETER                    Vol. 4 - 829

1    A. Yes.

2         MS. FRETER:  Okay.  So it seems like he

3    said more than just yes.  What else did he say?

4    A. Yes, like a cousin.

5    BY MS. FRETER:

6    Q. Okay.

7    A. Or a friend.

8    Q. Okay.  How do you end up -- or why do you end

9    up going from Atlanta to Chicago?

10   A. There were no jobs in Atlanta.

11   Q. And so why pick Chicago as opposed to somewhere

12   else?

13   A. First of all, there are a lot of Indians there;

14   and through a contact of mine -- actually, I play

15   drums, so I was able to talk to someone into the

16   music industry, and I also had a friend there, so I

17   went there.

18   Q. Okay.  And we saw in one of the Government's

19   exhibits there is a picture of somebody with a drum

20   set.  Do you remember that?

21   A. Yes.

22   Q. And was that you?

23   A. Yes.

24   Q. When did you go to Chicago?

25   A. I don't exactly remember, but I was in

PATEL - DIRECT/FRETER                    Vol. 4 - 830

1    Tennessee for like three to four months.  Then I

2    went to Chicago.  I needed a license because in

3    this country you can't do without a car.

4    Q.  Okay.  Mr. Patel, try really hard to answer the

5    question that I'm asking and not give too much

6    extra information so we don't get into something

7    else.

8    A.  Okay.

9    Q.  So my question was:  When did you get to

10   Chicago?

11   A.  I don't remember at the moment.

12   Q.  Do you remember if it was in 2022 or 2023?

13   A.  Twenty-two.

14   Q.  And where did you live in Chicago?

15   A.  Aurora.

16   Q.  And is Aurora a suburb of Chicago?  So meaning

17   it's like not downtown?

18   A.  I don't know about that.

19   Q.  And what kind of work were you doing while you

20   were living in Aurora?

21   A.  I got a job as a pizza delivery person.

22   Q.  How is it that you come to be a driver to pick

23   up packages?

24   A.  It so happened that I had bought a car for

25   $2,500, but it wasn't very good, and then I got

PATEL - DIRECT/FRETER                    Vol. 4 - 831

1    some music work, and then within a couple of

2    months, there were problems with my car.  The

3    transmission went off, so I had to spend a lot of

4    money on that, and I had to borrow all that money

5    from a friend to get this fixed, and I was looking

6    for work because I lost my job as a pizza delivery

7    person because there were too many people working

8    that job.

9    Q.  Okay.  My question, Mr. Patel, was how is it

10   that you end up -- like what happens to cause you

11   to go be driving to pick up packages?

12   A.  That time I just thought that this is legal

13   money.  What problem could be there?  I had no idea

14   about anything else about this place.

15   Q.  Okay.  Like who -- who calls you or talks to

16   you?  Like how does it happen that, like, somebody

17   says, Go pick this up?  Like how does that happen

18   for the first time?

19   A.  Danny, or Dinesh, Patel called me once, and he

20   asked how was I doing, do I have a job, et cetera.

21   And I said, Not really.  I don't.  So he said, I do

22   have a job.  Would you like to do that?  And I

23   said, Yes.

24   Q.  About when was that?

25   A.  I don't remember.

PATEL - DIRECT/FRETER                    Vol. 4 - 832

1   Q.  Do you know what year it was?

2   A.  Twenty-two.

3   Q.  Do you remember if it was warm or cold?

4   A.  It was cold.

5   Q.  And where did Danny tell you to go?  Where did

6   Danny tell you to go?

7   A.  Initially Danny told me to go to Indiana.

8   Q.  And what were you supposed to do in Indiana?

9   A.  He said you just have to go there, to the

10  address that I will give you, and someone will give

11  you a package.  As a courier, you just got to

12  deliver that.

13  Q.  And did you go pick up a package in Indiana?

14  A.  Yes.

15  Q.  And what did you do with the package the first

16  time after you picked it up?

17  A.  I just took that, and I delivered to the person

18  I was told to.

19  Q.  Who was that person?

20  A.  I have no idea about that.

21  Q.  Where was the person at?

22  A.  He was in Chicago.

23  Q.  Do you know where in Chicago?

24  A.  I don't remember.

25  Q.  Well, was it near you in Aurora?  Was it

PATEL - DIRECT/FRETER                     Vol. 4 - 833

1   downtown?

2   A.  I really don't know about this.  I can only

3   tell if I had a map.

4   Q.  Okay.  Was it like a house?  A business?  Like

5   what kind of place was this person at?

6   A.  No.  It was a small shopping mall, and he just

7   took it from there.

8   Q.  How did you know who to give the package to?

9   A.  So there was a dollar bill, and the number

10  would be confirmed by Danny, and then I would just

11  hand it over.

12  Q.  Okay.  I really don't understand what that

13  means.  Can you explain that some more?

14  A.  I don't know myself.

15  Q.  Okay.  My question was:  How did you know -- of

16  all the people, right, how did you know who to hand

17  the package to?

18  A.  So Dinesh Patel was coordinating all this.  I

19  would go to a certain place that he would direct me

20  to, and then Dinesh Patel would tell the other

21  person that this person has a brown car and this is

22  the license plate, and then that person would come,

23  and then we would talk to Dinesh Patel, and then

24  that's how the package would be picked up.

25  Q.  Okay.  What does that have to do with the

PATEL - DIRECT/FRETER                    Vol. 4 - 834

1   dollar bill?

2   A.   I'm not very sure about the dollar bill thing

3   because I don't know much about it, but then they

4   would look at the dollar bill, and then they would

5   confirm.

6   Q.  Who would look at the dollar bill?

7   A.  Danny and the person who would be there.  He

8   would tell me to take a picture of that and send it

9   to him, and I would do that, and the person who

10  would come there would be the one to give that

11  dollar bill.

12  Q.  You would give the dollar bill to the person

13  you also gave the package to?

14  A.  Yes, that person would.

15  Q.  I'm sorry.  I didn't hear the last --

16  A.  Yes, that person would.

17  Q.  Was it your dollar bill?  Was it your dollar

18  bill that you had that you took the picture of?

19  You, Mr. Patel, was it your -- you had a $1 bill,

20  and then you took a picture?  Was it your money?

21  A.  No, not mine.

22  Q.  Whose dollar bill was it?

23  A.  The person who would come there would have the

24  dollar bill.

25  Q.  Okay.  The person who would come would have the

PATEL - DIRECT/FRETER                    Vol. 4 - 835

1    dollar bill.  You would take a picture and then

2    would you send that to Danny; is that right?

3    A.  Correct.

4    Q.  And after that happened, then you would give

5    them the money?

6    A.  Right.

7    Q.  Did you pick up in Indiana and Wisconsin and

8    Illinois different packages?

9            INTERPRETER:  Indiana?

10   BY MS. FRETER:

11   Q.  Indiana, Wisconsin, Illinois?

12   A.  Yes.

13   Q.  And were you directed either by Danny or

14   someone else about where to go?

15   A.  Initially, it was Danny, and then there were

16   all these friends of his, but I have no idea about

17   these things because in my 44 years of life, I've

18   never done all these things.

19   Q.  Okay.

20   A.  I have no idea about this, but in India I used

21   to work for a music company.  We had to take huge

22   payments and deliver it to agencies, and I've done

23   that; but about this, I do not know.

24   Q.  Okay.  Well, did you think it was strange that

25   these elderly ladies were coming to your car to put

PATEL - DIRECT/FRETER                    Vol. 4 - 836

1    packages in it?

2    A.  Initially, as well as right now as we speak, I

3    have no idea if these ladies were giving me the

4    money or their husbands were or what because I came

5    to know about all these things only after this

6    happened.

7    Q.  Okay.  Do you remember a lady coming to give

8    you a package, and she used a wheel -- a walker to

9    get to you?  Do you remember that?

10   A.  Yes.

11   Q.  And then she loaded the stuff from the walker

12   into your car?  Do you remember that?

13   A.  Yes, I saw her, and then I was told to have the

14   package -- put it in the back of the car.  So I

15   just gestured to the lady, and that's what she

16   did.

17   Q.  It didn't seem strange to you that an elderly

18   woman with a walker would come to your car and put

19   packages in the back?  That didn't seem weird?

20   A.  I had no idea about this at all because who

21   knows.  She may have some problems.  She may have

22   been making some deliveries somewhere or whatever.

23   I have no idea.

24   Q.  The time when she came with the walker, where

25   did you take those packages to?

PATEL - DIRECT/FRETER                    Vol. 4 - 837

1    A.  I would take the package, and then I would be

2    directed to go to certain place where I would meet

3    that other person, and I would just deliver that.

4    Q.  And do you remember the lady when she came out

5    with the walker, because we can remember that one,

6    where did you take that package to?

7    A.  Everything had to be delivered the same day.

8    Everything would take place the same day, so I

9    don't really know much, but I think it was

10   Chicago.

11   Q.  Why did you take pictures on your phone of the

12   maps and the directions?

13   A.  Because that person would constantly ask me

14   where are you, how far have you reached, and I had

15   no idea, so I just took a picture and texted it.

16   Q.  Why would you take pictures of the packages?

17   A.  I did what I was told to do.

18   Q.  Okay.  So somebody told you take a picture of

19   the package and send it to them; is that right?

20   A.  Yes.

21   Q.  When you're in Wisconsin and you're stopped by

22   the police, didn't that cause you concern about

23   your package pickup business?

24   A.  No, because the lady used to give me the

25   package, and I had no idea about these things at

PATEL - DIRECT/FRETER                    Vol. 4 - 838

1    all.  I didn't even think about it.  I thought -- I

2    thought maybe there's some -- something concerning

3    guns and all that or maybe there was some

4    terrorists around and that's why they --

5               THE COURT:  All right.  We want to make

6    sure that you give your translator the opportunity

7    to convey your full answer.  So if you give a long

8    answer, it's more difficult for her to accurately

9    convey.  So say a few words, let her translate, and

10   then you can continue with your story.  Does that

11   work for you?

12              THE WITNESS:  Yes.

13   BY MS. FRETER:

14   Q.  And if I need more information, I'll ask more

15   questions.

16   A.  Okay.

17   Q.  So you get stopped by the police about this

18   package in Wisconsin.  Doesn't that make you think

19   maybe something's wrong with this situation, with

20   package pickups?

21   A.  No.

22   Q.  What did you think when the police in Wisconsin

23   let you go?

24   A.  I went immediately to the mall and I called

25   Dinesh, and I said, What's going on?  And he says,

1    No, it must be something else.  Don't worry.

2    Q.  And did you believe him?

3    A.  Not really because at first I did think

4    something was unusual but not much because, after

5    all, this lady was giving me the package, and it's

6    not like I was stealing anything.  I was just

7    delivering the stuff.

8    Q.  Okay.  So you sort of thought it was wrong or

9    you were sort of worried, but you still went to

10   Illinois later anyway?

11   A.  Actually, Dinesh gave me false information and

12   brainwashed me.

13   Q.  How did he brainwash you?

14   A.  He explained to me this is all legal.  Nobody

15   is going to catch you because the money is being

16   taken out of the bank.

17   Q.  All right.  And so when you say "the money is

18   being taken out of the bank," what does that

19   mean?

20   A.  That means it's honest money.

21   Q.  Oh, okay.  Meaning that it wasn't, like, from

22   the black market?

23   A.  Right.

24   Q.  Not from, like, an illegal sale?  That it's

25   legitimate money?

PATEL - DIRECT/FRETER                    Vol. 4 - 840

1    A.  Yes.

2    Q.  And so how did you get paid for picking up and

3    then distributing these packages?

4    A.  I told Dinesh to pay me by Zelle.

5    Q.  Okay.  And what is Zelle?

6    A.  It's something to do with the bank.  You get

7    direct transfer.

8    Q.  Do you use -- do you go to a bank, or do you

9    use it on your phone?

10   A.  Phone.

11   Q.  How much money would you get per package?

12   A.  $400.

13   Q.  Do you remember telling the police in Illinois

14   it was 250?

15   A.  Yes, there's a reason.  Because I have to spend

16   from -- anything from 150 to 180 on gas, so you

17   deduct that, and you're really left with around

18   250.

19   Q.  Okay.  So 400 is your gross and 250 is your

20   net?  Is that a fair statement?

21   A.  Yes, it would be around 250 or even around 200

22   sometimes.

23   Q.  Mr. Patel, why are you driving so far and so

24   many hours and only making $250 a package?

25   A.  First of all, I didn't have a job; secondly, I

PATEL - DIRECT/FRETER                        Vol. 4 - 841

1    had to pay rent; and third, I like traveling.  I

2    also had a travel business in India.

3    Q.  What does that mean, "a travel business"?

4    A.  I like to drive and enjoy nature.

5    Q.  When -- do you remember when you got arrested

6    in Illinois?

7    A.  Yes.

8    Q.  Why did you tell officers -- or what did you

9    mean when you kept saying "first time?"  What did

10   you mean by that?

11   A.  That I was arrested for the first time.

12   Q.  What is your opinion or belief about your

13   contact with the police in Wisconsin?

14   A.  Good.

15   Q.  Do you feel like you got arrested in

16   Wisconsin?

17   A.  Yes, but I had no idea that they would keep me

18   there in custody because I didn't know anything

19   about this.

20   Q.  Okay.  Did you get kept in custody in

21   Wisconsin?

22   A.  No.

23   Q.  So then I don't understand your answer.  My

24   question was:  How did you feel or what did you

25   view about your contact with the police in

PATEL - DIRECT/FRETER                    Vol. 4 - 842

1    Wisconsin?

2    A.  At that time I just thought that maybe some

3    investigation is going on, so they was just

4    checking me.

5    Q.  You'll agree that after your police contact in

6    Wisconsin, you did more pickups including in

7    Illinois?

8    A.  No.  I think it was one year, and then it was

9    this, just this.

10   Q.  Your contact with police in Wisconsin was in

11   November of 2022 -- no.  Sorry.  Yes, November of

12   20 -- November of '20.  November?  Is that right?

13           THE INTERPRETER:  November '20?

14   BY MS. FRETER:

15   Q.  November in Wisconsin, was it '24?

16           THE COURT:  No, '22.

17           MS. FRETER:  Twenty-two.  Sorry, Judge.

18           THE WITNESS:  Yes.

19   BY MS. FRETER:

20   Q.  And you got arrested in Illinois after that?

21   A.  Not in Illinois.  They did not arrest me.

22   Q.  Okay.  Well, in Madison County, here in

23   Edwardsville, they arrested you?

24   A.  Yes.

25   Q.  Okay.  When I asked you about Illinois, what

PATEL - DIRECT/FRETER                    Vol. 4 - 843

1    did you think I meant?

2    A.  I thought something else.

3    Q.  I know.  What did you think?

4    A.  Oh, I thought Illinois means Chicago.

5    Q.  Did you take money out of any of the boxes?

6    A.  No.

7    Q.  Do you remember telling the police that you did

8    take money out of the boxes?

9    A.  It so happened that they were torturing me.

10   They kept asking me questions, and at that time my

11   son was undergoing surgery, and my mother had a

12   brain stroke and even -- this woman, she's

13   paralyzed, and I didn't have money for that, and

14   even today my mother is so sick, but I'm unable to

15   send her for medical treatment.

16   Q.  Okay.  But the police -- when you talked to

17   them in Illinois, they gave you food and juice?

18   A.  Yes, they gave me juice.

19   Q.  They didn't hit you or beat on you?

20   A.  No.

21   Q.  They gave you a blanket?

22   A.  Yes.

23   Q.  Okay.  So when you say they're torturing you,

24   what do -- you don't mean physical torture.  What

25   do you mean?

Vol. 4 - 844

1    A.  Actually, they kept interrogating me.  They
2    kept interrogating me, and they kept asking me
3    questions, and I really had no idea what they were
4    trying to get at.
5    Q.  And when you were getting questioned by them,
6    how did all that make you feel?
7    A.  I felt like they were treating me like I was a
8    criminal terrorist.
9    Q.  Are you a terrorist?
10   A.  No.
11   Q.  But you were in the U.S. illegally, right?
12   A.  Yes.
13   Q.  So kind of that was -- that's a crime, right?
14   A.  Yes.
15   Q.  Were you worried about that?
16   A.  No, because I thought I stayed here honestly,
17   and I've never done anything dishonest and that I
18   would be paying my taxes and I have paid.
19          MS. FRETER:  Okay.  I don't have anything
20   further.
21          THE COURT:  Will you approach?
22          (Sidebar proceedings on the record.)
23          THE COURT:  Do you -- it's 10 after.  How
24   long do you think you're going to take?
25          MR. REED:  Given the pace with the

1    translator, probably a few hours.

2              THE COURT:  A few hours?

3              MR. REED:  Yes, Judge.

4              THE COURT:  Then we'll come back tomorrow,

5    and you're going to finish by 11:30, okay, and then

6    we'll just bring them back Monday, the jury, if you

7    think it's going to be hours.

8              MR. WEINHOEFT:  If we start at 9 --

9              MR. REED:  I think I will.

10              MR. WEINHOEFT:  -- there is no way we're

11    done by 11:30.

12              THE COURT:  There can be too much of a

13    good thing, guys.

14              MR. WEINHOEFT:  I hear you.

15              MR. REED:  Understood.

16              THE COURT:  No, listen, it's your case.

17              (End of proceedings at sidebar.)

18              THE COURT:  Mr. Patel, you have been on

19    the stand for a while, and the Government has a

20    number of questions they want to ask you.  So I

21    think the thing to do is we will recess for the

22    day, and we'll start back first thing tomorrow

23    because I think it's going to be a little while.

24    All right.  And people can get stressed out, you

25    understand, when you're being questioned.  All

Vol. 4 - 846

1     right, and, again, because we have to translate

2     this, it takes a little longer than usual.  Okay

3     with you?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  I was hoping we

6     can get finished today.  We certainly aren't going

7     to get wrapped up by 4:30, and so I think the thing

8     to do is we'll recess the jury for today, and we'll

9     start back tomorrow at 9 a.m.  All right.

10         Now, again, don't talk about this case.  I

11    think we're going to get it wrapped up tomorrow.

12    You may have to come back Monday for closing

13    arguments, I don't know, but -- so don't look at

14    the papers, don't do any independent research.

15         Mr. Patel's name, the surname Patel, as I

16    said, is more common than Jones and Smith; and so

17    if you do research on McGlynn in East St. Louis,

18    you're pretty much going to hit me and my family;

19    but if you research Patel in Atlanta, Chicago, all

20    over, you're going to get all sorts of things, and

21    that's one of the reasons we tell you just don't

22    try to do anything like that.

23         So you can't talk amongst yourselves.  The

24    only thing you can tell your family is that we're

25    back tomorrow; and when this is all over, I can

Vol. 4 - 847

1    tell you all about it, but right now we'll find

2    something else to discuss.

3            Okay.  Do we have -- we're not expecting

4    bad weather tomorrow, are we?

5            COURTROOM DEPUTY:  Monday.

6            THE COURT:  Great.  What is Monday?

7            COURTROOM DEPUTY:  They don't know yet.

8    It's too early.

9            THE COURT:  Folks, if we have Vancouver

10   floods on Monday, call in, and I'll have a Plan B.

11   Other than that, we'll talk tomorrow.

12            (Jury out at 4:15 p.m.)

13            THE COURT:  You guys stick around and we

14   can knock out instructions, but let's take a

15   five-minute recess.

16            (Recess at 4:15 p.m. until 4:25 p.m.)

17            THE COURT:  Mr. Patel, the testimony and

18   evidence is done for today.  Right now the lawyers

19   are just going to talk about what instructions will

20   be given to the jury, and it's legal decisions for

21   me to make, all right, so there's -- I don't see

22   any need for you to stick around and to keep the --

23   I really don't.  As I explained at the beginning of

24   trial, the selection of the jury, the instructions,

25   that sort of stuff, that's up to her.  If there is

Vol. 4 - 848

1    something that comes up this afternoon that I think

2    needs to be brought to your attention, we'll talk

3    about it first thing tomorrow morning when you get

4    back on the stand, okay?

5              All right.  Have a nice evening.

6              (Defendant exited the courtroom.)

7              (Off the record.)

8              THE COURT:  Do we have -- what

9    instructions are we hung up on?

10             MR. WEINHOEFT:  There is only one issue

11   from our perspective, and Kim sent an email this

12   morning with a number of issues to take up, so --

13             THE COURT:  All right.  I've been given 41

14   pages of instructions excluding the verdict form.

15             So let's start with Instruction No. 1,

16   members of the jury, 1.01, pattern instructions,

17   any objection?

18             MS. FRETER:  No objection.

19             THE COURT:  All right.  Number 2, 1.02,

20   charges against the defendant are in a document

21   called the indictment, any objection?

22             MS. FRETER:  No objection.

23             THE COURT:  All right.  That will be

24   given.

25             Instruction No. 3, presumption of

Vol. 4 - 849

1   innocence, 1.03, any objection?

2          MS. FRETER:  No objection.

3          THE COURT:  Okay.  Pattern -- or Number 4

4   is Pattern Instruction 2.01.  Any objection?

5          MS. FRETER:  No objection.

6          THE COURT:  It will be given.

7          Jury Instruction No. 5, 2.02, give the

8   evidence whatever weight you decide it deserves?

9          MS. FRETER:  No objection.

10          THE COURT:  All right.  That will be

11   given.

12          Instruction No. 6, Pattern Instruction

13   2.03, any objection?

14          MS. FRETER:  No objection.

15          THE COURT:  That will be given.

16          Number 7, Jury Instruction 2.04, number of

17   witnesses, any objection?

18          MS. FRETER:  No objection.

19          THE COURT:  Okay.  That will be given.  So

20   now we are at Instruction No. 8, the defendant has

21   an absolute right not to testify -- all right, so

22   that's not going to be given because he's

23   testifying.

24          MR. WEINHOEFT:  That is withdrawn.

25          THE COURT:  All right.  So 7 is

1  withdrawn -- I mean, 8.  Pardon me?

2           MR. WEINHOEFT:  I'm sorry.  I was just

3  asking counsel if we -- there's a separate -- I

4  know there is a separate pattern instruction for

5  considering the -- oh, it's considering the

6  credibility of the witnesses.  We gave that in the

7  alternate.  We're not quite there yet.

8           THE COURT:  All right.  So Instruction No.

9  9, 3.01, any objection?

10          MS. FRETER:  No objection.

11          THE COURT:  Okay.  That will be given.

12          Number 10, 3.02, proper for an attorney to

13  interview a witness?

14          MS. FRETER:  Your Honor, I requested that

15  the Government withdraw this in that that has not

16  come up in this case.

17          THE COURT:  It's proper for an attorney to

18  interview any witness in preparation for trial.

19          MR. WEINHOEFT:  I generally like to give

20  this instruction just on the off chance they pick

21  up on something we didn't.  I don't know that it

22  matters much either way.  I don't really have a

23  strong preference.

24          MS. FRETER:  I have a preference, which is

25  why I'm asking that it be removed.  There's been

Vol. 4 - 851

1    no -- sometimes you get into a thing, like, they

2    talked to you before trial and you worked on your

3    testimony and blah, blah, blah.  That's what this

4    instruction is about.  That hasn't come up.  I'm

5    asking that it be --

6         THE COURT:  I'm not going down that hill.

7    Her objection is sustained, so we'll refuse the

8    instruction.

9         I don't recall it coming up at all.  The

10   closest thing is the interview of the defendant

11   where he doesn't have the attorney present, but

12   that's -- if you don't want it, it's defendant's

13   case.

14        All right.  Jury Instruction 11, 3.03, you

15   have heard the evidence that before trial a witness

16   made statements that may be inconsistent, any

17   objection?

18        MS. FRETER:  Yes, Your Honor.  That,

19   again, this hasn't come up in the evidence.

20   There's been no impeachment of any of the

21   witnesses, no talk about inconsistent statements.

22   The next instruction is about inconsistent

23   statements of the defendant, so it would cover

24   Mr. Patel, so I'm asking that it also -- I'm

25   objecting or asking that it also be withdrawn.

1          THE COURT:  I'm going to give it over

2     objection.  You did cross-examine -- you did

3     cross-examine some witnesses about things that were

4     said when we got into translations.  There was some

5     cross-examination about that.  There may have been

6     some inconsistency, so I'll go ahead and give it.

7          Jury Instruction 3.04, you've heard

8     evidence before trial the defendant made

9     statements, do you have an objection to that?

10         MS. FRETER:  No.

11         THE COURT:  Okay.  That will be given.

12         Jury Instruction No. 13, 3.09, you've

13    heard testimony that the defendant made statements

14    to law enforcement, any objection?

15         MS. FRETER:  No objection.

16         THE COURT:  All right.  That will be

17    given.

18         Instruction No. 14 is 3.14 Pattern

19    Instruction, you have heard recorded conversations.

20    Any objection?

21         MS. FRETER:  Yes, Your Honor.  I think

22    that the next instruction is the appropriate one

23    that has to do with the transcripts between English

24    and Hindi or English and Gujarati and that in this

25    case we didn't have transcripts of like wire tapped

Vol. 4 - 853

1    calls or something that would be appropriate for

2    this instruction.

3            THE COURT:  Well, we have a witness by

4    deposition.  Is that handled in a different

5    instruction?

6            MS. FRETER:  I think so because they have

7    the actual -- they have the actual --

8            THE COURT:  All right.  During the

9    trial -- you're proposed -- is this 3.15?  Is this

10   your proposed instruction?

11           MS. FRETER:  3.15, no, that's the

12   Government also.  During the trial, Hindi and

13   Gujarati language recordings were admitted into

14   evidence.  You were given English transcripts,

15   et cetera.

16           Do you think these both should be given?

17   What's your position, Government?

18           MR. WEINHOEFT:  Well, I think certainly

19   3.15 should be given.  You know, I don't have a

20   strong preference -- I don't think it matters that

21   much on Number 14.  I'll defer to defense counsel.

22   Whichever she prefers is fine with me.

23           THE COURT:  Well, there was some stuff

24   from his cell phone, but there wasn't any

25   conversation.  There was some videos.  I don't

Vol. 4 - 854

1  recall hearing any -- all right.  I'm going to

2  grant 3.15.  And are you withdrawing 3.14 then?

3          MR. WEINHOEFT:  And I apologize, Your

4  Honor, since the defense doesn't want it, I know

5  that -- to me I see this as a tactical choice on

6  their end on how they want to view that, so we will

7  withdraw it at their request.

8          THE COURT:  All right.  Instruction No. 17

9  is 3.16, pattern instruction summaries, any

10  objection?

11          MS. FRETER:  No objection.

12          THE COURT:  That will be given.

13          Now, this says, Joint Jury Instruction

14  3.18, so that will be given.

15          Joint Jury Instruction No. 19 is 3.19 --

16          MS. FRETER:  Judge, I think that this got

17  marked as "joint."  I don't believe there were

18  deceptive investigative techniques and so that -- I

19  would object to this instruction.  There are

20  cautionary notes from the Seventh Circuit that go

21  with this pattern instruction about --

22          THE COURT:  Well, it says Joint Jury

23  Instruction.  I thought that meant you guys both

24  agreed on it.

25          MS. FRETER:  I understand, Your Honor.  I

Vol. 4 - 855

1    think it's a typo.

2          THE COURT:  You have heard evidence

3    obtained from Government's use of deceptive

4    investigative techniques.  The Government is

5    permitted to use these techniques.  You should

6    consider evidence obtained -- well, he's claiming

7    that the questioning of him was tortuous and that

8    he had people telling him he was a liar when he

9    wasn't lying.  I think, under those circumstances,

10   it's a proper -- they could decide, Well, they were

11   trying to deceive this guy.  His interpreter was

12   also his inquisitor; she wasn't an independent

13   agent, per se; and because of the confusion in the

14   translations, maybe they conclude that some of it

15   was deceptive, so I'll let you articulate your

16   objection.

17         MS. FRETER:  Thank you, Your Honor.  I

18   would object to this instruction in that the

19   instruction is designed for instances, for example,

20   when the Government uses a sting, or something to

21   that effect, to indicate to the jury that it's

22   appropriate for them to do a sting or do that kind

23   of operation in order to get somebody to do

24   something.

25         There is discussion in the notes regarding

Vol. 4 - 856

1    this about -- cautions when defendant asserts a

2    defense of entrapment.  This instruction is not

3    designed to be used to deal with whether or not a

4    defendant's statement were coerced or voluntary or

5    under the circumstances of that.  We have a

6    different instruction for that and that the Notes

7    on Use for this instruction urge caution in giving

8    it.

9           There's been no argument by me or

10   questions raised by me to suggest that the agents

11   did anything untoward in this case.  In fact, even

12   when the special agent was on the stand, we just

13   discussed how she didn't know or knew certain

14   things, how it would have changed the way in which

15   she asked questions with no hint of anything being

16   untoward.

17          Mr. Patel has just testified that even

18   though he didn't like them continuing to ask

19   questions, he's also testified on direct that he

20   was given a blanket and food and juice; and that

21   difficult questioning or forceful questioning is

22   not the same as a deceptive technique; and my

23   position would be that the giving this instruction

24   is contrary to all of the work that we've done in

25   order to set up the issue that language is a

Vol. 4 - 857

1    concern, and the information and the way that the

2    agents questioned Mr. Patel or what he said, that

3    somehow it paints that with the patina of

4    acceptability, and it takes away from the

5    instruction that has to do with how much weight the

6    jury could give his statement; so I object to this

7    instruction.

8              MR. WEINHOEFT:  Judge, I generally think

9    it's appropriate.  The Government had two stings in

10   this case where they --

11             THE COURT:  Like I said, two stings.

12             MR. WEINHOEFT:  -- created all sorts of

13   false pretenses, and, again, I don't have the

14   strongest feelings, but I do think the suggestion

15   can be -- the inference was there that, perhaps,

16   the case agent was doing something wrong by being

17   interpreter and case agent at the same

18   time especially since the point was made that she

19   wasn't in the room when questioning began, and so,

20   again, I don't have terribly strong feelings on

21   this, but I do generally think it's appropriate.

22             THE COURT:  I'm not going to go down this

23   hill either.  So objection sustained.  I'll refuse

24   to give that instruction.

25             4.05 -- I mean, there were two stings.

Vol. 4 - 858

1    You tried to suggest that it wasn't just a

2    problem -- the defendant attempting to suggest that

3    interviews -- it wasn't just a problem of

4    translation, that there was some kind of

5    underhanded stuff going there, but I'll refuse the

6    instruction.

7              Jury Instruction No. 20, 4.05 --

8              MS. FRETER:  No objection.

9              THE COURT:  -- superceding indictment?

10             All right.  4.06, accused of more than one

11   crime?

12             MS. FRETER:  No objection.

13             THE COURT:  That will be given.

14             Jury Instruction 22, 4.08 Pattern

15   Instruction, you're not to consider possible

16   punishment.

17             MS. FRETER:  Your Honor, I'm again

18   objecting to this instruction based on the comments

19   and the Notes on Use in the Seventh Circuit that

20   says that this is an optional instruction and that

21   the concerns with it are that it can be viewed as

22   lowering the Government's burden of proof; and for

23   those reasons, I object.

24             THE COURT:  It's a pattern instruction

25   that, I think, adequately --

Vol. 4 - 859

1          MS. FRETER:  It is.

2          THE COURT:  -- states the law, and so I'm

3    going to give it over objection.

4          Jury Instruction 23, 4.09, person attempts

5    to commit wire fraud, et cetera, any objection?

6          MS. FRETER:  Yes, Your Honor, in that

7    Mr. Patel is charged with substantive offenses, not

8    attempts, and so this instruction --

9          THE COURT:  I thought we had these worked

10   out.  Jesus Christ.

11         All right.  So you object because you

12   believe that this is -- because what is wrong with

13   this one?

14         MS. FRETER:  It's about attempt and

15   substantial step, and the Government has charged

16   all completed offenses.

17         MR. WEINHOEFT:  There is attempt language

18   in the indictment, but, your Honor, quite frankly,

19   these are obviously completed offenses, and it's

20   not a hill to die on.  If there's an objection, I

21   don't have a problem.

22         THE COURT:  All right.

23         MR. WEINHOEFT:  I'll withdraw.

24         THE COURT:  All right.  So you're going to

25   live with Jury Instruction No. 24?  Is that the one

1    we're going to go with?

2            MS. FRETER:  Yes, Your Honor.

3            THE COURT:  No objection by Government --

4    by plaintiff -- by defendant?

5            MS. FRETER:  No, Your Honor.

6            THE COURT:  It will be given.

7            Instruction No. 25, 5.09, definition of

8    conspiracy, any objection?

9            MS. FRETER:  No objection.

10           THE COURT:  It will be given.

11           Jury Instruction 26, based on *Salinas vs.*

12   *United States*, the conspiracy may exist even if the

13   conspirator does not agree to commit or facilitate

14   each and every part of the substantive offense, any

15   objection?

16           MS. FRETER:  Yes, Your Honor.  This is not

17   a pattern instruction.  The Government is citing

18   some language from the case here.  The Government

19   and I have had conversations about this.  They

20   believe it's the *Pinkerton* instruction.  My

21   position would be if the Government wants to give a

22   *Pinkerton* instruction, they should give -- I think

23   it's 5.10 has the full instruction in which the

24   Notes on Use caution that the full instruction

25   should be given so that all of the elements and all

Vol. 4 - 861

1    of the definitions are defined sufficiently when

2    giving a *Pinkerton* instruction.

3          MR. WEINHOEFT:  Judge, this is a hill to

4    die on.  This instruction is very central to the

5    Government's theory of the case.  The last -- or

6    the first -- the previous instruction defines what

7    a conspiracy is.  Jury Instruction No. 26 describes

8    in the situation like this, where it is a larger

9    conspiracy and there are people with multiple

10   roles, what the law is.

11         Most importantly, I would point out this

12   is an accurate statement of the law.  It is

13   verbatim taken from the U.S. Supreme Court.  It is

14   language that is routinely given in cases all over

15   the country and, quite frankly, I would have

16   briefed the issue for the Court, but I mean, we

17   exchanged these instructions over a month ago, and

18   I just found out today that we have an objection to

19   this.  This is a plainly appropriate instruction

20   based on the facts of this case; but most

21   importantly, it's an accurate statement of the law;

22   and it is the *Tolliver* case, *454 F.3d 660*, points

23   out -- it cautions district courts to provide an

24   adequate guidance on areas of conspiracy law and

25   the nuances of conspiracy law, and this is plainly

Vol. 4 - 862

1    an example in which this particular instruction

2    must be given.

3            THE COURT:  It will be given over

4    objection.

5            Jury Instruction No. 27, based on

6    statutory definition of wire fraud, any objection?

7            MS. FRETER:  No objection.

8            THE COURT:  It will be given.

9            Jury Instruction 28, any objection?

10           MS. FRETER:  No objection.

11           THE COURT:  Jury Instruction 29, proof of

12   scheme?

13           MS. FRETER:  No objection.

14           THE COURT:  All right.  That will be

15   given.

16           Jury Instruction 30, definition of

17   material?

18           MS. FRETER:  No objection.

19           THE COURT:  That will be given.

20           Jury Instruction 31, intent to defraud?

21           MS. FRETER:  No objection.

22           THE COURT:  That will be given.

23           Jury Instruction 32, 4.10, definition of

24   knowingly?

25           MS. FRETER:  No objection.

Vol. 4 - 863

1           THE COURT:  That will be given.

2           Jury Instruction 33, a joint venture, an

3    offense may be committed by more than one person,

4    any objection?

5           MS. FRETER:  No objection.

6           THE COURT:  That will be given.

7           Jury Instruction No. 34, 5.06, aiding and

8    abetting?

9           MS. FRETER:  Your Honor, I would object to

10   this instruction as it's given based on the fact

11   that the Government is giving conspiracy

12   instructions and then now they're going to give

13   this definition instruction that's not the full

14   *Pinkerton* instruction; and so as a result of that,

15   I would object to this instruction as being

16   confusing and contrary to the other instructions

17   that the Court is giving regarding conspiracy and

18   responsibility.

19          MR. WEINHOEFT:  Judge, I would have two

20   responses to that.  First of all, Counts 2, 3 and 4

21   specifically charge and allege aiding and abetting.

22   I'd point out that this instruction is appropriate

23   even when aiding and abetting is not charged.  The

24   Court should give it anyway, but here we went to

25   the length of actually charging aiding and abetting

Vol. 4 - 864

1    to make it really clear from the beginning what the
2    theory was, and so that's plainly charged in Counts
3    2, 3 and 4; and as to the fact that Count 1 is an
4    inchoate offense, it's black letter law that you
5    can also aide and abet a conspiracy as well.  So
6    it's an appropriate instruction and should be
7    given.
8         THE COURT:   It will be given over
9    objection.
10        MS. FRETER:  Your Honor, I have to
11   apologize.  In my list -- and I sincerely
12   apologize.  In Instruction 32 -- I'm sorry I have
13   to go back.  I sincerely apologize.
14        THE COURT:  You want to object to 32,
15   definition of knowingly?
16        MS. FRETER:  I don't want to object to the
17   instruction, Judge.  I had proposed to the
18   Government different language that they do not
19   like, which would be in the second paragraph where
20   it says, Believed it was highly probable that they
21   were being deceived, and instead of the word
22   "deceived" -- because the issue isn't deception.
23   This is defrauded, and so I requested that the word
24   "deceive" be replaced with "defraud."  The
25   Government doesn't agree.  I can submit a proposed

1    instruction that says "defrauded" so that the Court

2    can reject it.

3         MR. WEINHOEFT:  Deception is the pattern

4    language, and the scheme to defraud as charged in

5    2, 3 and 4 is -- plainly includes the concepts of

6    deception.  That's the --

7         THE COURT:  Do we have an instruction that

8    defines "deceive" or "defrauded"?

9         MR. WEINHOEFT:  What's that?

10        THE COURT:  Is there a separate

11   instruction that defines "deceived" or "defrauded"

12   that's being offered?  I mean, if it's a pattern

13   instruction, I'm going to leave it as is.  I don't

14   know the difference between -- I don't know why

15   this would be confusing.  If you want to offer a

16   second objection, I'll sleep on it, but I'm going

17   to -- I plan on giving this -- I mean, a separate

18   proposed one?

19        MS. FRETER:  Judge, the pattern

20   instruction where this language is, it just says,

21   "Insert conduct."  So it doesn't use this exact

22   language because every case is different, and so

23   the "defrauded" word that I'm using is coming from

24   the indictment.

25        MR. WEINHOEFT:  Again, this is -- this was

Vol. 4 - 866

1    dropped this morning.  I'd have to look at it

2    again, but I'd stand on it's a pattern

3    instruction.

4             THE COURT:  I'll sleep on it, but at this

5    point I'm overruling your objection and granting

6    it.  I'm going to give it.

7             Jury Instruction 33, 5.05 -- now we're to

8    Jury Instruction 35, success not required, any

9    objection?

10            MS. FRETER:  No objection.

11            THE COURT:  That will be given.

12            Instruction 36, wire communications, any

13   objection?

14            MS. FRETER:  No objection.

15            THE COURT:  That will be given.

16            Jury Instruction No. 37, use of mail as

17   interstate commerce, any objection?

18            MS. FRETER:  No objection.

19            MR. WEINHOEFT:  Judge, this is actually

20   the one that there's, I think, a small issue with.

21   This, as submitted -- 37, we submitted it with only

22   discussion of interstate wires, but Count 1 alleges

23   conspiracy of multi-object conspiracy of both mail

24   and wire fraud, so I think that we need to use the

25   pattern instruction that also includes commercial

Vol. 4 - 867

1    carrier because we do have three packages shipped

2    by UPS, and so I think there needs to be something

3    in the instructions to help the jury as it relates

4    to the multi-object conspiracy.  So I do have a

5    written -- a proposed written version.  It's

6    verbatim out of the pattern that just includes the

7    language of both interstate wire and interstate --

8    or private commercial carrier.

9             THE COURT:  Do you have any objection with

10   that?

11            MS. FRETER:  No, Your Honor.

12            THE COURT:  So I will treat this one as

13   withdrawn, and I'm going to make a note that you

14   are going to give me one in the morning.

15            MR. WEINHOEFT:  I came prepared.

16            LAW CLERK:  Can we get an electronic copy

17   of this as well?

18            MR. WEINHOEFT:  I'll send it.  So I've

19   labeled that 37(a), Your Honor.

20            THE COURT:  Okay.  Jury Instruction 38,

21   *United States vs. Pearson*, defendant caused an

22   interstate wire communication between the states of

23   Indiana and Oklahoma.  Any objection?

24            MS. FRETER:  No objection.

25            THE COURT:  All right.  That will be

Vol. 4 - 868

1    given.
2          Instruction No. 39, eluding examination or
3    inspection?
4          MS. FRETER:  No objection.
5          THE COURT:  All right.  That shall be
6    given.
7          All right.  Pattern Instruction 7.01 on
8    jury deliberations, any objection?
9          MS. FRETER:  No objection.
10         THE COURT:  All right.  That will be
11   given.  Jury Instruction 41 is 7.02, verdict form?
12         MS. FRETER:  No objection.
13         THE COURT:  That will be given.
14         Unanimity, disagreement among jurors, any
15   objection to 42?
16         MS. FRETER:  No objection.
17         THE COURT:  All right.  That will be
18   given.
19         All right.  I have that as everything.
20         Okay.  Nine o'clock -- what kind of
21   weather do we have coming Monday?
22         MR. WEINHOEFT:  I'm honestly not
23   certain.
24         THE COURT:  I think that this -- I'm just
25   going to say this:  There's a lot for this jury to

Vol. 4 - 869

1   go through.  There's a lot of documents.  If your

2   cross-examination is going to take a couple hours,

3   I don't think we get this case -- and if you're

4   closing argument is going to be an hour or more, I

5   don't think that we get this to the jury early

6   enough on Friday that we're not giving them an

7   impetus to cut short deliberations.  It's a lot for

8   them to go through.

9         So it's my inclination at this point that

10  once we get the testimony of Mr. Patel wrapped up

11  and you decide whether or not you want to call any

12  rebuttal witnesses, I would probably end it there

13  and tell the jury we're going to come back fresh on

14  Monday for oral argument -- for closing arguments

15  and deliberations.

16        If between now and tomorrow midmorning, if

17  it looks like we may have some inclement weather

18  that might be problematic, I probably won't have

19  the jury come in until ten, if necessary, and we've

20  got to track down -- we've got to make sure we can

21  have an interpreter, and getting two of them has

22  been harder than I've ever experienced in getting

23  an interpreter in a case.  They're traveling

24  distances.  If there is snow and ice on the East

25  Coast, we're going to hear, I can't make it.

Vol. 4 - 870

1        (Off the record.)

2        (Proceedings recessed at 4:57 p.m. until

3    9:00 a.m. February 7, 2025.)

4

5            *  *  *  *  *  *  *  *  *  *  *  *

6            CERTIFICATE OF COURT REPORTER

7

8        I, Erin M. Materkowski, hereby certify that

9    the foregoing is a true and correct transcript from

10   reported proceedings in the above-entitled matter.

11

12   /s/ Erin M. Materkowski          Date: 06/30/2025
     ERIN M. MATERKOWSKI, RPR, CRR
13   Official Court Reporter
     Southern District of Illinois
14   East St. Louis Division

15

16

17

18

19

20

21

22

23

24

25