UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )
                             )  Cause No.
  vs.                        )  3:23-cr-30076-SPM-1
                             )  East St. Louis, IL
NIRAV B. PATEL,              )  May 29, 2025
                             )  10:36 a.m.
        Defendant.           )

Before the
HONORABLE JUDGE STEPHEN P. MCGYLNN

**TRANSCRIPT OF SENTENCING HEARING**

FOR PLAINTIFF:     Mr. Peter T. Reed
                   Mr. Steven D. Weinhoeft
                   United States Attorney's Office
                   9 Executive Drive
                   Fairview Heights, Illinois  62208
                   peter.reed@usdoj.gov
                   steven.weinhoeft@usdoj.gov

FOR DEFENDANT:     Ms. Kim C. Freter
                   Federal Public Defender's Office
                   650 Missouri Avenue, Suite G10A
                   East St. Louis, Illinois  62201
                   kim_freter@fd.org

INTERPRETER:  Chetan Vyas

COURT REPORTER: Erin M. Materkowski, RPR, CRR
                erin_materkowski@ilsd.uscourts.gov
                750 Missouri Avenue
                East St. Louis, IL  62201

(Proceedings taken by machine shorthand; transcript
    produced by computer-aided transcription)

 1              (In open court.)

 2              COURTROOM DEPUTY:  Court calls Case No.

 3    3:23-cr-30076, the case of the *United States of*

 4    *America v. Nirav Patel.*  Case is called for a

 5    sentencing hearing.

 6              Parties, if you would please introduce

 7    yourselves for the record.

 8              MR. REED:  Good morning, Judge.  Peter

 9    Reed and Stephen Weinhoeft for the Government.

10              THE COURT:  Good morning.

11              MR. WEINHOEFT:  Good morning, Your

12    Honor.

13              THE COURT:  Good morning, gentlemen.

14              MS. FRETER:  Good morning, Your Honor.

15    Kim Freter for Mr. Patel, who is also present along

16    with the interpreter who we'll have swore in.

17              THE COURT:  Swear in the interpreter,

18    please.

19              (Interpreter sworn.)

20              THE COURT:  All right.  I see Mr. Patel

21    has his hand up.

22              Mr. Patel, I'll give you a chance to

23    address me in a moment.

24              Does the Government intend to call any

25    witnesses or offer any further evidence in addition

1      to the victim impact statements that I received

2      from some of the victims?

3                  MR. REED:  No, Judge.  The victims have

4      been informed of their right to be here.  They wish

5      they could but are not able to, so we will not be

6      calling any witnesses or presenting any additional

7      evidence.

8                  THE COURT:  All right.  Does the defense

9      intend to call any witnesses or offer any evidence?

10                 MS. FRETER:  Only Mr. Patel, Your Honor.

11                 THE COURT:  He wishes to address the

12     Court?

13                 MS. FRETER:  Yes, Your Honor.

14                 THE COURT:  All right.  Any objection to

15     the pretrial investigative report?

16                 MR. REED:  No, Judge.

17                 MS. FRETER:  Your Honor, I did not file

18     any written objections.  Mr. Patel has now twice

19     declined to go over the PSR with me.  When I review

20     the PSR, I don't find anything objectionable, but I

21     do not have his thoughts and opinions on that, so I

22     wanted to let the Court know.

23                 THE COURT:  All right.  The Court will

24     adopt the presentence investigative report as

25     written.  The defendant was found guilty on five

1    counts after trial by jury.

2           Defendant was convicted in Count 1 of

3    conspiracy to commit wire fraud, which has a

4    statutory penalty of not more than 20 years in

5    prison and a fine of up to $250,000.

6           Counts 2, 3, 4, the wire fraud counts,

7    also have a penalty of not more than 20 years'

8    imprisonment and a fine of up to $250,000.

9           Count 5, the illegal entry count, the

10   defendant can be sentenced to no more than 6

11   months' imprisonment and fined no more than $5,000.

12          The guidelines, as calculated by

13   probation, suggest the guideline range with respect

14   to Counts 1 through 4 is 87 months to 108 months.

15          Does the Government agree with that

16   calculation?

17          MR. REED:  Yes, Judge.

18          THE COURT:  Does defense agree with that

19   calculation?

20          MS. FRETER:  Yes, Your Honor.

21          THE COURT:  All right.  And then with

22   respect to the Count 5, there are no applicable

23   guideline range.  It just allows the Court to

24   consider the nature of the offense and can sentence

25   a maximum of six months' imprisonment, and that can

1    be either consecutive to or concurrent with the

2    sentences imposed by the Court on Counts 1 through

3    4.

4              Does the Government agree with that?

5              MR. REED:  Yes, Judge.

6              THE COURT:  Does defense agree with that?

7              MS. FRETER:  Yes, Your Honor.

8              THE COURT:  Okay.  In addition to

9    considering the advisory guidelines, I'm also to

10   consider other sentencing factors under Section

11   3553(a).  I'm directed to impose a sentence that is

12   sufficient, but not greater than necessary, to

13   comply with the purposes of our sentencing goals

14   and criminal justice system.

15             I'm asked to consider the need for the

16   sentence to reflect the seriousness of the crime,

17   to promote respect for the law, to provide just

18   punishment for the offense.  The sentence should

19   deter criminal conduct, protect the public from

20   future crimes by this defendant, promote his

21   rehabilitation.  I must also consider the nature

22   and circumstances of the offense, the history and

23   characteristics of Mr. Patel, the need to avoid

24   unwarranted sentence disparities among

25   similarly-situated defendants and the types of

1   sentences that are available.

2           At the time of sentencing, I follow a

3   procedure in where I allow the defendant to address

4   the Court, I then allow his lawyer to make

5   argument, I then will allow the Government to make

6   argument, and I will give the defense the last

7   word.

8           But before we get to -- before we get to

9   that, I did want to acknowledge that I had received

10  from Mr. Patel while he was incarcerated a letter

11  dated April the 23rd -- I'm sorry, a letter that we

12  received April 23rd of this year, a one-page letter

13  dated February 14, 2025.  It is a handwritten

14  letter.  It is written in the English language, and

15  it's signed by Mr. Patel.  I have read that.  The

16  writing is cursive.  Additionally, I received a

17  four-page printed letter purportingly to be from

18  Mr. Patel, and I have reviewed that.  There is,

19  finally, a two-page letter signed by Mr. Patel that

20  I received at that same time.  This is in cursive

21  writing, and it is in English, so I have reviewed

22  that.

23          I've also received a victim impact

24  statement relating to the victim V.B. that reads as

25  follows:

1    It's hard to put into words what my mother

2    has gone through as a victim of this scam.  She

3    honestly believed that she owed money from some

4    sort of mistake and was working with officials to

5    correct the problem.  When she found out how she

6    had been taken, she lost trust in institutions that

7    are supposed to protect us.  She also was afraid to

8    answer her phone, check her email or answer the

9    door.  In short, she was afraid to be alone and had

10   lost confidence in her ability to make decisions

11   for herself.

12   Since then, I have -- since then, I have

13   had to move my mother to a new residence, somewhere

14   she feels safe.  We have canceled her phone,

15   changed her email accounts and canceled any credit

16   card that they may have accessed.  We have switched

17   banks, put safeguards on all her accounts and

18   frozen her credit to ensure her economic survival.

19   For me -- and this is written by V.B.'s

20   daughter -- this has been a great deal of time

21   spent handling problems.  Times that would have

22   gone otherwise into a day out with my mother has

23   been spent on trying to safeguard her, reassure her

24   and manage problems that keep popping up as a

25   result of this scam.

1          The damage done was more than just a loss

2     of money.  My mother went from a happy, confident,

3     retired professional to someone who was willing --

4     I'm sorry, someone who was unwilling and unable to

5     make a decision.  She lost her willingness to

6     travel, explore and enjoy life.  I miss her spirit.

7     I know she is unable to reclaim it.

8          A letter from V.L. reads:

9          My life has been turned upside-down by the

10    experience of this case.  As a nurse, my life was

11    based on trust, truthfulness and service to others.

12    Now I'm left feeling betrayed by it all.  I found

13    myself distrustful of others, avoiding social

14    contact of all kind.  My free time was spent doing

15    artwork, painting canvasses, decorative art and

16    painting of murals.  I no longer feel motivated to

17    do these activities.  Financially living in near

18    poverty, very limited ability to afford more than

19    necessities, not the life I worked to build and

20    maintain.  I must admit I feel rage and anger for

21    those who chose to strip away the lives of others

22    through their greed.

23         Victim V.B. lost and restitution will be

24    ordered for V.B. in the amount of $101,900; victim

25    K.E. suffered a loss of $29,000; and Victim V.L.

1    suffered a loss of $308,016.66; and the amounts

2    that K.E. and V.L. lost will also be ordered as

3    restitution.

4          All right.  Mr. Patel, as I explained to

5    you previously, this is your opportunity to tell me

6    what it is you want me to know as I consider what

7    are the appropriate sentence to impose, a sentence

8    sufficient, but not greater than necessary, to

9    accomplish the goals of sentencing.

10          THE DEFENDANT:  This is my newspaper

11    article in India, 2007.  In that also with honesty

12    and hard working.  That's what my philosophy of

13    life is.  And that is written on the dollars only.

14          And second thing, I wrote a letter to the

15    Prime Minister of India.  I will return letter to

16    my embassy, United, Washington, D.C., White House,

17    news message from American media, CNN news media,

18    and the Indian media.  And all those places, what

19    they were -- catch them, whatever I could do, I

20    have done my efforts to catch them.  The person is

21    sitting in India, he's the son of a politician and

22    that the -- my Prime Minister and that political

23    group that person is.

24          THE INTERPRETER:  Okay.  Yeah.  Because

25    Judge needs to listen to what I am telling, okay?

1          THE DEFENDANT:  Whatever I could do, I've

2    done all my efforts to catch them because I want to

3    give full justice to these ladies, and I want to

4    return the money to those ladies.

5          The guy who is sitting in Atlanta, my

6    cousin, he's not picking up my phone itself.  They

7    killed my mother.  My children's future has been

8    ruined by them.  I am also a family person, and I

9    understand that, and I promise that, and -- and --

10   and, if they can be caught, if any honest officer

11   is there then; and if nothing -- if nothing

12   happens, then I'm ready to sell my body, and I want

13   to give money to -- return the money back to them.

14         But I can give them the confidence that I

15   do not belong to this gang, and I am not a member

16   of them; and in this laws and the constitutional

17   provisions, I am ready to do whatever -- even if I

18   get killed or I die, I'm ready to do that.

19   Everything has been finished for my life.  My house

20   is ruined.  So whatever you ask me to do, I am

21   ready to follow your instructions.

22         And -- and -- and -- and I called the

23   Indian Embassy and I give all the details, and you

24   can ask the Indian Embassy what I told them, all

25   the details; and whatever you instruct me, I'm

1    ready to do that.  I am going to give my life, but

2    I won't leave them alone.  So for $400 my life has

3    been finished.

4         I would sell off my body and give money

5    back to them, and you've got all the evidence there

6    is, all the papers.  You got all the evidence.  I

7    just need one -- I need one, one honest officer;

8    and I'll return the letter to the FBI chief

9    general.  He is a person I wrote to help me, sir.

10        Whatever is your decision and the justice,

11   I'm ready to accept it.  My -- from my side, my

12   defense lawyer never told them that this man is

13   ready to help them to catch those people.  There is

14   no -- not a single evidence has been given to the

15   jury from my side.  My father is 80 years old, and

16   is on -- today he is giving free services to

17   elderly homes.  My father is a rickshaw driver, and

18   he's giving free services to the old people.  There

19   is no bad reputation about me in India.  There is

20   not a single traffic ticket I have been given.  I

21   have driven 9 million miles in India, and there is

22   not a single crime committed there.  I'm ready to

23   sacrifice my life, but I won't live any one of

24   them.  I need one help, just one honest officer.

25   I'm not making any jokes, sir.  My mother died ten

1    months back until I'm not able to talk to my

2    family.  My wife's phone has been turned off.

3              THE COURT:  All right.  Thank you.

4              THE DEFENDANT:  I have been trapped into

5    these people -- by these people.  I'm giving

6    promise to this country.  Whatever it will be for,

7    I will do for this country.

8              THE COURT:  All right.  Thank you.

9              Counsel, argument?

10             MS. FRETER:  I'm -- this is one of those

11   cases I seem to have in front of you a fair amount

12   where I'm relieved that it's the Court's decision,

13   not mine, to decide on an appropriate sentence.

14   This Court has spent a lot of time with Mr. Patel

15   both pretrial, during the trial, and I think is

16   well versed and well aware of what Mr. Patel's

17   circumstances are.  He was on the stand, I think,

18   for at least three hours, maybe more.

19             And in terms of 3553(a) factors, the Court

20   is aware that Mr. Patel has been locked up for two

21   years not speaking the language.  The letters that

22   the Court has received, it's my opinion, and based

23   on conversation, that other detainees have helped

24   or assisted Mr. Patel with those, that those aren't

25   his exact words.  He speaks with a lot of

1    hyperbole, and that's not contained necessarily in

2    those letters, there's different handwriting.  His

3    English has improved in those two years, but it's

4    still very limited in that when we have

5    conversations -- folks who speak two languages

6    sometimes will start answering me back before the

7    interpreter.  Mr. Patel rarely, if ever, does that.

8        So I believe that he's tried to express to

9    the Court again today that he feels very badly for

10   these ladies.  He said that he will give up his

11   body and organ donation to pay the restitution.

12   He's consistently offered to meet with the

13   Government or sit down with the Government.

14   Unfortunately, as time has gone on, his information

15   that he would have isn't helpful, and there's not

16   within the -- within the rubric of sentencing and

17   the benefit from that, Mr. Patel has to accept

18   responsibility.  We had a trial and the Court has

19   listened to him testify and knows where that's at.

20       I think that the Government would agree,

21   and they can speak for themselves, Mr. Patel didn't

22   financially benefit from this.  The money went

23   somewhere else.  He was living very modestly and

24   working.  He didn't have a fancy car or a fancy

25   residence.  There's no indication that he was

1    laundering Bitcoin or hundreds of thousands of

2    dollars through his U.S. accounts and that he was

3    not an organizer, leader of this scheme.

4         The Government's sentencing memo lays out

5    good arguments for both general and specific

6    deterrence.  These kinds of scams are horrific.

7    They're horrific generally; but they are also

8    horrific when perpetrated by folks outside of the

9    United States because it makes it incredibly

10   unlikely that we're able to recover any restitution

11   at all, and that -- just the vast scale of it, that

12   there is a need for general deterrence as part of a

13   sentencing consideration in that non-U.S. residents

14   should not be imported, essentially, to carry out

15   fraudulent schemes and that there has to be a

16   deterrent generally to say to people back in India,

17   or elsewhere, don't come to the United States to do

18   this because you will end up with a prison

19   sentence.

20         I don't know what, though, in our national

21   conversation and as it relates to Mr. Patel, I

22   don't know what that number is.  As page 13 of the

23   PSR points out, to keep Mr. Patel incarcerated in

24   the Bureau of Prisons according to the AO estimate

25   will cost approximately $51,711 a year.  So that's

1    $600,000 for, what is it, for 12 years which is, I

2    think, what the Government is asking, which is more

3    than the total amount of restitution in this case.

4        When part of the goal of sentencing is

5    rehabilitation, reintegration into the community,

6    which are good and lofty goals of incarceration,

7    Mr. Patel is likely, upon his release, to be

8    deported, and so he could contribute based on

9    rehabilitation to the world, but he's not going to

10   be contributing that rehabilitation to the United

11   States at the cost of $57,000 per year.  I don't

12   know -- what the Court gets to do -- what the

13   balance is between the cost of incarceration, the

14   cost of keeping him here year after year after year

15   versus deportation.  The current national

16   conversation seems to be deportation is preferable

17   than keeping people in this country, seems to be

18   part of the, sort of, national conversation that's

19   gone on since change of administration in January.

20   Mr. Patel has been cut off from his family and has

21   suffered great distress as this Court has seen, so

22   he's been incarcerated for two years.  I don't know

23   a number for how much more that would be.

24       The Government is asking for sentence that

25   is significantly higher than the guidelines.  The

guidelines are high as they are anyway because
special sentencing factors, such as, vulnerable
victims, the huge amount of loss have been baked in
to the guideline calculation.  If the victims were
differently situated, if they didn't suffer
significant financial hardship, all those kind of
things, the guidelines would be lower, and the
Court would be looking at a less range.  So to
advocate that this sentence should be so far above
the guidelines based on the idea of general
deterrence, as it relates to Mr. Patel, who is not
an organizer, leader, or in charge and did not
substantially benefit financially from this, seems
excessive.

        Mr. Patel would like to go home, and he
was unable to, though, plead guilty and say that he
committed a crime, and I think that he sincerely
believes that he was a courier and that he did not
intend to defraud these ladies out of all of this
money, but this is one of those knew or should have
known, sort of, cases that based on all the
circumstances, that the types of folks that were
giving him money and the circumstances and,
certainly after the stop in Wisconsin, that that
maybe should have been enough.

1       So we leave it to the Court to have mercy

2   and consider all of the factors and the need for

3   both specific and general deterrence.  Mr. Patel

4   isn't going to do this again.  He suffered enough.

5   So I think the specific deterrence is satisfied by

6   the two years that he's been incarcerated in the

7   county jail.  Thank you.

8       THE COURT:  Thank you.

9       MR. REED:  I'll step up here so the

10  interpreter can hear me.

11      Judge, as defense counsel said, the

12  Government is asking for a sentence of 144 months,

13  which is 33 percent above the high end of the

14  guidelines and comparable to what has been imposed

15  in similar sentences both in this district and

16  nationwide, and just three points under the 3553(a)

17  factors in support of that.

18      First, Mr. Patel chose a side, and he

19  chose the side of the fraudsters and criminals, and

20  the fraudsters and criminals who prey on some of

21  the most vulnerable people in our society.  It's

22  not an exaggeration to say that this case is about

23  two Americas, right?  The defendant chose a side

24  when he came to the United States illegally.  From

25  there, he made his way to Atlanta to meet up with

1    his cousin and his coconspirator Danny, and then

2    moved to Chicago because that's where he could get

3    a driver's license so he could start committing the

4    fraud; and even at that early point -- there's

5    really two possibilities.

6        Option one is that Patel came to the U.S.,

7    and he went to his cousin Danny because he

8    specifically came here to commit this fraud, and

9    there's some indicators of that here.  He's a

10   family member, he's entrusted by these criminals

11   with large sums of money.  Sometimes these runners,

12   they work in pairs because of a lack of trust,

13   hundreds of thousands of dollars at issue here, but

14   Mr. Patel was trusted to work alone.  He's not

15   badgered even when he has hundreds of thousands of

16   dollars sitting in his back seat because he is a

17   family member and a trusted coconspirator.

18       The second option, even at this early

19   point, is the story Patel told the agents, that at

20   the very beginning he told his cousin Danny he

21   wouldn't do this kind of work because he knew it

22   was wrong.  Even early on, "I won't do this kind of

23   wrong.  I do anything else.  I won't do that

24   package work because I know it's wrong."

25       Either way he knew what he was doing was

1    wrong from the very beginning.  He chose the side

2    again when he began taking money from the victim,

3    and we heard from the victim.  We know what he saw.

4    He saw elderly women.  He saw that they had to come

5    to him.  It smelled bad in a hundred different

6    ways.  There's an elderly lady at an assisted

7    living facility using a walker on oxygen carrying a

8    box of gold bars.  There isn't a language issue.

9    It looks like crime anywhere.  That's what it looks

10   like, but he chose to keep doing that.

11         He drove hundreds of miles to keep doing

12   it.  He had them come to him.  He parked out in the

13   street after dark.  He's scared.  Multiple victims

14   testified about how he would turn his head so they

15   couldn't see his face.  The victim in Wisconsin

16   talked about how she couldn't find the car because

17   it was parked across the street, down the street,

18   and the lights weren't on because he didn't want to

19   be caught.  She had to call the coconspirator and

20   say, "I can't find the car," and only then did he

21   flash the lights so she could even find the car.

22   These are abundant signs of a guilty conscious from

23   the very start.

24         And then Mr. Patel chose a side when he

25   was stopped in Wisconsin and questioned by

officers.  If there's a *come to Jesus* moment in
this chain of events, it's that time.  Officers ask
him, "Why are you here?"  And the answer is, "I
came here to play music."  That was a lie.  When
they pushed past that story, "Who sent you here to
take the box from this woman?"  "Well, I don't
know.  I just heard from them the last day or two."
That was a lie.  It was his own cousin, Danny, the
one he had been living with.  It was his friend
Abhishek back in India.  Those were the people that
sent him there.  He knew that, and he knew at that
point that they were victimizing these women.  He
chose not to tell the officers that.  He chose not
to tell them that he had been to that same house a
week before.  He didn't tell them about the victim
in Indiana.  He made a choice, he chose a side, and
he chose the side of the fraudsters.

        Now, after Wisconsin, just four months
before he starts doing it again, he's laying low.
Where is he?  Is he at the address in Illinois that
he gave to the officers in Wisconsin?  No.  He ran
right back to his fellow criminals in Atlanta and
is staying there.

        And briefly, right here, I'd like to
address a couple points about financial benefit.

1    Sure, Patel wasn't the one with hundreds of

2    thousands of dollars in his pocket, but he did

3    financially benefit.  He took a cut, he took his

4    own cut out of the boxes, and the fact that he took

5    his cut out of box that these women were giving him

6    shows him he knew exactly what was going on.  This

7    isn't moving a package.  You don't take a cut --

8    you know, if I order ten widgets from Amazon, I

9    don't take two of them out as payment to deliver

10    it.  He knew exactly what was going on, and he took

11    his cut.

12            And his financial benefit went well past

13    that, right?  He's new in the country.  He gets a

14    driver's license; he gets a car that was being paid

15    for by Danny -- he testified to that -- he gets a

16    place to live and lay low when he's in Atlanta and

17    he gets a job.  He gets all these things.  There's

18    an enormous benefit that goes well beyond the cash

19    that he took out of the box, and I think that's

20    important here.

21            So going back to Mr. Patel's choices, he

22    lays low for four months and he makes another

23    choice.  He goes back to Chicago, and he keeps

24    doing the same thing.  And again, when you pull up

25    in front of a house, you're doing the same thing,

1   you see another old woman come out of the house

2   with a box, you know exactly what's going on.  You

3   know you're doing the same thing again, and he

4   chose to keep doing it.  He picked a side, and he

5   picked a side over and over again, and that shows

6   what side he picked.  So to come here at

7   sentencing, to come here today, and say I'm not a

8   part of this; of course, you're a part of this; you

9   chose to be a part of this over and over again; and

10  the question here today is as having chosen to be a

11  part of this, what should be the consequences?

12          So defense counsel talked briefly about

13  the cost of incarceration, and I'd say a couple

14  things about this.  First, as she said, Mr. Patel

15  wants to go back to India.  Deportation now is

16  rewarding this behavior.  It's the opposite of

17  deterrence, right?  It's if you go over, you get

18  caught, you get sent back, you're fine, no big

19  deal, we're going to cut you loose.  That's a

20  problem.  That's a huge deterrence problem to have

21  that -- to take that approach.

22          And the other side of this is if a U.S.

23  citizen were here and did these same acts, he or

24  she would go to prison and go to prison for a long

25  time, and there's a question about whether we're --

1    whether we're treating Patel better than an

2    American who would have committed the same acts if

3    we are not giving him the same prison sentence.

4         So let's talk about the other side of the

5    victims, and, Judge, I was going to read the victim

6    impact statements, but you already have so I won't.

7    Given their age and their geographic distance, it

8    was difficult to get them here for trial, let alone

9    back for sentencing.  One thing we received -- we

10   received that second victim impact statement

11   yesterday, and the reason is because that victim,

12   her phone doesn't receive calls.  She turned it off

13   so she can only make calls and can't receive calls.

14   She doesn't trust people.  It's a great irony in

15   these cases that we, as prosecutors, and agents, as

16   law enforcement, just deal with incredible

17   roadblocks in reaching victims because they don't

18   trust anybody who comes to them saying that they're

19   law enforcement.  They don't take phone calls.

20   They don't answer the door because they have lost

21   trust in the society around them.

22        So the victims -- you read the numbers,

23   you read the victim impact statement.  Victim V.L.

24   was a retired nurse, she moved from Arizona to

25   Indiana, and was staying at the assisted living

facility there at Christina House.  She lost over

$300,000.  Victim K.E. in Merrill, Wisconsin, she

worked at a 3M plant for many years and then hung

wallpaper before retiring.  She lost a lot of

money.  Victim V.B. was a SIUE physics professor,

she was chair of the physics department, who lived

in Edwardsville, and the impact on these

individuals, it goes far beyond financial.  It's

the psychological impact of what this scheme did to

them.

The conspirators carefully isolated them

by staying on the phone all the time, by making

sure they didn't tell anybody, by threatening them

with prosecution of their friends and family if

they did tell them what was going on, by having

them drive all over the place to use these Bitcoin

machines.

One thing I find very telling in this case

is only one of the three victims was able to figure

out how to use a Bitcoin machine, and that's why

folks like Mr. Patel are so essential to this

scheme's success.  At the end of the text messages

with the Edwardsville victim, she says a few things

that I think are very telling of her mindset at

that point.  She says, "I'd be better off behind

1    bars."  She says, "I'm home and not looking forward
2    to anything."  That's where she was at; and when
3    her daughter sent that victim impact statement, she
4    said, "It's hard to convey what has been lost as
5    the scam precipitated her total loss of self."  I
6    think that accurately summarizes the impact of this
7    scam on these victims.  It's hard to -- it's hard
8    to put into words.  It's enormous.

9        So Section 3553(a) entrusts this Court to
10   impose a sentence that reflects the seriousness of
11   the offense and its impact on the victims to
12   community, and there is just no doubt that that
13   calls for an above-guideline sentence here.

14       Section 3553(a) also instructs the Court
15   to look at deterrence and the need to protect the
16   public from future crimes, and I lay this out in
17   the memo, so I'll be brief, but I'd cite an
18   article, it's called, "Imposter Scams" by Professor
19   Freeman, where he describes these imposter scams as
20   public enemy number one.  This is the most common
21   type of consumer fraud against Americans surpassing
22   even identity theft now, and this is only going to
23   increase more as baby boomers retire, age and
24   become more susceptible to these type of schemes.
25   It's not a surprise that this has taken off just as

baby boomers hit their 70s and 80s.  There's an

enormous jump if you look at the FTC data at 2014

and 2015 and this is just sky rocketing.  And why?

Because you have more victims with easy access

through the Internet and through phones to be

scammed like this.  In 2024 alone, the FTC received

845,806 reports about imposter scams.  That's

people like these victims.  As I said in the memo,

that's filling Busch Stadium 19 days in a row, and

that's just one year.

THE COURT:  Which the Cardinals can't do

this year.

MR. REED:  Which the Cardinals can't do

this season.  Perhaps I should've just used Notre

Dame stadium and said nine or ten days, but it's

just an incredible number, 845,000, $2.95

billion in fraud -- billion dollars in fraud

annually, just incredible numbers; and this is the

kind of case where deterrence, this makes a huge

difference; even a little bit would make a big

difference; and there's reasons, I think, to think

here that deterrence is particularly important.

And, again, this is laid out in the

sentencing memo, but what you need here is a choke

point.  A choke point for this scheme is people on

1    the ground in the U.S.  It's easy to scam someone

2    from India, but it's a lot harder to get the money

3    if there's not someone not here willing to take it

4    out of their hands.  We know that from what we saw

5    here.  Only one of the victims was able to figure

6    out how to use the Bitcoin machine.  The other two,

7    they needed someone they trusted to go to their

8    house, look them in the eye, and take their money

9    from them.  That person was the defendant here; and

10   if we can prevent the next Nirav Patel from being

11   willing to engage in this scam through deterrence,

12   that's a huge, huge deal when it comes to

13   protecting victims.

14           There's good reason to think that that

15   choke point is important.  We can see that here.

16   They're necessary to the scheme's success, as I

17   just said.  They're a scarce resource.  Patel was

18   covering a three-state range:  Wisconsin, Indiana,

19   all the way down here to St. Louis.  It's a 240

20   mile-circle big.  It's a big area where they had

21   one guy.  If he wasn't there, they would have

22   stopped with the Bitcoin.

23           And I think there's an amplified

24   deterrence message here.  You have a proud

25   Indian-American immigrant community.  If you look

1    at the citations in the footnotes, these cases are

2    covered closely for that very reason.  They all

3    know and amplify the deterrent message that this

4    Court wants to send through the media.  That's the

5    way this works.  You reach the people who need to

6    hear it, and you do that through general

7    deterrence.

8         So for all these reasons, we're asking for

9    a sentence of 144 months, which is 33 percent above

10   the guideline range, with 6 months concurrent on

11   the immigration count.  As I said, this is very

12   similar to Judge Dugan's departure in a similar

13   case, which was affirmed on appeal, because of the

14   victim impact.

15        THE COURT:  Wasn't his sentence 72 months?

16        MR. REED:  It was a different -- it was a

17   different month number.  He varied 40 percent up,

18   however, Judge; and the guidelines are there for a

19   reason, right, because the guidelines reflect other

20   factors in this case that were not present in that

21   case.  Not only a dollar figure but acceptance,

22   obstruction, and a number of other factors.  So a

23   similar percentage increase here, I think, is more

24   than warranted for that reason.

25        THE COURT:  So Mr. Patel has said in court

1        here today, in open court previously, that he would

2        be happy to cooperate, to assist the Government in

3        catching the people that he thinks are more

4        culpable than he.  What would be the procedure,

5        going forward, if he were to cooperate and provide

6        substantial assistance?

7               MR. REED:  Judge, there was a time for

8        that and this isn't it.  The time for that was two

9        years ago when he was arrested, and I can tell you

10       why.  There's a finding in the PSR and adopted by

11       this Court that Mr. Patel took the stand and lied.

12       He's worthless as a witness.  I can't use him.  I

13       can't put someone on the stand who chose to take

14       the stand, lie to this Court about his own role,

15       and leading to a finding of obstruction of justice.

16       I can't use him as a witness, credible witness, in

17       front of a jury.  I wish I could.

18               THE COURT:  Counsel?

19               MS. FRETER:  I'll pick off with Judge

20       Dugan's case.  I think that citing to this Court

21       the idea that under certain circumstances it is not

22       error to go above -- or a certain percentage above

23       a guideline sentence is fine; but as this Court

24       knows, each case has its own specific things and

25       that, as the Government just said, the factors in

1    this case, vulnerable victim, substantial hardship,

2    those are baked into these guidelines where maybe

3    they weren't in Judge Dugan's case, but those

4    considerations are already baked in, and that's the

5    amount of loss.  That's why the guidelines are

6    high.

7         In terms of a deterrent, 87 to 108 months

8    is the guideline sentence.  That is a significant

9    time in the Bureau of Prisons, it's not a slap on

10   wrist, it's not probation, it's not *you did your*

11   *two years in the county jail; go back to india*.

12   That's a lot of time.  Even a 60-month sentence,

13   five years, is a substantial time.

14        In term of a deterrence, the perception

15   that people who, quote/unquote, "commit white

16   collar crime" just get probation or they go to *club*

17   *fed* or something like that, that's not Mr. Patel's

18   situation.  He's not going to be -- based on the

19   amount of loss and all of the circumstances, you

20   know, a guideline sentence is significant, it's not

21   minimal, and because the circumstances of this case

22   as they relate to Mr. Patel are baked into the

23   guidelines, a 30 percent above-guideline sentence

24   is -- based on the idea that these scams hurt

25   people, which they do -- crime hurts people.  We

1    have the death penalty as a deterrent; still, we

2    have murders.  I mean, it's -- a prison sentence in

3    BOP, under all of these circumstances, even a

4    guideline sentence, is significant.  It is a

5    specific and general deterrent, and it reflects the

6    seriousness of the offense.

7         There is nothing Mr. Patel can do at this

8    point to make these ladies whole.  The harm is

9    done.  It is irreparable.  After the sentencing, to

10   the extent that the Government wanted to listen to

11   him, he would be able to talk to them, which might

12   make him feel better, but, you know, his

13   information is stale; and as the Government said,

14   they can't use him as a witness.  Any search

15   warrant would have to give -- would have to include

16   that there's been an obstruction finding based on

17   that, so it hurts them in terms of future

18   prosecution.  Not to say that they couldn't use the

19   information to do something, but it's unlikely to

20   result in a sentencing Rule 35 or other matter.

21        So again we ask the Court to, as it always

22   does, consider Mr. Patel and the 3553(a) factors as

23   they relate to him and his specific circumstances

24   and his specific factors in sentencing.

25        THE COURT:  Mr. Patel, I've given you a

1    chance to address the Court; and from the

2    beginning, you've maintained your innocence.  From

3    the beginning, you've told me that you were,

4    essentially, an unwitting participant in this.

5    That's a lie.  You were on the cell phone

6    constantly telling the scammers where you were,

7    sending them pictures of what your MapQuest was

8    showing, where you were, how much longer.  When you

9    picked up the money, you sent photos showing that

10   you picked up the money, lots of money, gold bars.

11          Now, these scammers had this incredibly

12   sophisticated plan, and what you want me to believe

13   is they're going to take some down-on-his-luck

14   impoverished guy and say drive there, pick up all

15   this cash and then don't flee with it; don't say,

16   hell, I'm going to drive to California, I don't

17   have to give it to these people.  They knew you so

18   well that once you sent them pictures that you had

19   the money, they didn't ask you are you en route

20   back to give us the money, they didn't ask you show

21   us where you are, show us you're going to Chicago

22   as opposed to Miami Beach.  You knew where to go.

23   There's no communication to say show up at this

24   address and give it to the guy wearing a brown hat.

25   You knew exactly where to go, you knew exactly who

1    to give it to, and when you were asked about all

2    that, you were purposely evasive.

3          Your comment to your cousin Danny is

4    telling.  You didn't want to do the package stuff

5    because that's the guy that gets caught, that's the

6    guy that gets left holding the bag.  You did it

7    anyway.  You made repeated references to your sick

8    mother and your family, and I think it's reasonable

9    to conclude that you had the expectation that the

10   people in India were going to be providing money to

11   your spouse to pay for your children, to pay for

12   your mom's surgery, and, ironically, they have

13   abandoned you.  They have abandoned you, and so

14   they have scammed you like you scammed these

15   victims.

16         You know who these people are, and you

17   knew who the victims were to be, and you knew how

18   vulnerable they were, and you didn't care.  You

19   asked me for mercy that you did not extend to these

20   poor people.

21         No, sir.  You were allowed to address the

22   Court.  You have sent me letters.  We are beyond

23   that stage.  For the record, he was raising his

24   hand wanting to speak.

25         There's a lot of truth to the Government's

1   argument that these very sophisticated,

2   international scams need one thing for them to pull

3   it off, to be successful, they needed the guys like

4   you.  I will go hundreds of miles, pick up the

5   money, I will drive it back to god knows where to

6   give it to the people who are part of this scam.

7   You're not going to give all that money to a

8   stranger, because, if you were, you would have just

9   kept it yourself.  So the fact that your fellow

10  conspirators have abandoned you and, no doubt,

11  laugh that poor Nirav has to pay the price when

12  they got all the money, but you're going to have to

13  pay the price.

14          I find the Government's recommendation of

15  144 months appropriate.  I'm going to sentence you

16  to prison for 144 months on Counts 1, 2, 3 and 4.

17  Those terms will run concurrent with each other.

18  With respect to Count 5, I'll impose a term of

19  three months, but I will run that concurrent with

20  the sentence for Counts 1 through 4.  I'm not going

21  to impose any supervised release because I

22  anticipate you will be deported to India upon

23  serving your time in prison.  I am not going to

24  impose a fine.  I am going to order a restitution

25  in the total amount of $438,916.66, and I'm going

1    to order that you pay a special assessment of $100

2    on counts -- each count of 1 through 4 and a $10

3    assessment on Count 5 for a total guideline -- a

4    total special assessment of $410.

5              This is a terrible crime, and that's the

6    problem with being part of a conspiracy.  When

7    you're part of this conspiracy, you're responsible

8    for the worst part of it.  If this is were a bank

9    robbery and you said I'll be the escape driver,

10   I'll wait out in the car, if one of your

11   conspirators shoots the bank teller and kills her,

12   that's the felony murder rule.  You can be charged

13   with her murder because you were part of a crime.

14             This is -- it's a tough sentence.  I

15   understand that.  It's a tough sentence for a very

16   terrible crime.

17             You have the right to appeal your

18   conviction.  You have the right to appeal your

19   sentence if you believe it was illegally or

20   incorrectly imposed.  You can appeal your

21   conviction -- I'm sorry.  Any notice of appeal must

22   be filed within 14 days of the entry of a judgment

23   or within 14 days of the filing of a notice of

24   appeal by the Government.  If requested, the clerk

25   will prepare and file a notice of appeal on your

1    behalf.  If you cannot afford to pay the cost of an

2    appeal or for appellate counsel, you have the right

3    to apply for leave to appeal *in forma pauperis*.

4    That means that your financial situation is such

5    that you don't have the money to pay for an appeal,

6    and it would be unfair to try to force you to come

7    up with money to vindicate your rights.  On appeal,

8    -- I'm sorry.  You can apply for leave to file

9    appeal *in forma pauperis*, which means you can apply

10   to have the Court waive the filing fee.  On appeal

11   you may also apply for court-appointed counsel.

12           This is a sentence in which you lose just

13   about everything, but it's the sentence you imposed

14   on the victims of this crime.

15           So anything else for the Government?

16           MR. REED:  No, Judge.

17           THE COURT:  Anything else for defense?

18           MS. FRETER:  No, Your Honor.

19           THE COURT:  Oh, there is a pending Madison

20   County case.  Do we have any understanding of

21   what's going to happen because --

22           MR. REED:  I will alert Madison County of

23   the sentencing today.

24           THE COURT:  All right.  Because this -- it

25   arises out of the charges -- I mean, it's the same

37

1    set of circumstances that was part of the

2    case-in-chief presented in this case.

3                    MR. REED:  Yes, sir.

4                    THE COURT:  Anything else for the

5    defendant?

6                    MS. FRETER:  No, Your Honor.

7                    THE COURT:  It's a sad day for you,

8    Mr. Patel, I understand that, but it is a just

9    result.

10                   (Proceedings adjourned at 11:37 a.m.)

11

12                   *  *  *  *  *  *  *  *  *  *  *  *

13

14              CERTIFICATE OF COURT REPORTER

15

16        I, Erin M. Materkowski, hereby certify that

17   the foregoing is a true and correct transcript from

18   reported proceedings in the above-entitled matter.

19

20   /s/ Erin M. Materkowski_____        Date:  6/20/2025
     ERIN M. MATERKOWSKI, RPR, CRR
21   Official Court Reporter
     Southern District of Illinois
22   East St. Louis Division

23

24

25